11 CIV 5450

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br> vs.<br><br>BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; CITIBANK NA; HSBC HOLDINGS PLC; J.P. MORGAN CHASE & CO.; LLOYDS BANKING GROUP PLC; UBS AG; and WESTLB AG.,<br><br>       Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**<br><br>**JURY TRIAL DEMANDED** |

AUG 5 7811

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Mayor and City Council of Baltimore ("Baltimore" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this action against defendants Bank of America Corporation, Barclays Bank plc, Citibank NA, HSBC Holdings plc, JP Morgan Chase & Co., Lloyds Banking Group plc, UBS AG, and WestLB AG (collectively, "Defendants") and alleges as follows:

## NATURE OF CLAIM

1. This action arises from Defendants' conspiracy to unlawfully manipulate the London Interbank Offered Rate for the U.S. dollar ("LIBOR") from August 1, 2007 through such time as the effects of Defendants' illegal conduct ceased, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. As alleged herein, during the Class Period (defined below), Defendants conspired to and did suppress and manipulate LIBOR throughout the Class Period.

3.      Owned and administered by the British Bankers Association ("BBA"), LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10 different currencies.

4.      Every morning by 11:10 a.m. London time, the individual banks on the U.S. dollar LIBOR panel send data to Thompson Reuters Group ("Reuters"), a news information provider reporting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time." Reuters makes those rates public, which constitutes the day's LIBOR.  Prior to February 2011, 16 banks sat on the U.S. dollar LIBOR panel and Reuters determined LIBOR by discarding the lowest four and highest four of the reported estimates, and calculating the average of the remaining eight.  In February 2011, the panel size was increased to 20 banks and Reuters now calculates LIBOR from the rates provided by eliminating the five highest and five lowest rates and averaging the remaining 10.

5.      Throughout the Class Period, Defendants were members of the U.S. dollar LIBOR panel.  Pursuant to their illegal conspiracy, Defendants knowingly and purposely submitted borrowing rates to Reuters that were below their true borrowing costs in order to suppress and manipulate LIBOR.

6.      Defendants devised and executed their scheme to manipulate LIBOR in order to benefit their financial positions.  Throughout the Class Period, Defendants sold financial products which tied rates of return to LIBOR.  By manipulating LIBOR, Defendants paid lower returns to customers who bought those financial products.

7.     Defendants' manipulation of LIBOR directly caused and resulted in an artificially lower LIBOR during the Class Period.

8.     Defendants' conspiracy to suppress LIBOR violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff and members of the Class suffered damages by purchasing directly from Defendants during the Class Period financial products that had rates of return tied to LIBOR ("LIBOR-Based Derivatives"), as more fully alleged herein.

## JURISDICTION AND VENUE

9.     This action arises under Section 1 of the Sherman Act, 15 U.S.C., § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

11.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

12.     During the Class Period, Plaintiff Baltimore purchased tens of millions of dollars worth of Interest Rate Swaps directly from at least one Defendant in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

13.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.  During the Class Period, Bank of America was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

14.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.  During the Class Period, Barclays was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

15.     Defendant Citibank NA ("Citibank") is a wholly-owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York.  During the Class Period, Citibank was a member of the British Bankers' Associations' U.S. dollar LIBOR panel.

16.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public company with its corporate headquarters in London, England.  During the Class Period, HSBC was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

17.     Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware financial holding company headquartered in New York, New York.  During the Class Period, JP Morgan was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

18.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company with its corporate headquarters in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") and Lloyds TSB Bank plc ("Lloyds TSB"). During the Class Period, both HBOS and Lloyds TSB were members of the British Bankers' Association's U.S. dollar LIBOR panel.

19.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.  During the Class Period, UBS was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

20.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.  During the Class Period, WestLB was a member of the British Bankers' Association's U.S. dollar LIBOR panel.

## UNNAMED CO-CONSPIRATORS

21.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements which aided and abetted and was in furtherance of the unlawful conduct alleged herein.

