# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| | No. 11 Civ. 5450 (NRB) (THK) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF MAYOR AND CITY COUNCIL OF BALTIMORE FOR <u>APPOINTMENT OF INTERIM CLASS COUNSEL</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 4

    A.   Proposed Lead Counsel are highly qualified to represent the proposed class under the factors enumerated in Rule 23(g)(1)(A). ...................................................... 5

        1.   We are experienced in antitrust class actions of similar size and scope and have unique skill-sets that we will bring to bear in this case. ........................................ 7

            a.   Hausfeld LLP ................................................................................ 7

            b.   Susman Godfrey L.L.P. ................................................................ 11

        2.   We have unique experience as trial counsel in antitrust class actions. ................. 15

        3.   We have uncovered antitrust conspiracies before government cases have been brought through investigation and groundbreaking settlements, skills we have already brought to bear in this litigation. ............................................................ 17

        4.   We have the resources necessary to effectively prosecute this action. ................. 18

    B.   Additional factors counsel in favor of appointing Proposed Lead Counsel as Interim Class Counsel. ........................................................................................ 19

        1. Baltimore's choice of counsel should be given substantial deference. ................. 19

        2. The need for an efficient and flexible organizational structure counsels in favor of appointing Proposed Lead Counsel as Interim Class Counsel. ............................ 21

    C.   If the Court so desires, Proposed Lead Counsel would be qualified to guide the actions of a Steering Committee in managing and coordinating the prosecution of this case. ................................................................................................................. 22

III.  CONCLUSION ................................................................................................ 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)..........................................................................................................20

*Chill v. Green Tree Fin. Corp.*,
    181 F.R.D. 398 (D. Minn. 1998).......................................................................................21

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)..........................................................................................................20

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    No. 03 MDL 1529, 2008 WL 4128702 (S.D.N.Y. Sept. 3, 2008).........................................20

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    240 F.R.D. 56 (E.D.N.Y. 2006) ....................................................................................6, 21

*In re Bendectin Litig.*,
    857 F.2d 290 (6th Cir. 1988), *cert denied*, 488 U.S. 1006 (1989)............................................5

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir.2001)..........................................................................................20, 21

*In re Terazosin Hydrochloride*,
    220 F.R.D. 672 (S.D. Fla. 2004) ...................................................................................6, 19

*MacAlister v. Guterma*,
    263 F.2d 65 (2d Cir. 1958)..................................................................................................5

*Parkinson v. Hyundai North America*,
    No. 06 Civ. 345, 2006 WL 2289801 (C.D. Cal. Aug. 7, 2006) ...........................................6

*Vincelli v. Nat'l Home Health Care Corp.*,
    112 F. Supp. 2d 1309 (M.D. Fla. 2000) ............................................................................21

**STATUTES**

Private Securities Law Reform Act of 1995 ...........................................................................20, 21

Rule 23 of the Federal Rules of Civil Procedure ...........................................................1, 4, 5, 6, 19

**OTHER AUTHORITIES**

*Manual for Complex Litigation (Fourth)* (2010).................................................................4, 5, 21

Prof. John M. Connor, *The Great Global Vitamins Conspiracy*, 2006 American Antitrust Institute Paper, p. 28, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1103604##. ............................................17

Dr. Masimilano de Santis, "Demystifying Financial Derivatives: Interest Rate Swaps and Municipal Derivatives," *NERA Economic Consulting*, at 4-5 (March 2, 2011) available at http://www.nera.com/nera-files/PUB_Demystifying_Financial_Derivatives_0311.pdf. .....................................................2

Randall Dodd, "Municipal Bombs," *International Monetary Fund Finance and Development* (June 2010) available at http://www.imf.org/external/pubs/ft/fandd/2010/06/pdf/dodd.pdf..........................................2

Donald MacKenzie, "What's in a Number? ", *London Review of Books*, September 25, 2008, p. 11-12 available at http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number ........................................................................................................................1

Gretchen Morgenson, "The Swaps That Swallowed Your Town," *The New York Times* (March 6, 2010) available at http://www.nytimes.com/2010/03/07/business/07gret.html ......................................2

Pursuant to Federal Rule of Civil Procedure 23(g)(3), Plaintiff Mayor and City Council of Baltimore ("Baltimore") and the undersigned counsel respectfully request that this Court: (1) appoint Hausfeld LLP and Susman Godfrey L.L.P. ("Susman Godfrey") (collectively the "Proposed Lead Counsel") as Interim Class Counsel for the proposed class; and (2) authorize Interim Class Counsel, subject to the approval of the Court, to appoint an Interim Steering Committee to assist them.

## I.  INTRODUCTION

This case involves an alleged conspiracy to suppress the London Inter-Bank Offered Rate ("LIBOR") by member banks of the British Bankers Association's ("BBA") U.S.-dollar LIBOR panel.  LIBOR is a daily reference rate based on the interest rates at which the member banks report to the BBA that they can borrow U.S. dollars from one another.  The member banks are alleged to have colluded to underreport the rates at which they could borrow from one another – and thus to suppress LIBOR – in order to benefit their LIBOR-based derivatives positions.

The banks' primary LIBOR-based derivative positions were, and continue to be, in interest rate swaps.[1]  An interest rate swap is a contract between two parties through which one entity agrees to pay a variable rate on a specified principal amount in exchange for receiving from the other entity a fixed rate based on the same principal amount.  While hedge funds and other investors have increasingly begun to use interest rate swaps as investment vehicles in and of themselves, seeking to gain from fluctuations in interest rates, interest rate swaps are employed mainly by borrowers in order to hedge against exchange interest rate controls and

---

[1] *See* Donald MacKenzie, "What's in a Number? ", *London Review of Books*, September 25, 2008, p. 11-12 available at http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number ("Libor is an even more important factor in the huge market for interest-rate swaps . . . The total amounts involved, added up across the globe, exceed $300 trillion. Measured that way, the swaps market is the biggest financial market of them all, and most of it depends on Libor.")

market fluctuations.[2]  They thus enter into contracts – typically with banks such as Defendants –
to "swap" the fixed rate on a loan for a variable rate, primarily based on LIBOR.