## THE RELEVANT MARKET

22.     The relevant market is LIBOR-Based Derivatives sold directly by Defendants.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated.  The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who purchased LIBOR-Based Derivatives directly from Defendants, including their subsidiaries and/or affiliates, from August 1, 2007 through such time as the effects of Defendants' illegal conduct ceased.

24.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and

believes that at least thousands of geographically dispersed Class members purchased LIBOR-Based Derivatives directly from Defendants during the Class Period.

25.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

27.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially suppress LIBOR in violation of the Sherman Act;

(b)     Whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

(c)     Whether Defendants' conduct negatively affected the rates of return of LIBOR-Based Derivatives purchased directly from the Defendants during the Class Period; and

(d)     The appropriate measure of damages for the injury sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The

prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

29.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

### I.     Background

#### A.     Overview of LIBOR

30.     Administered and owned by the BBA, LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10 different currencies.

31.     Every morning by 11:10 a.m. London time, the individual banks on the U.S. Dollar LIBOR panel send data to Reuters, a news information provider reporting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time."  Reuters makes those rates

public, which constitutes the day's LIBOR. Prior to February 2011, 16 banks sat on the U.S.

Dollar LIBOR panel and Reuters determined LIBOR by discarding the lowest four and highest

four of the reported estimates, and calculating the average of the remaining eight. In February

2011, the panel size was increased to 20 banks and Reuters now calculates LIBOR from the rates

provided by eliminating the five highest and five lowest rates and averaging the remaining 10.

### B.    LIBOR-Based Derivatives

32.    LIBOR is the primary benchmark for short-term interest rates globally.

33.    According to the BBA, "the objectivity and accuracy of the [LIBOR] rates

allowed derivatives to be created based on the data as a reference, and this has flourished to

become an enormously successful cornerstone of business transacted in London and worldwide."

34.    The perceived integrity of LIBOR allows many derivative products to be priced

based on LIBOR. About $350 trillion worth of financial products globally reference LIBOR. To

the extent that LIBOR is mispriced, these derivatives are also mispriced.

## II.    Defendants Unlawfully Conspired to Suppress and Manipulate LIBOR

35.    In August, 2007, LIBOR began behaving erratically. Overnight, LIBOR began a

period in which it dramatically decoupled from other financial indicators that had historically

functioned as benchmarks. Reports initially assumed that low liquidity and increased credit risk

endemic to the financial crisis were the likely contributing factors to the aberrant behavior of

LIBOR. Subsequent examination reflects that Defendants were conspiring to artificially

manipulate LIBOR to the benefit of their LIBOR-Based Derivatives positions.

36.    As set forth below, Defendants' conspiracy to manipulate LIBOR throughout the

Class Period is evidenced by several forms of analysis. During the Class Period, LIBOR

shattered its historical relationships with various economic benchmarks, signifying that it was no

longer representative of external market forces and was a result of manipulation by the

Defendants.  Additionally, LIBOR has been shown to respond to external criticism, demonstrating that it was intentionally manipulated by Defendants, as opposed to reflecting an objective report of market conditions.

37.     An examination of Defendants' LIBOR quotes reveals inconsistencies among Defendants' reporting across currencies and on a day-to-day basis, which supports the fact that Defendants purposefully and collectively agreed to underreport their actual borrowing costs in order to artificially and unlawfully suppress LIBOR.  In so doing, they reaped massive profits from their enormous LIBOR-Based Derivatives positions, which directly benefited from their artificial suppression of LIBOR.

### A.     The Defendants' Unlawful Manipulation Of LIBOR

38.     On December 12, 2007, the day after the Federal Reserve cut short-term interest rates for the third time that year in an effort to help ease the credit crunch and reduce the chances of an impending recession, The Wall Street Journal ("Journal") published an article predicting that continued worry over the credit crisis would effectively keep LIBOR rates high, even as other short-term interest rates would continue to fall.  In fact, the Journal quoted one mortgage banker as stating that historically, in times of credit crisis, LIBOR rates have tended to spike.