Municipalities and other debt-issuing political subdivisions constitute the core customers
of interest rate swaps with banks, including the Defendants, as they seek to use the swaps to
maximize revenue from public debt offerings.  During the financial crisis, interest-rate swaps
became synonymous with toxic investments for a growing number of states, cities and towns
across America as returns from interest rate swaps plummeted along with the LIBOR.[3]  As
LIBOR declined as a result of Defendants' conspiracy, Baltimore and others like it lost money
because the LIBOR-based returns that they received from Defendants pursuant to interest rate
swap agreements with them decreased while their obligations to pay fixed rates to the
Defendants remained constant.  To the extent that the variable LIBOR rate was suppressed below
the fixed rate paid in exchange, the value of municipalities' debt burden increased accordingly.

Baltimore is an independent city in the State of Maryland with a population of over six
hundred thousand, serving a metropolitan area of well over two million.  During the Class
Period, Baltimore entered into over a hundred million dollars of interest rate swaps, the majority
of which were entered into directly with the Defendants, and was harmed by the loss of millions
of dollars as a result of Defendants' conspiracy.

As details of worldwide government investigations into a conspiracy to manipulate
LIBOR came to light in March of this year, numerous plaintiffs quickly filed private cases in

---

[2] *See* Dr. Masimilano de Santis, "Demystifying Financial Derivatives:  Interest Rate Swaps and
Municipal Derivatives," *NERA Economic Consulting*, at 4-5 (March 2, 2011) available at
http://www.nera.com/nera-files/PUB_Demystifying_Financial_Derivatives_0311.pdf.

[3] *See* Gretchen Morgenson, "The Swaps That Swallowed Your Town," *The New York Times*
(March 6, 2010) available at http://www.nytimes.com/2010/03/07/business/07gret.html; Randall
Dodd, "Municipal Bombs," *International Monetary Fund Finance and Development* (June 2010)
available at http://www.imf.org/external/pubs/ft/fandd/2010/06/pdf/dodd.pdf.

federal courts.  These cases were typically brought by individual investors on commodities

exchanges for products that were indexed in some manner to LIBOR,[4] and not by those who

contracted directly with Defendants for financial products based on LIBOR, such as interest rate

swaps.[5]  Baltimore engaged Proposed Lead Counsel and filed its complaint only after Proposed

Lead Counsel spent months conducting an extensive investigation and analysis of the conspiracy.

This case is an antitrust class action with some ancillary commodities and common law

causes of action.  Proposed Lead Counsel are recognized among the preeminent and most

innovative plaintiffs' antitrust law firms in the United States.  Both firms ___*specialize*___ in antitrust

litigation, and represent Baltimore, other municipalities, and the class as Interim Co-Lead

Counsel in *In Re Municipal Derivatives Antitrust Litigation*, MDL No. 1950 (S.D.N.Y.) (VM), a

case involving an alleged conspiracy among major banks, including some of the Defendants in

this case, to fix, maintain and stabilize the price of derivatives, such as interest rate swaps, and to

rig bids and allocate customers and markets for derivatives, which were sold to municipalities

and other entities.  Proposed Lead Counsel are thus currently representing Baltimore and the

class in a case relating to the initial pricing of derivatives contracts between banks and

---

[4] *See FTC Capital GMBH et al v. Credit Suisse Group AG et al*, 11 Civ. 2613 (S.D.N.Y.); *Francis v. Bank of America Corporation et al*, No. 11 Civ. 3423 (S.D.N.Y.); *Independence Trading Inc. v. Bank of America Corporation et al*, No. 11 Civ. 4736 (S.D.N.Y.); *Laydon v. Credit Suisse Group AG et al*, 11 Civ. 5638 (S.D.N.Y.); *McCormick et al v. Bank of America Corporation et al*, 11 Civ. 5640 (S.D.N.Y.); *Hershey v. Credit Suisse Group AG et al* , 11 Civ. 5641 (S.D.N.Y.); *Haynes v. Bank of America Corporation et al*, 11 Civ. 5927 (S.D.N.Y.); *AVP Properties, LLC v. Bank of America Corporation et al*, 11 Civ. 5928 (S.D.N.Y.); *Atlantic Trading USA, LLC v. Bank of America Corporation et al*, 11 Civ. 5929 (S.D.N.Y.); *Calle Gracey v. Bank of America Corp. et al*, 11 Civ. 5931 (S.D.N.Y.).

[5] While it is impossible to determine conclusively by the pleadings, a small minority of cases may have been brought by private funds who invested in interest rate swaps as pure investment vehicles, rather than to manage debt.  *See Carpenters Pension Fund of West Virginia v. Bank of America Corporation et al*, 11 Civ. 2283 (S.D.N.Y.); *City of Dania Beach Police & Firefighters' Retirement System v. Bank of America Corporation et al*, 11 Civ. 3128 (S.D.N.Y.); *Ravan Investments, LLC v. Bank of America Corporation et al*, 11 Civ. 3249 (S.D.N.Y.); *Insulators and Asbestos Workers Local #14 v. Bank of America Corporation et al*, 11 Civ. 3781 (S.D.N.Y.).

municipalities and other entities, while this action concerns the returns – tied to LIBOR – that were later realized by municipalities and others from derivatives contracts.  Proposed Lead Counsel have a wealth of experience drawn from the *Municipal Derivatives* action, and are thus uniquely suited to act as Interim Class Counsel in this action.  Their appointment represents the most efficient means for the coordination of this action.  It will also ensure that the interests of Baltimore, the most representative direct purchaser plaintiff in the action and the one likely with the most significant financial interest in the litigation, will be adequately represented.