39.     Despite the Journal's prediction, in the early months of 2008, during the most significant financial crisis since the great depression, U.S. dollar-denominated LIBOR rates submitted by panel banks did not vary markedly, nor did they increase or decrease sharply.  This fact did not correspond to traditional market behavior because in times of severe uncertainty, banks would normally be reluctant to lend to one another on an unsecured basis without receiving a higher risk premium.

40.     In a market not artificially manipulated, LIBOR rates should have increased significantly during this period.  In addition, because different panel banks were experiencing

different levels of economic stress, the panel banks should have been reporting markedly different borrowing rates. None of this was reflected in LIBOR rates reported by Defendants.

41.     On April 16, 2008, the <u>Journal</u> published an article detailing the findings of a three month study it conducted into the borrowing rates of the 16 banks forming the U.S. dollar LIBOR panel. The <u>Journal</u> concluded that a number of banks – specifically Citibank, WestLB, HBOS, JP Morgan and UBS – had been reporting significantly lower borrowing costs than what other market measures suggest they should have been reporting. The <u>Journal</u> attributed this disparity to certain panel banks intentionally understating their borrowing rates.

42.     The <u>Journal</u>'s examination of the borrowing costs submitted by the panel banks during the first four months of 2008 indicated that the panel banks reported remarkably similar borrowing rates despite the fact that the banks were facing different financial stresses. For the first four months of 2008, for example, the three-month borrowing rates reported by the panel banks remained, on average, within a range of only .06 of a percentage point.

43.     According to Professor Darrell Duffie, a Stanford University finance professor, the reported rates during the first four months of 2008 "[were] far too similar to be believed."

44.     David Juran, a statistics professor at Columbia University who reviewed the <u>Journal</u>'s methodology, concluded that the <u>Journal</u>'s calculations demonstrate "very convincingly" that reported LIBOR rates are lower than what the market thinks they should be by a factor which well surpassed the threshold statisticians use to assess the significance of a result.

45.     Following the <u>Journal</u>'s April 16, 2008 report that the panel banks may be intentionally understating their borrowing rates, the BBA announced it would review LIBOR reporting process and remove any bank found to be reporting inaccurate rates from the panel.

10

46.     In November 2007 and again in April 2008, the money market committee of the Bank of England raised questions about the integrity of LIBOR.  The minutes of the committee's November 2007 meeting stated that, "several group members thought that Libor fixings had been lower than actual traded interbank rates."  Minutes from the April, 2008 committee meeting noted that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates."  Similarly, Citigroup interest-rate strategist Scott Peng raised similar questions, writing that "Libor at times no longer represents the level at which banks extend loans to others."

47.     On April 17, 2008, just days after the Journal published its analysis, there was a sudden jump in the U.S. dollar-denominated LIBOR.  The benchmark dollar rate for three-month borrowing hit 2.1875% Thursday, or about .08 percentage points more than the 2.735% rate set on Wednesday.

48.     Suspiciously, reported LIBOR rates for other currencies fell or remained relatively flat at the time the U.S. dollar LIBOR surged, a sign that the U.S. dollar LIBOR rate was susceptible to manipulation.

49.     Notably, the significant move in the U.S. dollar-denominated LIBOR closely followed the BBA's announcement that it was accelerating its inquiry into the daily borrowing rates that banks provide to establish LIBOR rate.

50.     The BBA's decision to speed up its inquiry was made in response to concerns expressed by bankers and the financial media that certain panel banks were not accurately reporting the rates they were paying for short-term loans.

51.     In a note to clients the day after LIBOR surged, UBS strategist William O'Donnell suggested that the panel banks were responding to the heightened scrutiny, noting that

the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market."

52.     At the time, William Porter, credit strategist at Credit Suisse, said he believed the three-month U.S. dollar LIBOR was .4 percentage points below where it should be.  That echoed the view of Scott Peng, who concluded that LIBOR understated panel banks' true borrowing costs by as much as .3 percentage points.