Moreover, Proposed Lead Counsel do not have any agreements with other counsel that would bind them to any particular allocation of work in this action.  Thus, Proposed Lead Counsel are in the best position to fully and efficiently utilize the expertise of the various plaintiffs' attorneys involved in this litigation.  Given the magnitude of this litigation, and the variety of interests involved, a Plaintiffs' Steering Committee would likely be useful in managing and coordinating the prosecution of this litigation, as it has been in other successfully prosecuted antitrust class actions.  Accordingly, if appointed as Interim Class Counsel, Proposed Lead Counsel would ask the Court – consistent with the recommendations of the *Manual for Complex Litigation (Fourth)* (2010) (the "*Manual (Fourth)*") – to authorize them to appoint an interim Plaintiffs' Steering Committee, subject to the Court's approval.

## II.  ARGUMENT

Rule 23 of the Federal Rules of Civil Procedure provides that a court "may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  Fed. R. Civ. P. 23(g)(3).  The Advisory Committee notes to Rule 23(g)(2)(A) explain that the rule "authorizes [a] court to designate interim counsel during the

pre-certification period if necessary to protect the interests of the putative class."  The *Manual*

*(Fourth)* elaborates:

> If . . . there are a number of overlapping, duplicative, or competing suits pending in other courts, and some or all of those suits may be consolidated, a number of lawyers may compete for class counsel appointment.  *In such cases, designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities*, such as making and responding to motions, conducting any necessary discovery, moving for class certification and negotiating settlement.

Manual § 21.11 (emphasis added).

In complex cases, a court can, and customarily does, appoint lead counsel to coordinate

the prosecution of the case.  *See, e.g., In re Bendectin Litig.*, 857 F.2d 290, 297 (6th Cir. 1988),

*cert denied*, 488 U.S. 1006 (1989). "The benefits achieved by consolidation and the appointment

of general counsel, *i.e.*, elimination of duplication and repetition and in effect the creation of a

coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be

channeled, will most certainly redound to the benefit of all parties to the litigation."  *MacAlister*

*v. Guterma*, 263 F.2d 65, 69 (2d Cir. 1958).

Here, approval of the proposed Interim Class Counsel will make for the most efficient

prosecution of this action pending a decision on class certification.  It will also facilitate potential

settlement discussions that Proposed Lead Counsel believe are likely to occur, assuring all

parties that these firms are empowered to act on behalf of the proposed class.

### A.  Proposed Lead Counsel are highly qualified to represent the proposed class under the factors enumerated in Rule 23(g)(1)(A).

Proposed Lead Counsel are well qualified under the criteria set forth in Rule 23(g)(1)(A),

which sets forth four factors that courts are to consider in appointing class counsel:  (i) counsel's

knowledge of the applicable law; (ii) counsel's experience in handling class actions, other

complex litigation, and the types of claims asserted in this action; (iii) the work counsel has done in identifying or investigating potential claims in this action; and (iv) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).   Courts appointing *interim* class counsel also apply those factors as well as other factors.  *See, e.g., Parkinson v. Hyundai North America*, No. 06 Civ. 345, 2006 WL 2289801, at *2 (C.D. Cal. Aug. 7, 2006); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006).[6]  Of these factors, courts have found proposed counsel's "experience in, and knowledge of, the applicable law in this field" to be most persuasive.  *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 702 (S.D. Fla. 2004).

These factors strongly support appointing Proposed Lead Counsel as Interim Class Counsel.  Proposed Lead Counsel respectfully submit that they possess the requisite experience, knowledge, size, and resources to skillfully and efficiently handle this litigation on behalf of the proposed class.  Both individually and together, we have served as lead counsel in such cases and will be able to draw upon our experience and resources to represent Plaintiffs and the proposed class in this litigation.

Moreover, we have demonstrated an ability to serve successfully together as co-lead counsel in similarly large and complex antitrust class actions.  Specifically, lawyers at our firms served as co-lead counsel in the *Vitamins Antitrust Litigation*, not only obtaining a $1.1 billion settlement, but also winning a $148.5 million jury verdict after trial against four non-settling defendants.  We also serve as interim co-lead counsel in *In Re Municipal Derivatives Antitrust Litigation* – a case similar to this action in that it involves a conspiracy by major banks to fix the

---

[6] These cases refer to the factors contained in former rule Fed. R. Civ. P. 23(g)(1)(C), which was renumbered to Fed. R. Civ. P. 23(g)(1)(A) by the December 1, 2007 Amendments to the Federal Rules of Civil Procedure.

initial pricing of derivative products, including interest rate swaps, sold to municipalities – and *In re Egg Products Antitrust Litigation* – a case concerning a conspiracy to reduce supply and otherwise fix the price of eggs and egg products by a consortium of egg producers.  In each of the latter two cases, we have orchestrated groundbreaking early agreements and settlements with defendants that provided a crucial roadmap of the complex conspiracies at issue, a process that we have begun to explore here, and believe likely if we are appointed Interim Class Counsel.

A summary of our qualifications is provided below and further factual detail is provided in the Declarations of Michael D. Hausfeld and William Christopher Carmody, and attached exhibits.

**1. *We are experienced in antitrust class actions of similar size and scope and have unique skill-sets that we will bring to bear in this case.***

   a.  <u>Hausfeld LLP</u>

Hausfeld LLP is widely acknowledged to be one of the nation's preeminent antitrust litigation firms.  The *Legal 500* ranks Hausfeld LLP as one of only three Tier 1 law firms in the plaintiffs' antitrust class action category, noting also – in the "EU and Competition" category – the growing success of the firm's London office, which provides Hausfeld LLP with a presence, unique among plaintiffs' firms, in the European Union.  This is especially important in this case, given that the BBA, which sets global LIBOR rates, is based in London, and governmental investigations into the Defendants' misconduct include those by United Kingdom and European Union authorities.