**B.      Empirical Evidence Confirms Defendants' Manipulative and Conspiratorial Conduct**

53.     One of the unique characteristics of LIBOR's calculation is its opaqueness.  The method for LIBOR calculation is only transparent to the extent that each panel bank reports to Reuters its borrowing rate and Reuters publicizes the rates and computes LIBOR.  The internal calculations and methodology of the panel banks in determining their borrowing rates are unobservable to the public.  This renders LIBOR susceptible to manipulation by Defendants.  Since LIBOR is the basis for a large number of daily financial transactions, comparisons to observable market rates have historically been monitored.

54.     In reaction to the media reports of LIBOR manipulation, various empirical studies have demonstrated that the aberrant behavior of LIBOR during the Class Period is suggestive of collective agreement amongst Defendants to manipulate and suppress LIBOR.  During the Class Period, LIBOR deviated dramatically from its historic relationships with other economic indicators.  This sudden and dramatic variation is consistent with the fact that LIBOR was in fact being manipulated by Defendants, as opposed to accurately reporting market characteristics.

**1.      LIBOR Diverges From Its Historical Relationship With The Eurodollar**

55.     The U.S. dollar LIBOR, in effect, measures the interest rate offered to panel banks to borrow U.S. dollar deposits, also known as Eurodollars.  Eurodollars are also traded in

the market, and the market rate for Eurodollars is commonly seen as the best market proxy for LIBOR. An analysis conducted by Connan Snider, a Professor at UCLA and Thomas Youle, emphasized that, prior to August 2007, the previous day's Eurodollar bid rate was a better predictor of LIBOR than the previous days LIBOR.

56.     Historically, the difference between LIBOR and Eurodollar rate, known as LIBOR/Eurodollar spread (effectively LIBOR minus the Eurodollar bid rate), average 2.75 basis points.[1]  The spread was almost always positive, meaning the Eurodollar rate was slightly lower, reflecting the measurement of LIBOR as an offer rate and the Eurodollar rate as a bid rate on U.S. dollar deposits. After August 2007, Defendants' manipulation and suppression of LIBOR resulted in a decoupling of LIBOR and the Eurodollar rate, and a reversal of the relationship so that the spread was negative. In the post manipulation period, the average spread was -24.70 basis points.

57.     Even more indicative of Defendants' manipulation was that after August 2007, LIBOR/Eurodollar spread became strongly negative as opposed to the historical mildly positive relationship, as illustrated by the chart below. This change in the historical relationship is evidence of the downward manipulation of LIBOR. In some cases, LIBOR was 15 to 20 basis points lower than the Eurodollar market rate. In effect, LIBOR reported that banks were offering Eurodollars at a rate lower than market participants were actually buying them, a result that strongly indicates Defendants' manipulation of LIBOR.

-------

[1] A "basis point" is a term commonly used to measure a financial instrument, interest rates. A basis point is equal to 1/100th of 1%. It is a commonly used term of measurement for financial instruments because daily rate changes are typically smaller than 1 percent, though small changes have huge financial effects.



58.     When Snider and Youle performed the identical analysis for the period after August 2007, they found that the previous day's Eurodollar rate had less predictive power on LIBOR.  In fact, as LIBOR dropped below the Eurodollar rate, the previous day's LIBOR became a better predictor of the current LIBOR.  This demonstrates that LIBOR was no longer responding to market forces, but instead was the product of Defendants' manipulation.

### 2.     LIBOR Diverges From Its Historical Relationship With Credit Default Swaps

59.     A credit default swap ("CDS") is a swap contract and agreement in which the protection buyer of the CDS makes a series of payments (often referred to as the CDS "fee" or "spread") to the protection seller and, in exchange, receives a payment if the underlying credit instrument (typically a bond or loan) experiences a credit event.  The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan. The greater the risk of default on the underlying bond or loan, the greater the spread.  In the case

of a CDS whose underlying instrument is an interbank loan in which a panel bank is the
borrower, the greater the perceived risk that the panel bank will default on the loan, the higher its
CDS spread.