The firm was also named in the 2010 *National Law Journal* "Plaintiffs' Hot List," which noted that "Hausfeld has quickly positioned itself as a leader in antitrust and class action litigation . . . establish[ing] new frontiers for plaintiffs' legal recovery, while pursuing global

cartels and representing victims of apartheid." The *Global Competition Review* has also recently stated that Hausfeld LLP "is clearly recognized as one of the best plaintiffs firms in the country."

Firm members have achieved notable recent successes, including *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06 MD 01775 (E.D.N.Y.) (obtained $278 million in partial settlements on behalf of a class of purchasers of air cargo shipping services); *In re International Air Transportation Surcharge Antitrust Litig.*, Case No. 06 Civ. 01793, MDL No. 1793 (N.D. Cal.) (Hausfeld LLP appointed Interim Co-Lead Counsel on behalf of thousands of air travelers in action alleging price-fixing of air passenger transportation that settled in 2009 for approximately $190 million); *In Re: Rubber Chemicals Antitrust Litig.*, No. 03 Civ. 1496 (N.D. Cal.) (Hausfeld LLP lawyers, serving as Co-Lead Counsel, settled the direct purchaser class's global price-fixing claims with certain defendants for more than $300 million), and others.

Hausfeld LLP's lawyers have garnered significant praise from district court judges. In the *Transpacific Air Passenger* case, for example, the firm was praised by United States District Judge Charles R. Breyer of the Northern District of California for its efforts in achieving "really, an outstanding settlement in which a group of lawyers from two firms coordinated the work . . . and brought an enormous expertise and then experience in dealing with the case." The Court also observed that the firm's lawyers are "more than competent. They are outstanding." *In re Transpacific Passenger Air Transportation Antitrust Litigation*, 07 Civ. 5634, MDL No. 1913, Hearing Transcript, at 5:20-25, 7:11-12 (N.D. Cal., January 30, 2009). Similarly, in *Four In One Co. v. SK Foods, LP*, 08 Civ. 03017, 2009 WL 747160 (E.D. Cal., Mar. 20, 2009), in an order appointing interim co-lead counsel in an antitrust case alleging a conspiracy by tomato producers of fixing the prices of processed tomato products, United States District Judge Morrison C. England Jr. of the Eastern District of California praised Hausfeld LLP for having "the breadth of

experience, resources and talent necessary to navigate a case of this import." The court held that "[a]lthough there [was] no question that the other firms proposed as co-lead counsel are also well qualified," Hausfeld LLP and one other firm "st[ood] out from the rest," leading the court to appoint Hausfeld LLP and the other firm as Interim Co-Lead Counsel. *Id.* at *3.

Hausfeld LLP attorneys thus possess wide-ranging expertise in antitrust class actions. Moreover, the principal Hausfeld LLP attorneys for this matter – Michael D. Hausfeld and William P. Butterfield – will bring to bear their industry-leading expertise in antitrust, commodities, class action litigation, electronic discovery and negotiation; a blend uniquely capable of ensuring the efficient prosecution of this action and the maximization of recoveries for the class in this case.

Michael D. Hausfeld is the name partner and founder of Hausfeld LLP and his career has included some of the largest and most successful class actions in the fields of consumer protection, antitrust law, and human rights. The *National Law Journal* has recognized him as one of the "Top 100 Influential Lawyers in America" and the *Legal Times* named Mr. Hausfeld among the top 30 "Visionaries" in the Washington legal community in 2008. The *New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and in 2009 the *Washingtonian* named him one of thirty "Stars of the Bar." *Global Competition Review* has reported that he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world – and succeeding." The *Legal 500* lists Mr. Hausfeld as one of seven leading plaintiffs' antitrust lawyers in the country, in 2008 stating that "[t]he outstanding Mike Hausfeld is a titan of the antitrust bar." Mr. Hausfeld's vision and influence is international in scope. Recently, he was named as co-chair of the ABA Section of Antitrust Law's Civil Redress Task Force. The Task Force brings together antitrust

practitioners and members of the judiciary in the U.S. and Europe to examine questions being raised as to private enforcement of competition laws internationally.  The Task Force aims to become a center for information and policy-shaping of private antitrust enforcement around the world.

Mr. Hausfeld is also noted as a leading negotiator.  For example, he successfully negotiated the first-ever private settlement of a company's global liability in connection with a price-fixing cartel and is one of thirty negotiators profiled in a book entitled, *Done Deal: Insights from Interviews with the World's Best Negotiators*, by Michael Benoliel, Ed.

Hausfeld LLP partner William P. Butterfield has significant experience with antitrust and commodities litigation.  On the commodities side, he was recently appointed to the Steering Committee in a class action alleging antitrust and commodity futures manipulation claims involving silver.  *In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.*, 11 MD 0221 (RPP) (S.D.N.Y.).  Previously, he represented class plaintiffs in *In re Natural Gas Commodity Litig.*, No. 03 Civ. 6186 (S.D.N.Y.), and served as outside counsel for federal banking agencies, where he investigated and litigated claims arising from losses in commodity hedging programs used by failed financial institutions.  He has prosecuted and defended individuals and companies in federal courts and administrative tribunals in matters involving antitrust violations, securities and commodities fraud, insider trading, takeover litigation, broker-dealer violations and registration issues.  He has taught a course in commodities law and regulation as an adjunct professor at American University, Washington College of Law.