60.     CDSs are a useful benchmark for LIBOR because both CDSs and LIBOR are a
measure of perceived credit risks.  On May 29, 2008, Carrick Mollenkamp and Mark
Whitehouse ("Mollenkamp and Whitehouse") published an article in the <u>Journal</u>, emphasizing
significant disparities between certain panel banks' perceived risk in the CDS market and their
LIBOR reporting.  A higher CDS spread is indicative of a larger perceived risk in lending to an
institution because it represents the cost of insuring against a default on that loan.

61.     In their analysis, which followed Mollenkamp and Whitehouse, Snider and Youle
performed two separate comparisons between LIBOR and CDSs to highlight inconsistencies in
LIBOR reporting.  First, they noted that a specific reporting bank may have a comparatively
higher CDS spread than a second reporting bank (and therefore be perceived as comparatively
"riskier"), while simultaneously having a lower LIBOR than the same bank (which would
indicate that it is perceived as a "less risky" investment).  For example, Citigroup consistently
has a substantially higher CDS spread than the Bank of Tokyo – Mitsubishi, yet Citigroup
reported comparatively lower LIBOR quotes. Mollenkamp and Whitehouse also noted the same
pattern.

**C.     <u>Inconsistencies With LIBOR Reporting By Individual Banks</u>**

62.     A close examination of the borrowing rates reported by Defendants to Reuters for
calculation of LIBOR during the Class period and each bank's incentive to manipulate LIBOR
further evidences Defendants' conspiracy to manipulate and suppress LIBOR.  For example,
Alexandre Harthieser of ESCP Europe and Natixis Bank and Phillippe K. Spieser, Professor of

Finance at ESCP Europe, performed clustering analysis on the panel members' individual

reporting and concluded that "a suspect cartel has been identified."

### 1.     Panel Banks Report Inconsistent Rates Across Currencies

63.      Panel Banks report LIBOR across different currencies each day.  Since LIBOR is

a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of

panel banks should largely be the same across different currencies (allowing for the variation in

panel composition across currencies).  A comparison of LIBOR across different currencies

shows this is not consistently so.

64.      For example, Bank of America and Bank of Tokyo-Mitsubishi both report rates to

Reuters for calculation of the U.S. dollar and Yen LIBOR.  Over the manipulation period, it was

common for Bank of America to simultaneously quote a lower rate than Bank of Tokyo-

Mitsubishi in U.S. dollar LIBOR and a higher quote in the Yen LIBOR.  Since institutional risk

should be the same for each panel bank regardless of the what currency it is measured in, this

indicates that the rates being reported do not accurately reflect market conditions and are an

indication of manipulation.

### 2.     Bunching

65.      Throughout the Class Period, the rates reported by certain Defendants "bunch"

around the fourth lowest quote each day.  That is to say that the rates reported by those

Defendants to Reuters were consistently near the fourth lowest of the 16 panel banks.  Since

Reuters, at the time, calculated LIBOR by removing the lowest (and highest) four reported rates

everyday, bunching around the fourth lowest rate is suggestive that those Defendants collectively

acted and colluded to suppress and manipulate LIBOR.

66.      As an initial matter, bunching among Defendants' reported rates demonstrates

that Defendants intended to report the same or similar rates.  The individual variation between

the financial situation of each reporting bank should lead to differences in the reported rates. The fact that, throughout the Class Period, Defendants repeatedly reported identical rates to Reuters is an indication that the Defendants were conspiring to manipulate LIBOR.  The chart below, for example, indicates that, in late 2008, Bank of America, UBS and Citibank reported nearly identical rates to borrow dollars for three months.



67.      Further, certain Defendants' consistent bunching of their reported rates at or near the fourth lowest position is suggestive of their intent to artificially suppress LIBOR.  This is because the fifth lowest quote is the lowest quote that is included by Reuters in calculating the day's LIBOR.  Defendants' clustering at or near the fourth lowest rate ensures that the artificially low rates reported by Defendants will be included in the BBA's daily calculation resulting in the artificial suppression of LIBOR.