Mr. Butterfield is also noted for his pioneering role in the development of the electronic discovery field.  Mr. Butterfield has been a leader in the field of e-discovery since the early 1990s, when he helped design and implement an electronic document repository to manage more

than 15 million pages of documents produced in a complex securities case.  In 2005, Mr.

Butterfield testified before the U.S. Judicial Conference Rules Committee regarding proposed

electronic discovery amendments to the Federal Rules of Civil Procedure.  Mr. Butterfield is one

of only two plaintiffs' lawyers on the Steering Committee of The Sedona Conference® Working

Group on Electronic Document Retention and Production.  He is also a member of the Sedona

Conference® Working Group on International Electronic Information Management, Discovery

and Disclosure.  Currently, Mr. Butterfield serves as an adjunct professor at American

University, Washington College of Law, where he teaches a course in electronic discovery.  He

serves as a guest lecturer at Georgetown University, and on the faculty of Georgetown

University Law Center's Advanced E-Discovery Institute and the Masters Conference Advisory

Board.  Mr. Butterfield has testified as an expert witness on e-discovery issues, and speaks

frequently on that topic domestically and abroad.  Recently, he served as co-chair for the 12th

Annual Sedona Conference® on Complex Litigation, and as a participant at the Duke University

School of Law: 2010 Advisory Committee Conference on Civil Rules.  Mr. Butterfield was one

of twenty-five people – consisting of lawyers, judges and academics – recently invited to advise

the Rules Committee on amendments to the Federal Rules of Civil Procedure currently under

consideration.  Mr. Butterfield's expertise, therefore, will be crucial to ensuring an efficient

discovery process in this litigation, as well as to ensuring that the interests of the commodities

trader plaintiffs are adequately represented.

b.  <u>Susman Godfrey L.L.P.</u>

Susman Godfrey is one of the preeminent law firms in the country in antitrust litigation.

Steve Susman founded the firm in 1980 after specializing in antitrust at a large law firm,

teaching antitrust at the Texas Law School, and serving as a special assistant on antitrust to the

11

Attorney General of Texas. Beginning with the landmark *Corrugated Container* price-fixing case in 1980, in which Susman Godfrey recovered $500 million on behalf of plaintiffs as a result of settlements and a verdict after a 3-month jury trial, Susman Godfrey has been in the forefront of antitrust litigation. Susman Godfrey has recovered hundreds of millions of dollars for plaintiffs bringing price-fixing, market allocation, concerted refusal to deal, and monopolization claims involving a number of industries.  Susman Godfrey litigated two landmark cases, *Affiliated Capital v. City of Houston* and *Business Electronics v. Sharp*, from jury verdicts to decisions by the United States Supreme Court.  For plaintiffs, the firm has tried to judgment predatory pricing cases; Robinson-Patman Act cases; and dealer termination cases. Susman Godfrey has represented companies such as Bell Atlantic in a Section 7 case against AT&T, and Gearhart Industries, Inc. in an injunction trial brought by the Attorney General of Texas to block a merger.  Susman Godfrey has represented Northwest Airlines in a consumer class action challenging its merger with Republic Airlines under Section 7.  Susman Godfrey partners have served on the Council of the ABA Antitrust Section, the Texas Bar Antitrust Section, the Washington State Bar Antitrust and Consumer Protection Section, and the Executive Committee of the Antitrust and Unfair Competition Law Section of the State Bar of California. They regularly publish and lecture around the country on antitrust subjects.

Among other nationwide class actions in which the firm is currently involved, Susman Godfrey is serving as either lead or co-lead counsel in the following nationwide antitrust class actions, among others:

*In re Processed Egg Products Antitrust Litigation*, 08 MD 2002, pending in the Eastern District of Pennsylvania (co-lead counsel with Hausfeld LLP);

*In re Municipal Derivatives Antitrust Litigation*, MDL Docket No. 1950, pending in the Southern District of New York (co-lead counsel with Hausfeld LLP);

*In re Korean Air Lines Antitrust Litigation*, MDL Docket No. 1981, pending in the Central District of California.

In addition to Steve Susman, who has antitrust litigation experience unparalleled in the plaintiffs' bar, *see* Decl. of William C. Carmody in Supp. Interim Class Counsel Mot. ("Carmody Decl."), Ex. B, the principal attorneys assigned to this matter, Marc M. Seltzer and Bill Carmody, have decades of experience in high-stakes class action litigation.  Marc Seltzer co-authored *California State Antitrust and Unfair Competition Law*, published by the State Bar of California, was a past vice-chair of the Executive Committee of that bar's Antirust and Unfair Competition Law section, and currently serves as a member of the Advisory Board for the American Antitrust Institute.  He has practiced law for over thirty-five years, and is a Life Member of the American Law Institute.  Mr. Seltzer's relationship with Susman Godfrey began in the late 1970s when he worked with Steve Susman on the landmark *Corrugated Container* antitrust case, which resulted in hundreds of millions of dollars being paid to the plaintiffs.  Marc Seltzer also teamed with Steve Susman in prosecuting the *In re Vitamins Antitrust Litigation*, which was settled pursuant to agreements that made more the $1.05 billion available to the class.

Mr. Seltzer has been appointed to serve as lead counsel for the plaintiffs in numerous securities, antitrust, and other class action cases, including *In re Korean Air Lines Antitrust Litigation*, where Mr. Seltzer served as one of three lead counsel for the class, and won a $21 million settlement with one defendant, with litigation proceeding against the other.  Mr. Seltzer has also achieved significant victories serving as lead counsel in other antitrust class actions, including: *In Re Universal Service Fund Telephone Billing Practices Litigation*, an antitrust and breach of contract class action involving more than fifty consolidated cases in which Marc Seltzer and other attorneys at the firm served as co-lead trial counsel for plaintiffs. The case was settled as to one defendant for benefits to the class totaling $25 million, and tried to a verdict as

13

to the remaining defendant; *Masimo v. Tyco Healthcare L.P*., an antitrust case in which Marc Seltzer, together with Steve Susman and other Susman Godfrey attorneys served as co-trial counsel for the plaintiff.  The court awarded over $43 million in damages (after trebling), an award affirmed by the Ninth Circuit; and *White v. NCAA*, an antitrust class action brought in Los Angeles federal court challenging limitations on financial assistance provided by colleges and universities to student athletes. Marc Seltzer served as co-lead counsel for the plaintiff class. The case was settled for benefits for the class totaling approximately $220 million.  *See* Carmody Decl., Ex. C.