68.     The following charts of daily U.S. dollar LIBOR reported rates show the frequency with which Defendants Bank of America, Citibank, HSBC, and JP Morgan reported within a given percentage rate from the 4th lowest quote.  A negative difference means that they were below the 4th lowest quote, and therefore not included in the daily LIBOR calculation. Zero difference means that they either were the 4th lowest quote on a given day or tied at the same value as the 4th lowest quote.[2]





_____

[2] If there is a tie between LIBOR quotes on a given day, one of the banks' quotes is discarded at random.





69.     While bunching is reflective of Defendants' intention to report the lowest borrowing rate to be calculated by Reuters, *i.e.*, the fifth lowest borrowing rate, this does not suggest that the panel banks reporting the four lowest quotes (quotes that are discarded by Reuters) are not members of the conspiracy.  Due to the mechanics of LIBOR calculation, there will always be discounted outliers.  If all of the panel banks reported the same low rate, the lowest four would always be discounted.  Therefore by bunching quoted rates around the 4th lowest rate, the panel banks ensured the maximum downward manipulation.

### 3.      Defendants Had Significant Incentives to Manipulate LIBOR

70.     Defendants held significant financial positions in LIBOR-Based Derivatives, such as in exchange-traded futures contracts and in over-the-counter Interest Rate Swaps, providing them incentive to suppress LIBOR.  Defendants' positions in Interest Rate Swaps, for example, were so large throughout the Class Period, that even a small unhedged exposure to LIBOR-Based Derivatives would create enormous financial incentives for Defendants to manipulate LIBOR.  Furthermore, when LIBOR experienced a significant drop in Q1 2009, Defendants reaped billions of dollars in profits.  It was no accident that Defendants experienced sharply increased profits in their Interest Rate Swap positions at the time LIBOR fell – Defendants purposely took positions in Interest Rate Swaps, which benefited from their suppression of LIBOR.  Upon information and belief, throughout the Class Period, Defendants' manipulation and suppression of LIBOR benefited their other LIBOR-Based derivative positions as well.

71.     As a result of these incentives Defendants' trading positions came to dominate their reporting obligations to the BBA.  A Financial Times article reports, for example, that Barclays is currently under investigation by the regulatory authorities of the United States and the United Kingdom for violating "Chinese Wall" rules which restrict information sharing between different parts of the bank.  Barclays' treasury department submits its daily borrowing costs to the BBA and is walled-off from its traders.  Barclays is being investigated regarding communications between its traders and its treasury department which improperly influenced the daily submission process.

## III.    Governmental Investigations

72.     Defendants' conspiracy to manipulate and make artificial LIBOR-Based Derivatives during the Class Period has spurred investigations by numerous government regulatory agencies into the reporting practices of various banks on the U.S. dollar panel.

73.     The regulatory investigations were first publicly disclosed on March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the United States Department of Justice, as well as an information request from the Japanese Financial Supervisory Agency, relating to its reporting of lending rates to Reuters for calculation of LIBOR.  UBS's disclosure states that the focus of the investigations is "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." Other Defendants have subsequently disclosed that they are subject to investigation by regulatory authorities related to LIBOR.  On August 1, 2011, for example, HSBC released its 2011 Interim Results and Barclays released its Half-Yearly Report in the United Kingdom, each disclosing that they were under investigation by various regulatory authorities around the World.  Barclays specifically identified investigations by the United Kingdom Financial Services Authority, the Commodity Futures Trading Commission, the Securities and Exchange Commission, the Department of Justice Fraud Section of the Criminal Division and Antitrust Division' and the European Commission.  The Journal has reported that the investigators are looking into whether the banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

74.     A Financial Times article published the same day as UBS's disclosure reported that the three U.S. agencies the Japanese Financial Supervisory Agency and the United Kingdom's Financial Services Authority had also requested information, and had begun interviewing witnesses, connected to Defendants for several months.