Over the past twenty years, Bill Carmody has tried cases for plaintiffs and defendants in state and federal courts throughout America.  He has been listed in the Lawdragon 500 as one of its top 100 securities lawyers and one of the leading plaintiffs' lawyers in the country.  He is listed in *The Best Lawyers in America* and his peers have voted him both a "Texas Super Lawyer" and a "New York Super Lawyer."  His trial victories have been profiled in numerous periodicals, including *The National Law Journal*, *Business Week*, *The Wall Street Journal*, *Dallas Business Journal*, *Texas Lawyer, Forbes*, and *The American Lawyer*.  Bill Carmody specializes in trying "David v. Goliath" lawsuits for plaintiffs against large institutional defendants.  Mr. Carmody has also achieved victories in numerous class action cases, including *Shockey v. Chevron U.S.A.*, where Mr. Carmody won a net $40 million settlement for landowners after prevailing on hotly contested issues of class certification and choice of law. Mr. Carmody has and continues to aggressively litigate cases in the antitrust field, including *Medical Mutual of Ohio v. GlaxoSmithKline, et al.* and *Pacificare Health Systems, Inc. v. Abbott Laboratories*, *et al.* opt-out antitrust litigation relating to the *In re Wellbutrin SR*

*Antitrust Litigation* and *In re Tricor Antitrust Litigation* class actions.  Mr. Carmody also serves as co-lead counsel in the *Municipal Derivatives Antitrust Litigation*.  *See* Carmody Decl., Ex. D.

Susman Godfrey's skill is reflected in its wide recognition as one of the nation's leading firms for litigation, including by *The American Lawyer* in its first-ever "Litigation Boutique of the Year" competition, as a leading Commercial Litigation Law Firm in *ACQ Finance Magazine*, and its 1st place Ranking in *Chambers USA*.  The firm's lawyers are consistently recognized as "Super Lawyers" and "Rising Stars" in the states where they practice.  Susman Godfrey currently has eighty-eight lawyers, over 90% of whom served in highly sought-after judicial clerkships after law school.  Seven of Susman Godfrey's attorneys have clerked at the highest level—for Justices of the Supreme Court of the United States, including one of the partners on the team assembled for this case, Arun Subramanian. *See* Carmody Decl., Ex. E.

Susman Godfrey has achieved a number of other significant victories for plaintiffs in antitrust cases, including most recently a significant appellate victory in *Behrend v. Comcast Corp.*, No. 10-2865 (3d Cir. Aug. 23, 2011), where the Court affirmed the certification of the plaintiff class.  The plaintiffs are seeking in excess of $875 million against Comcast in the case. Susman Godfrey has also garnered well over six hundred million dollars in recoveries on behalf of clients in antitrust cases against Microsoft Corp. over the past decade.  These are only a few of the many examples of the firm's extensive litigation experience and, more importantly, litigation victories, especially in the antitrust domain.  *See also* Carmody Decl., Ex. A.

### 2. We have unique experience as trial counsel in antitrust class actions.

While it is true that most large antitrust cases settle before trial, it is also true that the proven ability and willingness of its counsel to try such cases benefits the class, by among other things giving it additional leverage in settlement negotiations.  Proposed Lead Counsel have tried

many complex cases, including the leading exemplars of antitrust class actions prosecuted through a jury trial in the past decade.  These trials show defendants our willingness to try cases and thus demonstrate that it may be advantageous to offer meaningful settlement at an early stage of litigation.

For example, in 2003, after obtaining then-record settlements of over a billion dollars from the initially settling defendants in the *Vitamins Antitrust Litigation*, Michael Hausfeld of Hausfeld LLP and James Southwick of Susman Godfrey, together with other co-counsel, tried the class case against four non-settling defendants and won a jury verdict of $49.5 million (10% more than was requested from the jury), which was then trebled to $148.5 million (the judgment was later reduced slightly to reflect offsets for other settlements).

Similarly, in the *Corrugated Container Antitrust Litigation,* Steve Susman and Marc Seltzer represented the plaintiffs in over 50 consolidated class action antitrust cases.  Together with other co-counsel, Susman Godfrey recovered $500 million for plaintiffs as a result of settlements achieved both before and after a verdict in the plaintiffs' favor.

In April 2000, Susman Godfrey settled a securities class action for $40 million and other relief in Las Vegas federal court.  The case settled after three weeks of trial and just before plaintiffs rested their case-in-chief.  Susman Godfrey attorneys worked closely with the Federal Trade Commission and attorneys general from Hawaii, Maryland, Michigan, Nevada, North Carolina, Tennessee, and Virginia to achieve this result.

More recently, in 2005, a federal jury in Los Angeles, California reached a $140 million trial verdict in favor of Susman Godfrey client Masimo Corporation, against Tyco Healthcare Group LP and its affiliate, Mallinckrodt, Inc.  Steven Susman and Marc Seltzer were the plaintiffs' lead trial lawyers.  After a retrial on damages, Susman Godfrey ultimately achieved a

judgment in Masimo's favor for $43.5 million, plus attorneys' fees and costs, which was affirmed on appeal.