75.     On July 26, 2011, the Financial Times reported that investigators had expanded their probe to include yen-based LIBOR and the Tokyo interbank offered rate ("TIBOR").  In its

results announcement made that day, UBS confirmed that the investigation's scope had widened and disclosed that it had received "conditional leniency and conditional immunity" from the United States Department of Justice for turning over information on the setting of yen-based LIBOR and of the Tokyo interbank offered rate ("TIBOR"). UBS said that while its immunity stretched to the yen-based LIBOR and the TIBOR the deal did not bar the Department of Justice or other "government agencies from asserting other claims against us". The Antitrust Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity" and the policies protect leniency recipients from criminal conviction. Notably, each of the Defendants from 2006 to 2009 were members of the yen-based LIBOR panel.

76.     Latham & Watkins LLP has observed that the coordinated antitrust investigations in the United States, EU, UK, and Japan indicate that the enforcers are cooperating with each other and that the antitrust investigations may have been triggered by one of the banks taking advantage of the Antitrust Division's Corporate Leniency Policy, as well as other leniency policies around the globe.

## FRAUDULENT CONCEALMENT

77.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate LIBOR.

78.     Defendants fraudulently concealed their participation in their conspiracy to manipulate LIBOR by, among other things, engaging in secret meetings and communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the

Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

79.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

80.    Defendants' actions in fraudulently concealing their illegal conspiracy caused the BBA, the organization that owns and administers LIBOR, to issue a number of statements defending the integrity of LIBOR.

81.    For instance, in a statement issued in May 2008, in response to published reports suggesting that Defendants had artificially suppressed LIBOR as evidenced by the decoupling of LIBOR from the CDS market, a BBA spokeswoman announced that there was "no indication" that the default-insurance market provides a more accurate picture of banks' borrowing costs than LIBOR.

82.    In June 2009, John Ewan, director of the BBA, represented that LIBOR was "not a false signal to the markets." Even as recently as March 2011, in response to UBS's disclosure that it was the subject of government investigations in connection with Defendants' suppression of LIBOR, the BBA issued a statement characterizing LIBOR as an "accurate and reliable benchmark[]."

83.    Plaintiff and members of the Class were lulled into believing that the returns on their LIBOR-Based Derivatives were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

84.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs and members of the Classes from suing them for the

anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEFENDANTS' ANTITRUST VIOLATIONS

85.     Beginning at least as early as August 1, 2007, and continuing until at least the date of the filing of the Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress and stabilize LIBOR and thus the prices and rates of return on LIBOR-Based Derivatives sold by them.

86.     In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the price of LIBOR-Based Derivatives.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Reuters for calculation of the daily LIBOR;

(b)     Defendants agreed during those meetings and conversations to unlawfully report their borrowing rates to Reuters for calculation of LIBOR in order to drive down LIBOR and otherwise to depress or make artificial LIBOR;

(c)     Defendants signaled to one another their intention to depress or otherwise make artificial LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)     Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of LIBOR-Based Derivatives.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

87.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiff and other members of the Class who traded in LIBOR-Based Derivatives during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## COUNT ONE

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

88.    Plaintiff incorporates by reference the preceding allegations.

89.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

90.    During the Class Period, Defendants controlled what LIBOR rate would be reported and therefore controlled the rates of return on LIBOR-Based Derivatives sold by them.

91.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and stabilized LIBOR and thus the prices and rates of return on LIBOR-Based Derivatives sold by them.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

92.    Defendants' conspiracy, and resulting impact on the market for LIBOR-Based Derivatives, occurred in or affected interstate and foreign commerce.

93.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

94.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT TWO

## UNJUST ENRICHMENT AND RESTITUTION

95.     Plaintiff incorporates by reference the preceding allegations.

96.     It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

97.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

98.     Alternatively or additionally each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

## RELIEF SOUGHT

Accordingly, Plaintiff demands relief as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

C.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.      That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F.      That the Court direct such further relief it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  August 3, 2011                    Respectfully submitted,

Arun Subramanian
William Christopher Carmody
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Facsimile:  (212) 336-8340

Marc Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

Michael D. Hausfeld
William P. Butterfield
Ralph J. Bunche
HAUSFELD LLP
1700 K St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201

***Counsel for Plaintiff and the Proposed Class***