> ### 3. We have uncovered antitrust conspiracies before government cases have been brought through investigation and groundbreaking settlements, skills we have already brought to bear in this litigation.

Proposed Lead Counsel are also notable for their ability to develop cases in the absence of a government case, skills they have already brought to bear in this litigation. For example, attorneys from Proposed Lead Counsel filed the first complaints in the *Vitamins Antitrust Litigation* based on counsel's investigation before the announcement of any government investigation. A commentator wrote about the unique accomplishments: "[t]he results of a private investigation by an intrepid class-action law firm in mid-1997 . . . were shared with DOJ prosecutors who decided to reopen an investigation of vitamins price fixing . . ."[7] Approximately one year after those first complaints were filed, defendant F. Hoffman La Roche pled guilty and agreed to pay the U.S. government a criminal fine of $500 million.

Similarly, Proposed Lead Counsel have achieved landmark groundbreaking settlements in antitrust cases. For example, Proposed Lead Counsel currently both serve as co-lead counsel in *In Re Municipal Derivatives Antitrust Litigation* and *In re Egg Products Antitrust Litigation*. In each case Proposed Lead Counsel orchestrated early agreements and settlements with a defendant for, *inter alia*, cooperation from the defendant which provided a crucial roadmap to prosecution of the action in the absence of government case from which the facts could be developed. Without the critical information provided in these settlements, class plaintiffs' claims may well have foundered.

---

[7] Prof. John M. Connor, *The Great Global Vitamins Conspiracy*, 2006 American Antitrust Institute Paper, p. 28, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1103604##.

In this litigation, Proposed Lead Counsel have already devoted significant time and expense to the investigation of the claims following the publication of news reports that government agencies were investigating the claims.  While there was an initial rush by other firms to file suit subsequent to the publication of these reports, Proposed Lead Counsel, prior to filing the suit, spent months investigating the legal, economic and factual issues related to this case and analyzing Baltimore's potential claims, discovering that its claims likely represented the most significant and direct claims of any plaintiff who had filed.  Proposed Lead Counsel have also explored the possibility of reaching groundbreaking settlements in order to bring more facts to bear in this case in the absence of a government case and believe that this is likely to occur should we be appointed as Interim Class Counsel.

### 4.   We have the resources necessary to effectively prosecute this action.

Proposed Lead Counsel regularly advance the costs of antitrust class actions and are prepared to do so in this case.  In addition to the substantial expertise outlined above, Proposed Lead Counsel have the resources necessary to effectively prosecute this action.

Hausfeld LLP currently has 24 lawyers in the United States and abroad.  Its business model allows its attorneys to devote their time to complex plaintiff-side actions such as this one. Uniquely among plaintiffs' firms, the firm has six experienced plaintiffs' attorneys in its London office – Hausfeld & Co. LLP – devoted to litigating claims in the United Kingdom and in mainland Europe.  As previously noted, many of the relevant events in this litigation occurred in the United Kingdom as a result of the Defendants' participation in the British Bankers' Association US-dollar LIBOR panel.  In addition, many of the Defendants are located in the United Kingdom and in Europe.  Because of its presence in London, Hausfeld LLP has the expertise to analyze UK banking practices and the ability to more efficiently investigate the facts

regarding the LIBOR swaps at issue.  Hausfeld LLP attorneys are, therefore, uniquely capable of assisting in the international aspects of this litigation.

Similarly, Susman Godfrey possesses the resources to staff the case with top lawyers and the geographic scope to manage discovery and related proceedings anywhere in the United States.  Susman Godfrey currently has eighty-eight lawyers, across five offices in the United States.  Susman Godfrey already has assembled a team of attorneys who will devote a significant portion of their time to this litigation.  Its team currently includes partners in the firm's New York and Los Angeles offices.

### B. Additional factors counsel in favor of appointing Proposed Lead Counsel as Interim Class Counsel.

In addition to the mandatory factors enumerated in Rule 23(g)(1)(A), "the Court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class and may, if it deems it necessary, direct the proposed class counsel to provide information on any subject pertinent to the appointment."  *In re Terazosin Hydrochloride*, 220 F.R.D. at 701-02; *see* Fed. R. Civ. P. 23(g)(1)(C)(ii)-(iii).  Two additional factors support the appointment of Proposed Lead Counsel as Interim Class Counsel: (1) the paramount interests of Plaintiff Baltimore in this action; and (2) the need to avoid unnecessarily complex, bloated or rigid organizational structures.

#### 1. *Baltimore's choice of counsel should be given substantial deference.*

Baltimore is an independent city in the State of Maryland with a population of over six hundred thousand, serving a metropolitan area of well over two million.  During the Class Period, Baltimore entered into over a hundred million dollars of LIBOR-based interest rate swaps relating to its public debt offerings, the majority of which were entered into directly with the Defendants.  Proposed Lead Counsel estimates that Baltimore suffered millions of dollars in

19

damages as a result of Defendants' conspiracy.  Defendants' conspiracy resulted in Baltimore

receiving significantly lower returns from the LIBOR-based interest rate payments that the

Defendants agreed to swap in exchange for fixed rate interest rate payments from Baltimore.

The majority of plaintiffs who have filed cases in this consolidated proceeding, on the

other hand, appear to be individual commodities traders who purchased or sold derivative

products, such as Eurodollar futures, that were linked in some manner to LIBOR but which, by

the nature of the commodities exchanges, cannot be directly traced to any individual Defendant.

Thus, Baltimore's claim in this matter is undoubtedly more direct and less remote than the claims

of these plaintiffs.  *See generally Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724 (1977)

(asserting the primacy of direct purchaser claims in private antitrust damages actions);

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542

(1983) (enumerating remoteness as a key determinant of antitrust standing).[8]

It appears possible that some other plaintiffs in this action – specifically the investment

and pension funds – transacted in interest rate swaps with the defendants, albeit as a pure

investment vehicle rather than as a debt management tool.  However, given what is known about

the nature of the interest rate swap market and the extent of the participation by municipalities in

it, it is doubtful that these plaintiffs transacted in interest rate swaps to the extent that Baltimore

did, or that they suffered damages to the extent that Baltimore did.[9]  Under the securities class

action regime enacted by the Private Securities Law Reform Act of 1995 ("PSLRA") there is a

---

[8] Proposed Lead Counsel note that an indirect purchaser class is being sought by a financial
advisor who alleges that he purchased and sold "exchange-traded LIBOR-based derivative[s],"
the same products that the majority of other plaintiffs in this action allege that they purchased.
*See* Memorandum of Law in Support of Motion to Appoint Counsel for Indirect Purchaser
Plaintiffs, Exhibit A at ¶ 8, Doc. 5-1.
[9] *See* Notes 1-3 *supra*.

"'strong presumption in favor'" of the choice of counsel made by the plaintiff with the greatest interest in the litigation. *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MDL 1529, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (*quoting In re Cendant Corp. Litig.,* 264 F.3d 201, 276 (3d Cir.2001). While this case is not governed by the PSLRA, the principles underlying counsel selection pursuant to the PSLRA support the Court's appointment of Baltimore's choice of counsel here. *See In re Cendant Corp. Litig.*, 264 F.3d at 273 ("The entire thrust of Weiss and Beckerman's argument [upon which the PSLRA's choice of counsel provisions were based] was that large investors would do a better job at counsel selection, retention, and monitoring than judges have traditionally done…"). As highlighted above, Baltimore has chosen two of the nation's preeminent antitrust firms to pursue its claim and that of the class. Baltimore's well-considered choice of counsel, therefore, should be granted substantial deference by this Court.

> ### 2. The need for an efficient and flexible organizational structure counsels in favor of appointing Proposed Lead Counsel as Interim Class Counsel.

The *Manual (Fourth)* counsels courts to assess, *inter alia*, "whether there has been full disclosure of all agreements and understandings among counsel." *Manual (Fourth)* § 10.2224. Moreover, the *Manual (Fourth)* counsels against overly complicated organizational structures that can "lead to substantially increased costs" and to "unnecessary duplication of efforts" among counsel. *Id*. § 10.221; *see also Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 413 (D. Minn. 1998) ("The functions of lead counsel may be divided among several attorneys, but the number should not be so large as to defeat the purpose of making such appointments.") *(citing Manual for Complex Litigation (Third)* § 20.221); *Vincelli v. Nat'l Home Health Care Corp.*, 112 F. Supp. 2d 1309, 1318 (M.D. Fla. 2000) ("It appears that the appointment of an executive

committee consisting of five firms will not promote the efficient prosecution of this case, and is not warranted. Having five firms making decisions for or with the plaintiffs could increase the difficulty of arriving at decisions and monitoring the case."); *In re Air Cargo Shipping Services Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006) (denying an application for interim leadership where the proposed group "appears to the court to be too large and therefore runs the risk of both inefficiency and unnecessary expense").

Here, Proposed Lead Counsel do not have any agreements with other plaintiffs' counsel to this litigation and a two firm co-lead structure with firms that have the skills and expertise of Proposed Lead Counsel will maximize the efficiency of this litigation.  Given the firms' expertise and experience in antitrust law, commodities law, class action litigation, electronic discovery, case investigation, settlement negotiation and trial advocacy, the quality of their lawyers both in the United States and in Europe, and the firms' background of successfully working together to prosecute some of the largest and most complex antitrust class actions in the last decade, Proposed Lead Counsel respectfully submit that they are ideal candidates to coordinate this litigation as Interim Class Counsel.

### C. If the Court so desires, Proposed Lead Counsel would be qualified to guide the actions of a Steering Committee in managing and coordinating the prosecution of this case.

This litigation presents legal, factual, and logistical issues that will require significant efforts and substantial coordination to bring these claims to trial.  While Baltimore and Proposed Lead Counsel believe that Proposed Lead Counsel are best positioned to coordinate this litigation, they recognize that there are multiple diverse talents available within the group of counsel that constitute the plaintiffs' side of this litigation from which Proposed Lead Counsel may wish to draw.  Thus, if the Court so desires, Proposed Lead Counsel would be prepared to

work with and guide a Steering Committee to benefit the plaintiffs and the proposed class, while also ensuring representation of the various types of plaintiffs in this litigation. Therefore, if we are appointed as Interim Class Counsel, Proposed Lead Counsel would ask the Court to authorize them to appoint an interim Steering Committee, subject to the Court's approval.

### III. CONCLUSION

Proposed Lead Counsel respectfully request that this Court grant our Motion for Interim Class Counsel and enter an order:  (a) appointing Hausfeld LLP and Susman Godfrey L.L.P. as Interim Class Counsel for the proposed class; and (b) authorizing Interim Class Counsel to appoint an Interim Steering Committee, subject to the Court's approval.

Dated:  September 1, 2011


By:    /s/ Michael D. Hausfeld                              /s/ William Christopher Carmody

      Michael D. Hausfeld                         William Christopher Carmody
      William P. Butterfield                          Arun Subramanian
      Ralph J. Bunche                                 SUSMAN GODFREY L.L.P.
      HAUSFELD LLP                                 560 Lexington Ave, 15th Floor
      1700 K St NW, Suite 650                    New York, NY 10022
      Washington, DC 20006

                                             Marc M. Seltzer
                                           SUSMAN GODFREY L.L.P.
                                         1901 Avenue of the Stars
                                         Los Angeles, CA 90067-6029


      *Attorneys for Plaintiff Mayor and City Council of Baltimore*