**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | ECF Case |
| | **ORAL ARGUMENT REQUESTED** |
| MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL., <br>      Plaintiffs, <br>     v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>       Defendants. | No. 11-cv-5450 |
| EXCHANGE-BASED PLAINTIFF ACTION | No. 11-cv-2613 |
| GELBOIM, ET AL., <br>      Plaintiffs, <br>     v. <br> CREDIT SUISSE GROUP AG, ET AL., <br>       Defendants. | No. 12-cv-1025 |
| CHARLES SCHWAB BANK, N.A., ET AL., <br>      Plaintiffs, <br>     v. <br> BANK OF AMERICA CORPORATION, ET AL. <br>       Defendants. | No. 11-cv-6411 |
| SCHWAB MONEY MARKET FUND, ET AL., <br>      Plaintiffs, <br>     v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>       Defendants. | No. 11-cv-6412 |
| SCHWAB SHORT-TERM BOND MARKET FUND, ET AL., <br>      Plaintiffs, <br>     v. <br> BANK OF AMERICA CORPORATION, ET AL., <br>       Defendants. | No. 11-cv-6409 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' ANTITRUST CLAIMS**

# **TABLE OF CONTENTS**

P̲A̲G̲E̲

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 5

      A.     Parties.......................................................................................................5

      B.     LIBOR Overview.....................................................................................7

      C.     Antitrust Allegations................................................................................8

ARGUMENT ................................................................................................................. 11

I.      PLAINTIFFS DO NOT ADEQUATELY PLEAD A CONTRACT, COMBINATION OR CONSPIRACY .................................................................................................11

      A.     Plaintiffs Allege No Direct Evidence of Conspiracy............................................13

      B.     Plaintiffs' Motive Allegations Directly Undermine any Inference of Conspiracy 14

      C.     Plaintiffs' Purported Statistical Evidence Either Fails To Support or Directly Undermines an Inference of Conspiracy.................................................................18

      D.     Plaintiffs' Allegations Regarding Government Investigations Fail To Support an Inference of Conspiracy and Should Be Struck or Disregarded ..........................20

II.     PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE ....................................22

III.    PLAINTIFFS LACK ANTITRUST STANDING............................................................25

      A.     Plaintiffs Have Not Pleaded any Reduction in Competition and Therefore Have Not Suffered an "Antitrust Injury" .......................................................................26

      B.     Plaintiffs' Injuries Are Too Indirect and Speculative to Support Standing...........27

IV.    INDIRECT PURCHASERS LACK STANDING UNDER *ILLINOIS BRICK* ...............33

CONCLUSION.............................................................................................................. 34

# TABLE OF AUTHORITIES

### CASES

*Ambook Enters. v. Time, Inc.*,
    612 F.2d 604 (2d Cir. 1979)...............................................................16

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)...............................................................14

*Apex Hosiery Co. v. Leader*,
    310 U.S. 469 (1940).......................................................................22

*Aquatherm Industries, Inc. v. Florida Power & Light Co*,
    145 F.3d 1258 (11th Cir. 1998) ...........................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................12

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)........................................................25, 26, 27, 29

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)....................................................................26, 27

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994)................................................................26

*BanxCorp* v. *Apax Partners, L.P.*,
    No. 10-cv-4769 (SDW), 2011 U.S. Dist. LEXIS 32364 (D.N.J. Mar. 28, 2011)..............12, 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................ *passim*

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)....................................................................22, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).......................................................................26

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ...........................................................30

*de Atucha v. Commodity Exch., Inc.*,
   608 F. Supp. 510 (S.D.N.Y. 1985).................................................................26, 28

*Dedication & Everlasting Love to Animals v. Humane Soc'y of the United States*,
   50 F.3d 710 (9th Cir. 1995) ...........................................................................22

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)..............................................................28

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
   No. 09 Civ. 4050 (PKC), 2010 U.S. Dist. LEXIS 102134 (S.D.N.Y. Sept. 28, 2010)...........21

*Gotlin v. Lederman*,
   367 F. Supp. 349 (E.D.N.Y. 2005) .................................................................20

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................................20

*Gross v. New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997)..............................................................30, 33

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
   392 U.S. 481 (1968)....................................................................................32

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)..............................................................................33, 34

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
   864 F.2d 1409 (7th Cir. 1989) ....................................................................24

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010).........................................................................16

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) .......................................................16, 20

*Los Angeles Memorial Coliseum Commission v. NFL*,
   791 F.2d 1356 (9th Cir. 1986) .....................................................................32

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*,
   596 F.2d 573 (3d Cir. 1979).................................................................29, 30, 31

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   676 F. Supp. 486 (S.D.N.Y. 1987).................................................................32

*Nichols v. Mahoney*,
    608 F. Supp. 2d 526 (S.D.N.Y. 2009)......................................................................26

*Paycom Billing Servs. Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006).........................................................................26, 27, 34

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................................21

*Porrazzo v. Bumble Bee Foods, LLC*,
    822 F. Supp. 2d 406 (S.D.N.Y. 2011)......................................................................33

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    587 F. Supp. 2d 27 (D.D.C. 2008)...........................................................................25

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir.1980)...................................................................................28, 34

*Reading Int'l, Inc v. Oaktree Capital Mgmt., LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)................................................................25, 26

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ....................................................................................24

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ........................................................................23, 24, 25

*Stephens v. CMG Health*,
    No. 96 Civ. 7798 (KMW), 1997 U.S. Dist. LEXIS 23797 (S.D.N.Y. July 22, 1997).............15

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
    502 F.3d 47 (2d Cir. 2007)..........................................................................12, 13, 16

*Twombly v. Bell Atl. Corp.*,
    425 F.3d 99 (2d Cir. 2005), rev'd on other grounds, 550 U.S. 544 (2007) ............................20

*United States v. Am. Soc'y of Anesthesiologists, Inc.*,
    473 F. Supp. 147 (S.D.N.Y. 1979)......................................................................23, 24

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988).......................................................................................27

*Williams v. Citigroup, Inc.*,
    No. 08 Civ. 9208 (LAP), 2009 U.S. Dist. LEXIS 105864 (S.D.N.Y. Nov. 2, 2009),
    *aff'd in part and vacated in part on other grounds*, 433 F. App'x 36 (2d Cir. 2011) .............14

<u>STATUTES & RULES</u>

15 U.S.C. § 1 ................................................................................................ *passim*

Cal. Bus. & Prof. Code § 16720, et seq. ...................................................................34

Fed. R. Civ. P. 12(b)(6).............................................................................................11

Fed. R. Civ. P. 12(f) ..................................................................................................20

<u>OTHER AUTHORITIES</u>

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1433a, at 259 (3d ed. 2010) .............14

Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic: Is LIBOR Broken?,"
   Apr. 10, 2008 ...................................................................................................15

Defendants[1] submit this Memorandum in support of their motion to dismiss the Sherman Act section 1 antitrust claims asserted in all three of the amended consolidated class action complaints[2] and the amended complaints in the three individual *Schwab*[3] actions (collectively, the "Amended Complaints").[4]

## Preliminary Statement

The Amended Complaints do not state a claim under the antitrust laws.  At most, Plaintiffs accuse Defendants of making false reports for their own purposes to a trade association regarding the rates at which they believed they could borrow money in London.  Those reports allegedly affected a widely used interest rate index calculated daily and made public by the association.  It is of course a mathematical truism that the published index would have been different if higher or lower rates had been reported by a sufficient number of banks.  That might impact financial results to those who chose to incorporate the index in their transactions, but that

---

[1] This memorandum is submitted on behalf of Bank of America Corporation, Bank of America, N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., Citibank, N.A., Citigroup, Inc., Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, The Norinchukin Bank, Royal Bank of Canada, The Royal Bank of Scotland Group plc, and WestLB AG.  Defendants UBS AG and Barclays Bank plc are filing separately, but joining in certain of the arguments herein.

[2] The amended consolidated class action complaints are:  Consol. Am. Compl., Mayor and City Council of Baltimore v. Credit Suisse Grp. AG, Apr. 30, 2012 ("OTC Compl."); Am. Consol. Class Action Compl., Exchange-Based Plaintiff Action, Apr. 30, 2012 ("Exch. Compl."); First Am. Class Action Compl., Gelboim v. Credit Suisse Grp. AG, Apr. 30, 2012 ("Gelboim Compl.").

[3] The Schwab complaints are:  Am. Compl., Charles Schwab Bank, N.A. v. Bank of Am. Corp., Apr. 30, 2012 ("Charles Schwab Compl."); Am. Compl., Schwab Money Market Fund v. Bank of Am. Corp., Apr. 30, 2012 ("Schwab Money Market Compl."); Am. Compl., Schwab Short-Term Bond Market Fund v. Bank of Am. Corp., Apr. 30, 2012 ("Schwab Short-Term Bond Compl.").

[4] Plaintiffs assert other claims in their Amended Complaints, which Defendants are concurrently moving to dismiss. Two separate memoranda address the additional claims made in the Exchange-Based and *Schwab* actions, respectively.  Taken together, Defendants' three memoranda address all claims in all three class actions and the *Schwab* actions, with the exception of the unjust enrichment claim in the OTC Complaint.  (OTC Compl. ¶¶ 227-30.)  That claim is essentially identical to the unjust enrichment claim made in the Exchange-Based Complaint (Exch. Compl. ¶¶ 250-53), and Defendants adopt and incorporate by reference the arguments for its dismissal set out in their memorandum addressed to the Exchange-Based Complaint.  (*See* Mem. of Law in Support of the Defs.' Mot. to Dismiss the Exchange-Based Plaintiffs' Claims at § IV.)

is not a restraint of trade.  The Amended Complaints fail to show how any of what they allege would have restricted *competition* among Defendants or anyone else.

Defendants (or their affiliates) are current or past members of a panel of banks invited by the British Bankers Association ("BBA") to report each day the rates at which they believe they could borrow U.S. Dollars from other banks in London.  An administrator compiles the submissions, excludes the highest and lowest reported rates, and publishes the average of the remaining submissions as the U.S. Dollar London Interbank Offered Rate ("USD LIBOR"), a widely referenced interest rate index.  Plaintiffs allege that Defendants underreported their expected borrowing rates to the BBA from August 2007 until May 2010 (the "Class Period"), thereby reducing the level of USD LIBOR and allegedly resulting in harm to Plaintiffs based on their purchases of various types of financial instruments indexed to it.  Although the BBA publishes LIBOR for several currencies, the Amended Complaints assert claims based solely on USD LIBOR.

All of the actions allege that Defendants' submission of false reports was an antitrust violation, specifically of section 1 of the Sherman Act and, in the *Schwab* cases, its California analogue, the Cartwright Act.  The fact allegations relevant to the antitrust claims in the various Amended Complaints are similar, and in large part nearly identical, in all respects material to this motion.  Defendants respectfully submit that the allegations are insufficient to state any antitrust claim for multiple independent reasons.

*First,* the Amended Complaints do not adequately plead *joint* action by competitors to restrain competition in some market.  The Amended Complaints are devoid of any direct factual allegations of an actual agreement among Defendants to suppress USD LIBOR throughout the Class Period.  Nor do the Amended Complaints allege any facts from which such an agreement

could be inferred.  Plaintiffs allege only that USD LIBOR for some period was lower than their experts believe it should have been, from which they infer that Defendants' submissions were artificially low.  Even if true, such allegations do not support an inference of collective action by all Defendants to suppress USD LIBOR over the course of several years.  Plaintiffs themselves cite as the primary motive for the alleged false reports a desire by Defendants to hide their supposed financial weakness from each other and the public, which would naturally call for circumspection by such banks, not discussion and agreement among them.  Plaintiffs' own allegations thus suggest *independent*, rather than collective, action and fail to meet the *Twombly* standard for plausibly alleging an antitrust conspiracy.

*Second*, even if there were sufficient allegations of concerted action to satisfy the *Twombly* test, Plaintiffs do not allege any conduct that would constitute a "restraint of trade" in violation of section 1 of the Sherman Act.  Plaintiffs' claims are aimed at alleged false reporting in connection with a BBA survey.  Such false reporting in and of itself is not alleged to be, and plainly is not, a competitive act, and does not restrain trade in any market.  There are no buyers or sellers, no market, no profit, and no competition of any kind associated with the mere reporting of rates or setting of USD LIBOR.  Defendants do compete for the provision of loans and other financial products, some of which are indexed to USD LIBOR, but Plaintiffs do not allege any reduction in competition in connection with any loans or other financial products. And contrary to Plaintiffs' suggestions, USD LIBOR is not a "price" of anything; it is an index, a composite derived from the BBA's survey of the panel banks.  Market participants are free to make use of or disregard USD LIBOR as they see fit when negotiating rates for new transactions.

Notably, Plaintiffs do not allege that publication of USD LIBOR based on reports from panel banks is anticompetitive. Nor do Plaintiffs claim that Defendants' submission of expected borrowing rates, without which there would be no USD LIBOR, is anticompetitive. Their only complaint is that the reported rates were allegedly inaccurate, causing USD LIBOR to be lower than it otherwise would have been. Whether that is true or not, it has nothing to do with competition, among Defendants or anyone else.

*Third*, Plaintiffs lack antitrust standing to bring their claims. For the same reasons they fail to allege any restraint on competition, Plaintiffs fail to allege the required "antitrust injury" needed to establish standing. Plaintiffs also lack standing because their alleged injuries are, at best, highly speculative and indirect. As an initial matter, there is no objectively verifiable "correct" USD LIBOR, because the panel banks' USD LIBOR submissions do not reflect actual borrowing rates from completed transactions, but rather hypothetical rates at which the panel banks believe they can borrow on a given day. Moreover, even if "but-for" USD LIBOR rates could be determined, those rates would be insufficient to determine the economic terms on which past transactions referencing USD LIBOR would have been consummated. And even if "but-for" terms could be calculated, numerous purchasers of USD LIBOR-based instruments likely would have benefited from allegedly understated USD LIBOR, and some – including one of the named Over-the-Counter ("OTC") Plaintiffs according to its own admission – may have been indifferent to USD LIBOR movements, depending on the types of instruments they purchased and their net exposures to USD LIBOR. These and various other sources of uncertainty surrounding Plaintiffs' alleged injuries defeat antitrust standing as a matter of law.

*Fourth*, to the extent Plaintiffs claim overcharges or underpayments incorporated into instruments not acquired from or sold to Defendants, their claims are barred by the *Illinois Brick*

doctrine.  Aside from the OTC Plaintiffs and certain of the Schwab Plaintiffs, no other Plaintiffs

allege that they transacted in USD LIBOR-based products directly with Defendants.[5]

**Statement of Facts**

**A.     Parties**

**1.     Over-the-Counter ("OTC") Plaintiffs**

The OTC Plaintiffs allege that they purchased from Defendants during the Class Period

various financial instruments that paid interest indexed to USD LIBOR.  (OTC Compl. ¶ 34.)

The two named OTC Plaintiffs allege that they purchased USD LIBOR-based interest rate

swaps.  (*Id.* ¶¶ 12-13, 32(f).)  At least one of the named OTC Plaintiffs purchased interest rate

swaps as a hedge against other floating rate liabilities incurred in the municipal bond market,

thereby creating a synthetic fixed rate liability that was designed to be floating rate neutral.  (*See*

*infra* § III.B.3.)  In addition, neither OTC Plaintiff alleges that it would have been better off with

higher USD LIBOR rates, given that it would have had to pay more to obtain such higher rates.

**2.     "Exchange-Based" Plaintiffs**

The Exchange-Based Plaintiffs allege that they traded Eurodollar[6] futures and options

contracts on public exchanges during the Class Period and, therefore, did not directly purchase

from or sell directly to any Defendant.  (Exch. Compl. ¶ 221).  The Exchange-Based Plaintiffs do

not allege what side of these transactions they were on, *i.e.*, short, long or, possibly, both.  They

---

[5] Each of the Defendants submitting this memorandum maintains that none of the Amended Complaints in any of the actions pleads sufficient facts to state any claim against it.  While some Defendants are submitting individual briefs to demonstrate this point with respect to it, all Defendants assert this argument for the reasons stated in the three briefs submitted.  In an effort to reduce the amount of briefs before the Court, certain Defendants have refrained from filing individual briefs but reserve the right to file a separate reply to the extent they have unique responses to Plaintiffs' opposition briefs.

[6] Eurodollars are "U.S. dollars deposited in commercial banks outside the United States."  (Exch. Compl. ¶ 200.)

allege only that they "traded on-exchange based products tied to LIBOR." (Exch. Compl. ¶¶ 20-26.)

### 3. "Gelboim" Plaintiffs

The Gelboim Plaintiffs allege that they owned debt securities during the Class Period that paid interest tied to USD LIBOR. (Gelboim Compl. ¶ 1.) The Gelboim Plaintiffs do not allege that they purchased from or sold any debt securities to any Defendant, or that they received any interest rate payments from any Defendant. The named plaintiffs allege that they owned debt securities issued by General Electric Capital Corporation and the State of Israel, neither of which is a Defendant in this action. (*Id.* ¶¶ 15-16.)

### 4. "Schwab" Plaintiffs

The various Schwab Plaintiffs allege that they purchased fixed and floating rate notes tied to USD LIBOR from Defendants, their subsidiaries and affiliates, and from unrelated third parties during the Relevant Period. (*E.g.*, Charles Schwab Compl. ¶¶ 12, 192, 194-200).[7] The Schwab Plaintiffs do not allege what they paid for these notes or whether the purchase price was affected by the alleged suppression of USD LIBOR. The Schwab Plaintiffs do not allege that they received interest payments tied to USD LIBOR during the alleged relevant period.

### 5. Defendants

Defendants are various U.S. and foreign financial institutions. Among the Defendants are the sixteen banks designated by the BBA to contribute to the determination of USD LIBOR during the Class Period by reporting the rates at which they believed they could borrow U.S. Dollars from other banks in London.

---

[7] The Schwab cases, which are not class actions, refer to the "Relevant Period" rather than the "Class Period," but the time period at issue is the same across all of the Amended Complaints – *i.e.*, August 2007 through May 2010. (*E.g.*, Charles Schwab Compl. ¶ 1.) For simplicity, the term "Class Period" is used throughout.

### B.      LIBOR Overview[8]

USD LIBOR is calculated each day based on individual submissions from designated panel banks.  As directed by the BBA, each panel bank reports to an independent administrator the rate at which it believes it could borrow unsecured funds, in "reasonable market size," denominated in a particular currency, and for a particular maturity, from other banks in the London interbank market.  The banks are thus instructed to answer a hypothetical question regarding expected borrowing rates, not necessarily the rates they have actually paid in the past. The administrator ranks the submissions from highest to lowest, discards the top and bottom quartile (*i.e.*, the four highest and lowest submissions from a panel of sixteen), averages the remaining submissions, and publishes the result as the daily USD LIBOR.  The banks' daily USD LIBOR submissions are non-public before their communication to the administrator, but become public thereafter.

Different bank panels are designated to report borrowing rates for different currencies, and the BBA publishes separate LIBOR rates for each.  Plaintiffs' claims are based on USD LIBOR.[9]  The Amended Complaints contain various references to other interest rate indexes, principally Japanese Yen LIBOR ("Yen LIBOR"), as well as the Euroyen Tokyo InterBank Offered Rate ("TIBOR"), which is determined by submissions to the Japanese Bankers Association.  Although Plaintiffs mention these alternate rates in portions of their Amended

---

[8] *See generally* http://www.bbalibor.com/bbalibor-explained (last visited June 28, 2012).

[9] Three of the four plaintiff groups expressly limit their claims to USD LIBOR.  (*See* Exch. Compl. ¶ 5 & n.3 ("This case arises from the manipulation of LIBOR for the U.S. dollar ('USD-LIBOR' or simply 'LIBOR'). . . .  "[F]or convenience, Plaintiffs use the term 'LIBOR' to reference USD-LIBOR."); Schwab Compls. ¶ 5 & n.2 (same); Gelboim Compl. ¶ 1 (describing the action as brought against owners of instruments with interest "payable at a rate expressly linked to the U.S. Dollar Libor rate ('US$ LIBOR' or simply 'LIBOR')").)  Over-the-Counter Plaintiffs implicitly limit their claims to USD LIBOR by characterizing their complaint as an action against "the banks that comprised the U.S. dollar LIBOR panel," (OTC Compl. ¶ 5), and by confining their purported statistical evidence of LIBOR suppression to studies of USD LIBOR (*id.* ¶¶ 55-127).

Complaints, they do not allege that they are determined by the same processes or the same bank panels involved with USD LIBOR.

LIBOR is used as a reference index for various types of financial instruments, including floating rate notes, interest rate and other "swap" agreements, and other financial derivative products.  In its simplest application, LIBOR may serve as a reference rate for a floating-rate note that pays the lender an interest rate calculated as a premium over LIBOR (*i.e.*, LIBOR + X%).  LIBOR is also referenced in more complex formulas underlying financial instruments, with payouts potentially determined by the extent to which LIBOR has increased or decreased over a particular period, independent of its absolute level at any particular time.

### C.     Antitrust Allegations

Plaintiffs allege, in conclusory terms barren of any facts, a coordinated effort by sixteen Defendant banks during the Class Period to understate the borrowing rates they reported to the BBA, in a purported attempt to lower USD LIBOR.  Plaintiffs do not, however, plead any direct factual evidence of such concerted action.  They do not, for example, purport to identify any communication or meeting among Defendants or other direct evidence of an alleged agreement or conspiracy to suppress USD LIBOR over the course of the Class Period.  Instead, Plaintiffs make only circumstantial allegations that are insufficient to establish the required plausible inference of conspiracy or agreement among Defendants.

### 1.     Alleged Motives to Understate LIBOR

The Amended Complaints allege that Defendants had two motives to suppress USD LIBOR:  (1) "to portray themselves as economically healthier than they actually were"; and (2)

"to pay lower interest rates on USD LIBOR-based financial instruments that Defendants sold to investors."  (OTC Compl. ¶ 5.)[10]

In support of the first alleged motive, Plaintiffs allege that Defendants were individually motivated to understate their USD LIBOR submissions, particularly during a time of economic turmoil, "because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks."  (*Id.* ¶ 52.)  The Amended Complaints thus characterize this first motive as a self-interested incentive on the part of each Defendant not to appear financially weaker than the other Defendants.

In support of their second alleged motive, Plaintiffs cite statements by four of the sixteen Defendants in the 2008-2009 timeframe that their financial situation at that time would improve if "interest rates" fell, and/or that their situation would have deteriorated if "interest rates" increased.  (*Id.* ¶ 53.)  Plaintiffs do not allege that all Defendants would have been similarly impacted by changes in interest rates in 2008-2009, or that any Defendant – including the four Defendants identified as benefiting from decreased rates in 2008-2009 – would have consistently benefited from lower interest rates throughout the Class Period.  Nor do Plaintiffs contest that LIBOR is at most one of many factors that may impact any given bank's interest costs in only a subset of its transactions, or otherwise attempt to link a bank's overall exposure to general interest rate changes to changes in LIBOR.

## 2.     Patterns in LIBOR Rates

Plaintiffs rely heavily on statistical analyses purportedly suggesting that USD LIBOR was lower than it should have been during the Class Period.  The Amended Complaints focus in

---

[10] Citations to the OTC complaint are used for illustrative purposes.  Given the near uniformity of the factual allegations across the various Amended Complaints, citations to the remaining Complaints are generally omitted except to the extent needed to identify materially distinguishing features.

particular on various supposed proxies for USD LIBOR, which Plaintiffs assert have historically been correlated with USD LIBOR but allegedly diverged from USD LIBOR during the Class Period.  (OTC Compl. ¶¶ 57-104, 114-16.)  Plaintiffs also allege that USD LIBOR submissions were inconsistent with the financial circumstances of certain Defendants (*id.* ¶¶ 128-38); were "bunched" together (*id.* ¶¶ 105-13, 117-20); and increased in April 2008 following a *Wall Street Journal* article raising questions about LIBOR and an announcement by the BBA that it would initiate an inquiry into the LIBOR-setting process (*id.* ¶¶ 121-27).

Even accepting as true the studies' opinions that USD LIBOR was lower than it should have been during the Class Period, Plaintiffs do not allege how this conclusion supports any theory of concerted action, particularly given Plaintiffs' allegation that each Defendant individually would have been incentivized to under-report its expected borrowing rates.  Indeed, as discussed below, the cited studies either fail to support any inference of collusion or directly undermine any such inference.  (*See infra* § I.C.)

### 3.    Government Investigations and Other Proceedings

Plaintiffs seek to bolster their allegations through references to ongoing investigations and other proceedings involving U.S. and foreign governmental authorities.  As publicly reported in various media and other sources, regulators have been reviewing the rate-setting submissions processes for LIBOR and other indexes.  (*See, e.g.*, OTC Compl. ¶¶ 142-52.)

A reported focus of these investigations has been whether there were improper communications between certain of the banks' derivatives traders and individuals responsible for LIBOR and other rate-setting submissions, allegedly for purposes of obtaining trading advantages on particular days, either by attempting to decrease or *increase* the published index.[11]

---

[11] On June 27, 2012, Defendant Barclays Bank plc ("Barclays") announced a settlement with various U.S. and U.K. regulators in connection with its LIBOR and EURIBOR submissions.  The settlement includes statements in which

(*See, e.g.*, *id.* ¶ 164 (citing February 2012 *Wall Street Journal* article reporting that LIBOR probes "are focusing on a small number of traders suspected of trying to influence other bank employees to manipulate the rates"); *id.* ¶ 175 (quoting from Canadian affidavit alleging that "[interest rate derivatives] traders at the Participant Banks communicated with each other their desire to see a *higher* or lower Yen LIBOR to aid their trading position(s)" (emphasis added)).) Plaintiffs do not seek to connect this theory to their own theory of wrongdoing alleged in this case – *i.e.*, a purported agreement among all Defendants to consistently suppress USD LIBOR throughout the entire Class Period.

## ARGUMENT

## I.    PLAINTIFFS DO NOT ADEQUATELY PLEAD A CONTRACT, COMBINATION OR CONSPIRACY

Section 1 of the Sherman Act, 15 U.S.C. § 1, proscribes joint action in restraint of trade. It does not reach single firm conduct. An essential element of Plaintiffs' section 1 claim is that Defendants acted together, that is, that they joined in a "contract, combination, or conspiracy," all of which requires some form of agreement to engage in the competitive restraint. *Id.* The Amended Complaints here must be dismissed because they fail to make allegations sufficient to raise a plausible inference of such concerted action.

The Supreme Court addressed precisely this issue in the leading precedent on pleading. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Just as here, plaintiffs in *Twombly* sought to sustain a price-fixing conspiracy charge based solely on circumstantial allegations. The Court held that to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to

---

Barclays acknowledges that certain of its LIBOR and EURIBOR submitters made LIBOR and EURIBOR submissions based on requests from certain swaps traders seeking to obtain trading advantages and, for a certain period, based on an internal desire of certain managers to lower Barclays' LIBOR submissions to avoid inaccurate, negative attention regarding Barclays' financial health. Nothing in the Barclays settlement alleges any agreement among USD LIBOR panel banks to maintain USD LIBOR at a suppressed level over the course of the Class Period as alleged in the Amended Complaints.

state a claim to relief that is plausible on its face." *Id.* at 570.  This requirement serves a critical gate-keeping role, particularly in complex antitrust cases where the threat of vast and costly discovery can provide plaintiffs with significant leverage, regardless of the ultimate merits of their claims.  *See id.* at 557-59 (explaining that the "obvious" "potential expense" of discovery can permit plaintiffs to extract "in terrorem" settlements from defendants through far-reaching but groundless claims).

Because section 1 of the Sherman Act does not prohibit all restraints of trade, only *agreements* to restrain trade, a complaint alleging a section 1 violation must contain "enough factual matter (taken as true) to suggest that an *agreement* was made." *Id.* at 553, 556 (emphasis added).  "[I]t is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement," *Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 50 (2d Cir. 2007), and "neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy," *Twombly*, 550 U.S. at 561 n.7.  The Court also expressly held in *Twombly* that allegations consisting of mere "labels and conclusions" and a "formulaic recitation of the elements of a cause of action" are wholly inadequate to satisfy the plausibility pleading standard for antitrust conspiracy claims.  *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [under *Twombly*].").

Moreover, the alleged facts must be specific to *each* defendant; the use of the "'global term[s] defendants [and cartel] to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient' under *Twombly*." *BanxCorp* v. *Apax Partners, L.P.*, No. 10-cv-4769 (SDW), 2011 U.S. Dist. LEXIS 32364, at *12 (D.N.J. Mar. 28, 2011) (alterations in original) (citation omitted); *accord In re Elevator Antitrust*

*Litig.*, 502 F.3d at 50-51 (general allegations "without any specification of any particular activities by any particular defendant . . . . do[] not supply facts adequate to show illegality" (internal quotation marks and citation omitted)).

Where, as here, a complaint seeks to raise an inference of an agreement indirectly through allegations of parallel conduct, rather than through specifically alleged communications or other direct indicators of an "actual agreement," *Twombly*, 550 U.S. at 564, the alleged parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct *that could just as well be independent action*." *Id.* at 557 (emphasis added). Parallel conduct resulting from "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" is similarly insufficient to plead a conspiracy. *Id.* at 556 n.4.

## A.   Plaintiffs Allege No Direct Evidence of Conspiracy

The Amended Complaints contain no direct allegations of any "actual agreement" to engage in the conduct alleged. They do not, for example, purport to identify when, where, how, or by whom any alleged agreement to suppress USD LIBOR throughout the Class Period was supposedly made. Instead, Plaintiffs seek to infer such a conspiracy from alleged motives to suppress USD LIBOR, statistical patterns in USD LIBOR, and ongoing government investigations and other proceedings. (*See supra* Statement of Facts § C.) Plaintiffs rely on these indirect allegations to support two separate layers of inference on which their case relies: first, that all Defendants allegedly understated the rates at which they believed they could borrow from each other in their submissions to the BBA throughout the Class Period; and second, that Defendants allegedly *agreed* with one another to do so. Because Plaintiffs offer no direct evidence even as to their first claim, they face an inferential hurdle not typically present in a

parallel conduct case – *i.e.*, whether there was any relevant parallel conduct in the first place, let alone whether that conduct was coordinated.[12]

Even accepting as true Plaintiffs' allegation that some Defendants understated their USD LIBOR submissions, the circumstantial evidence alleged in the Amended Complaints does not create any inference of *concerted* action to engage in the conduct alleged sufficient to withstand a motion to dismiss.

**B.      Plaintiffs' Motive Allegations Directly Undermine any Inference of Conspiracy**

Plaintiffs allege that the BBA's LIBOR-setting process provided Defendants with the opportunity to suppress USD LIBOR and that they were incentivized to do so:  (1) "to portray themselves as economically healthier than they actually were" in the wake of the financial crisis; and (2) "to pay lower interest rates on USD LIBOR-based financial instruments that Defendants sold to investors."  (OTC Compl. ¶ 5; *supra* Statement of Facts § C.1.)  Neither alleged motive supports an inference of concerted action.

As an initial matter, an alleged motive to enter an antitrust conspiracy is never sufficient to plead that the alleged conspiracy occurred.  *See, e.g.*, *Williams v. Citigroup, Inc.*, No. 08 Civ. 9208, 2009 U.S. Dist. LEXIS 105864, at *10 (S.D.N.Y. Nov. 2, 2009), *aff'd in part and vacated in part on other grounds*, 433 F. App'x 36 (2d Cir. 2011); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1433a, at 259 (3d ed. 2010).  Every manufacturer, for example,

---

[12] The absence of any alleged direct evidence of conspiracy dramatically distinguishes this case from the Second Circuit's recent decision in *Anderson News, LLC v. Am. Media, Inc.*, which reversed the dismissal of an antitrust complaint based on sufficiently pled "meetings and communications," explaining that the complaint in that case "allege[d] not just that all of the defendants ceased, in virtual lockstep, to deal with [plaintiff], but allege[d] that on various dates within the preceding two-week period defendants and [their co-conspirator] – through their executives, 10 of whose names or positions are specified – had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement to attempt to eliminate [plaintiff and a third party] as wholesalers in the single-copy magazine market and to divide that market."  *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 187 (2d Cir. 2012).

would like higher prices for its widgets, but that hardly provides a basis to infer a conspiracy to raise prices.

Moreover, by pleading a desire to portray economic health during the financial crisis, Plaintiffs expressly concede the type of "independent responses to common stimuli" and "mere interdependence unaided by an advance understanding among the parties" that defeat a claim of conspiracy.  *Twombly*, 550 U.S. at 556 n.4.  The basic premise of Plaintiffs' theory is that each bank would have *individually* responded to the economic crisis by understating its own borrowing rates "to ensure it was not the 'odd man out.'"  (OTC Compl. ¶ 52.)  As Plaintiffs allege based on market commentary from 2008:

> "[T]he most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment.  If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, *let alone one higher than its competitors*.  Because all LIBOR postings are publicly disclosed, *any bank posting a high LIBOR level runs the risk of being perceived as needing funding*."

(*Id.*) (emphasis added) (quoting Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic: Is LIBOR Broken?," April 10, 2008).  If, as Plaintiffs allege, each bank was individually incentivized to keep its USD LIBOR submissions low and close to the daily publicized submissions of other panel banks, any statistical patterns suggesting artificially low or "bunched" USD LIBOR submissions would be consistent with the very unilateral, self-interested motive that Plaintiffs allege.[13]

Thus, far from pleading actions "taken contrary to [defendants'] self-interest unless pursued as part of a collective plan," "market phenomena that cannot be explained rationally

---

[13] This is very different from a one-time bidding situation where each bidder must take something of a shot in the dark.  Here, there are daily public reports on what each bank has submitted.  Thus, a bank wishing to keep its own submissions roughly in line with other banks needs no conspiracy.  Rather, it can simply and unilaterally observe the other banks' recent submissions and adjust its submissions accordingly.

except as the product of concerted action," or other so-called "plus factors" potentially indicating concerted action,[14] Plaintiffs themselves allege an "obvious alternative explanation" for defendants' conduct. *Twombly*, 550 U.S. at 567.  Indeed, an alleged conspiracy runs directly counter to Plaintiffs' motive theory.  If, as Plaintiffs allege, a bank perceived that it was financially weak and wanted to keep that fact hidden by understating its borrowing rates to avoid being the "odd man out" (OTC Compl. ¶ 52), it would not have revealed the very fact it wished to conceal by soliciting the participation of other banks in a conspiracy.[15]

For all these reasons, Plaintiffs fail the *Twombly* test.  *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (rejecting inference of conspiracy based on conduct that was "just as much in line" with conspiracy as "with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" (quoting *Twombly*, 550 U.S. at 554)); *LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 153-54 (E.D.N.Y. 2010) (holding that plaintiffs had not "allege[d] the type of anomalous actions giving rise to a strong inference of conspiracy because there could be no other 'discernible reason' for such behavior" but rather that "plaintiffs themselves have alleged that defendants" had a rational reason to independently engage in parallel conduct); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show

---

[14] *See, e.g.*, *Stephens v. CMG Health*, No. 96 Civ. 7798 (KMW), 1997 U.S. Dist. LEXIS 23797, at *18 n.13 (S.D.N.Y. July 22, 1997) (listing action against self-interest and other commonly cited "plus factors" potentially supporting an inference of conspiracy).

[15] In addition, while the Amended Complaints allege that "at least some" Defendants had financial difficulties during the relevant period (*see, e.g.*, OTC Compl. ¶ 128), they do not – and cannot – allege that all Defendants were having financial problems.  Some Defendants, for example, had a AAA credit rating during the relevant time period. Plaintiffs offer no plausible theory why banks not alleged to have been facing risk or liquidity problems would have had an incentive to participate in a conspiracy designed to help competitors mask their alleged financial difficulties. *See, e.g.*, *Ambook Enters. v. Time, Inc.*, 612 F.2d 604, 616 (2d Cir. 1979) ("[O]ne factor to consider in determining if agreement should be inferred from parallel conduct was whether agreement benefited the alleged conspirators . . . .").

that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior.").

Plaintiffs' alternative theory – that Defendants stood to benefit financially from low USD LIBOR – is equally unavailing.  Plaintiffs do not begin to plead an adequate factual basis for the proposition that all Defendants, over the course of the entire Class Period, uniformly stood to benefit from lower USD LIBOR levels.  Given the complexity of USD LIBOR-based instruments and the various, ever-changing positions that Defendants maintain with respect to such instruments, it is simply implausible that their USD LIBOR exposure would have converged over a multi-year period (coinciding with the most severe market disturbances in recent history) and resulted in a stable, net position always favoring low USD LIBOR.  After all, Defendants are banks that lend large amounts of money, and lower USD LIBOR means they receive lower payments from their borrowers.

Plaintiffs' only attempt to plead otherwise consists of inapposite references to public disclosures of four of the Defendants, in which they allegedly stated that they stood to benefit financially from lower "interest rates" in 2008 and 2009.  (OTC Compl. ¶ 53.)[16]  Plaintiffs fail to cite similar information for the other twelve Defendants, or any such information for any Defendant relating to other portions of the Class Period.  Further, Plaintiffs improperly attempt to conflate "interest rates" with USD LIBOR.  As confirmed by one of Plaintiffs' own sources, a bank's USD LIBOR exposure does not necessarily track its exposure to "interest rates" in

---

[16] Tellingly, Plaintiffs' allegations regarding Defendants' supposed exposure to "interest rates" are not supported by citation to the public disclosures on which the Amended Complaint relies.  The risk management section of JPMorgan's 2009 Annual Report, which appears to be a source of Plaintiffs' allegations, discusses unanticipated "immediate change[s] in rates" (and not gradual or sustained rate changes) and thus by its own terms "present[s] a limited view of risk."  *See* Exhibit A to the Declaration of Robert F. Wise, Jr. dated June 29, 2012 ("Wise Decl.") at 123.  Indeed, the same section of JPMorgan's 2008 Annual Report reflected that a 100bp *increase* in interest rates would result in a gain of $672 million.  *See* Exhibit B to Wise Decl. at 104.  In short, Plaintiffs' allegations as to Defendants' economic motive for lower interest rates are conclusory and insufficient to sustain the Amended Complaints.

general.[17]  Plaintiffs thus fail to allege plausibly that Defendants shared a common incentive to

reduce USD LIBOR throughout the entire Class Period, much less that they engaged in any

concerted action to do so.

      **C.**     **Plaintiffs' Purported Statistical Evidence Either Fails To Support or Directly Undermines an Inference of Conspiracy**

Plaintiffs' purported statistical evidence would be insufficient to plead a conspiracy under

any circumstances, and particularly given Plaintiffs' theory of unilateral motive discussed above.

Plaintiffs rely almost exclusively on statistical studies that compare USD LIBOR to other alleged

proxies for bank borrowing rates and purport to conclude, at most, that USD LIBOR diverged

from those alleged proxies for portions of the time period in question.  Most of the studies

Plaintiffs describe do not even purport to address the question of potential coordination, let alone

conclude that any observed discrepancies between USD LIBOR and other measures are

attributable to coordinated conduct.  (*See supra* pp. 9-10.)  Thus, even if for purposes of the

instant motion the alleged studies are assumed to support an inference that USD LIBOR was

lower than it should have been during the relevant time period, that would be sufficient at most

to allege parallel conduct – *i.e.*, low USD LIBOR submissions by one or more Defendants – but

not the additional and essential element of an agreement to do so.  The absence of that element

requires dismissal.  *See, e.g.*, *Twombly*, 550 U.S. at 561 n.7 ("[N]either parallel conduct nor

conscious parallelism, taken alone, raise the necessary implication of conspiracy.")[18]

---

[17] *See* http://www.thesunshinereport.net/marksunshine/?p=36 (cited at OTC Compl. ¶ 50 n.20.)  According to this source, "*US dollar LIBOR will not be the rate that US banks borrow and lend to one another in the United States*. LIBOR will continue to be determined by mostly foreign banks in London.  If there is a correlation between LIBOR and the cost of funds of United States banks operating in the United States it will be coincidental."

[18] Moreover, by relying on purported discrepancies between USD LIBOR and other rates, such as the Eurodollar deposit rate, Plaintiffs fail to account for the unprecedented dislocations in financial markets – and particularly, the interbank lending market – during the period at issue.  Plaintiffs' allegations that the spread between the Eurodollar deposit rate and USD LIBOR remained close to zero after the dot-com bubble and the September 11 attacks, but

Other than their own conclusory allegations that the alleged LIBOR patterns are themselves evidence of collusion, Plaintiffs cite only two studies in which they claim the authors opined that allegedly low USD LIBOR was the result of concerted, as opposed to independent, actions by Defendants.  Neither advances Plaintiffs' case; indeed, one contradicts it.  The first is a study conducted by Plaintiffs' own unidentified retained expert of alleged discrepancies between USD LIBOR and Eurodollar deposit rates.  In a one-sentence, passing reference, Plaintiffs claim that these alleged discrepancies are evidence of collusion by Defendants.  (OTC Compl. ¶ 87.)  But Plaintiffs do not attempt to explain the basis for this purported conclusion, which appears to rest on nothing more than an inference that USD LIBOR was lower than it should have been, not any demonstrable indication that allegedly low USD LIBOR resulted from coordinated conduct.

The only other study cited in the Amended Complaints that purports to address alleged collusion is a study by Rosa Abrantes-Metz and Albert Metz (the "Metz Study"), which directly undermines Plaintiffs' theory.  (Exhibit C to Wise Decl. ("Ex. C"); OTC Compl. ¶¶ 117-20.)  The Metz Study analyzes the "coefficient of variation" among the banks' USD LIBOR submissions over time, which reflects the degree to which the submissions are similar or different from one another on a given day (with lower coefficients reflecting more similar submissions).  The authors observe that the coefficient of variation remained close to zero from August 2006 through August 2007, *i.e.*, in the year *before* the start of the Class Period in this case, which the authors allege supports a hypothesis of coordinated USD LIBOR submissions during that time period.  (Ex. C at 5-8.)  Immediately after August 2007, however, the authors' data indicate a sudden *increase* and overall upward trend in the coefficient of variation.  (*Id.* at

diverged slightly in August 2007 and then diverged to a much greater extent following Lehman Brothers' bankruptcy (OTC Compl. ¶¶ 75-83), simply underscore the unprecedented impact of the recent crisis on banks.

5.)  That is, the authors find that USD LIBOR submissions became *more*, not less, varied among banks at the outset of the Class Period.  Thus, to the extent coefficients of variation are relevant evidence of the presence or absence of coordinated USD LIBOR submissions – which Plaintiffs allege they are – the Metz Study directly undermines any claim of coordination for the time period at issue in this lawsuit.

### D.      Plaintiffs' Allegations Regarding Government Investigations Fail To Support an Inference of Conspiracy and Should Be Struck or Disregarded

Having pleaded and expressly relied upon a theory of unilateral motive  at odds with the required agreement element of a Sherman Act section 1 claim, and lacking any statistical or other evidence of concerted action, Plaintiffs rely on allegations that various regulators and governmental units are conducting ongoing investigations related to LIBOR and other indexes.

It is well-established that pending investigations, governmental inquiries, or other forms of unadjudicated allegations do not suffice to plead an antitrust conspiracy.  *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) (holding a request for investigation by the House of Representatives "irrelevant at the pleading stage," because "[a]n allegation that someone has made a similar allegation does not, without more, add anything to the complaint's allegations of fact"), *rev'd on other grounds*, 550 U.S. 544 (2007); *LaFlamme*, 702 F. Supp. 2d at 154 (allegation of an investigation "carries no weight in pleading an antitrust conspiracy claim" (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)).

Indeed, because allegations of pending government investigations or other litigation are irrelevant as a matter of law, as well as unfairly prejudicial, they are properly stricken from a complaint under Federal Rule of Civil Procedure 12(f).  "[C]ourts hold that references in pleadings to administrative investigations that do not result in adjudication of underlying issues

are immaterial and can properly be stricken under Rule 12(f)." *Gotlin v. Lederman*, 367 F. Supp. 2d 349, 363-64 (E.D.N.Y. 2005) (citing cases). Thus, for example, this Court has struck as immaterial to a securities fraud suit references to pending criminal fraud investigations by the FBI and DOJ, an investigation and civil complaint by the SEC, as well as pending and settled legal actions by the Attorneys General of California, Illinois, Florida, and New Jersey, and various pending civil cases. *See Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 U.S. Dist. LEXIS 102134, at *14-15 (S.D.N.Y. Sept. 28, 2010) (striking the Second Amended Complaint ¶¶ 5, 6, 19, 20, 49, 113, 214, 215, 216(a)-(i), 217, 219-21, *id.*, ECF No. 32). And more recently, this Court struck from a civil antitrust complaint references to a CFTC order finding that defendants there engaged in a manipulative trading scheme and imposing sanctions, explaining that "[a]lthough the CFTC Order included certain factual findings, it nevertheless was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 591-94 (S.D.N.Y. 2011).

Further undermining Plaintiffs' attempted reliance on governmental investigations and other actions, Plaintiffs' allegations pertain to investigations reportedly focused not on an alleged agreement among all Defendants to lower USD LIBOR over the course of several years, as alleged here, but rather purported attempts to gain daily trading advantages by moving LIBOR or other index rates either up or down on particular days. (*See supra* pp. 10-12.) Plaintiffs do not attempt to reconcile these theories. Instead, Plaintiffs rely on the pure speculation that allegations unrelated to their theory of liability suggest that Defendants "might have" engaged in the misconduct they actually allege. (Exch. Compl. ¶ 136.) But that is precisely the type of

speculative inference that *Twombly's* pleading standards are designed to prevent.  *See Twombly*, 550 U.S. at 570 (claims must be plausible, not merely conceivable).

## II.     PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE

Plaintiffs do not allege an essential element of an antitrust conspiracy:  that defendants *restrained competition* in the marketplace.  The only allegedly wrongful conduct here concerns the accuracy of submissions by the USD LIBOR panel banks.  But USD LIBOR is just an index and is not itself a marketplace transaction.  Banks are expected to compete in the marketplace of making loans, etc., but Plaintiffs allege no restraint on each Defendant bank's freedom to compete on whatever terms it chose.

Section 1 of the Sherman Act only prohibits conspiracies "in restraint of trade or commerce."  The "end sought [by the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions."  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940).  To be an antitrust violation, the alleged agreement must actually restrain trade. *See, e.g.*, *Dedication & Everlasting Love to Animals v. Humane Soc'y of the United States, Inc.*, 50 F.3d 710, 712-13 (9th Cir. 1995).

Plaintiffs do not adequately allege any competition-reducing aspects of USD LIBOR – not with respect to the process by which USD LIBOR is set, nor with respect to the ways in which it is used.  As a threshold matter, Defendants are not alleged to, and plainly do not, "compete" in the setting of USD LIBOR.  Parties "compete" in a "market" where their products are substitutes for one another, *i.e.*, where a price increase by one party will result in a switch of customer demand to the competitor's product.  *See Brown Shoe Co. v. United States*, 370 U.S. 294*, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.");* United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003).

Section 1 of the Sherman Act prohibits agreements among otherwise competitive sellers to suppress these competitive forces by collectively setting anticompetitive prices that would otherwise have been defeated by "competition."  If customers will not make such a switch between the parties' products, then the products are not competing with one another in a relevant "market."  *See Visa U.S.A.,* 344 F.3d at 239 (finding that alternative payment methods did not compete with general purpose credit cards in the same market because customers would not abandon their credit cards for those forms of payment in the face of significantly increased credit card fees).

Plaintiffs' USD LIBOR submissions do not compete with one another.  USD LIBOR is not itself a product that is bought, sold, or traded.  No Defendant is concerned that it will lose USD LIBOR business to another Defendant if its USD LIBOR submissions are too high or too low.  Defendants have no customers for USD LIBOR and Plaintiffs have no USD LIBOR suppliers.  Defendants earn no profits from making USD LIBOR submissions to the BBA.  Simply put, the mere submission of rates to the BBA is not an activity that involves buying, selling, or any competition at all.

The case law confirms that joint action by industry participants to create a policy or index that nonetheless leaves members free to compete in the marketplace does not restrain trade.  For example, in *Schachar v. Am. Acad. of Ophthalmology, Inc.*, an association of doctors published a joint statement that a procedure was "experimental."  870 F.2d 397, 397 (7th Cir. 1989).  Plaintiffs – doctors who performed the procedure – claimed that the statement constituted a conspiracy to discourage use of the procedure.  *Id.* at 398.  The court (Easterbrook, J.) disagreed, explaining that "[t]here can be no restraint of trade without a restraint.  That truism decides this case."  *Id.* at 397.  The association's statement did not restrain conduct in the marketplace.  It

"did not require its members to desist from performing the operation or associating with those who do." *Id*. at 398; *see also United States v. Am. Soc'y of Anesthesiologists, Inc.*, 473 F. Supp. 147, 155 (S.D.N.Y. 1979) (holding that a trade association's creation of a relative value guide for anesthesiology services did not restrain trade because the association "has never employed formal or informal sanctions to discourage individual anesthesiologists from independently determining their own fees").

Notably, Plaintiffs do not allege that the setting of USD LIBOR is inherently anticompetitive, or that LIBOR is anything other than a jointly created informational statement of the type routinely upheld by courts as permissible under the antitrust laws.  Plaintiffs' only complaint is that the information provided was allegedly false.  But Plaintiffs fail to tie that allegation to any alleged harm to competition.  Indeed, Plaintiffs' theory runs directly counter to the antitrust rule that provision of allegedly false information generally does not constitute a restraint of trade.  *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (Easterbrook, J.) (holding that the dissemination of false information disparaging a competitor's products did not constitute a restraint of trade); *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1262-63 (11th Cir. 1998) (holding similarly with respect to an electric company's false promotion of energy inefficient heat pumps intended to increase customers' use of electrical power).  The Sherman Act is "not a code of . . . ethics or methodology."  *Schachar*, 870 F.2d at 400; *see also Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989).  Rather, "[u]nless one group of suppliers diminishes another's ability to peddle its wares . . . there is not even the beginning of an antitrust case."  *Schachar*, 870 F.2d at 399. Plaintiffs here have not alleged, and the law does not support, any theory under which the setting of USD LIBOR could be a restraint of trade.

Nor is there any basis to infer that the use of USD LIBOR in the marketplace renders the alleged conduct anticompetitive.  Plaintiffs do not allege any agreement among Defendants or anyone else to require the use of USD LIBOR for any types of transactions.  Even accepting as true Plaintiffs' allegations that some Defendants understated USD LIBOR, both Defendants and any other party entering a financial transaction were entirely free not to use USD LIBOR, to use a modified version of USD LIBOR, or to negotiate any other interest rates on financial products.  Unlike a true price-fixing conspiracy, which would bar participants from cheating on the conspiracy by offering better terms in the marketplace, here there is a complete absence of any alleged "enforcement mechanisms [which] are the 'restraints' of trade."  *Schachar*, 870 F.2d at 399.  USD LIBOR may affect payments on existing financial instruments if the parties have agreed to tie their instruments to USD LIBOR.  But there is no effect on competition because such contracts and instruments have already been agreed to by the parties.  As to future transactions, buyers and sellers are free to seek out the most favorable rates that the market will bear, regardless of USD LIBOR levels.[19]

For all these reasons, Plaintiffs fail to allege any restraint of trade in violation of section 1 of the Sherman Act.

## III.  PLAINTIFFS LACK ANTITRUST STANDING

Plaintiffs' antitrust claims must also be dismissed because they lack the requisite "antitrust standing" to pursue them.  Standing may be denied if plaintiffs are not deemed the proper parties to bring their antitrust claims.  *See generally Associated Gen. Contractors of Cal.,*

---

[19] This freedom in the marketplace fundamentally distinguishes cases where an index was created as part of an allegedly broader scheme to restrict actual marketplace competition.  For example, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008) involved an alleged conspiracy among railroads to impose "an across-the-board artificially high and uniform fuel surcharge." *Id.* at 30.  Plaintiffs alleged that the railroads created a rail cost index to facilitate imposition of that fuel surcharge. *Id.*  Having created the index, the railroads allegedly then applied "identical fuel surcharges" in the marketplace. *Id.*  No such allegation is made here.

*Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"); *Reading Int'l, Inc v. Oaktree Capital Mgmt., LLC*, 317 F. Supp. 2d 301, 311 (S.D.N.Y. 2003) ("Although the antitrust laws were intended as tools to prevent the concentration of market power and protect competition, they are not available to every injured plaintiff.").

The Second Circuit has set forth a "two-pronged analysis to determine whether a plaintiff has antitrust standing." *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994). First, a court must determine whether plaintiffs have alleged an "antitrust injury." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (defining antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful"); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (same). Then, if plaintiffs can establish antitrust injury, the court must determine whether any of the other so-called "*AGC* factors," which largely relate to the directness and identifiability of plaintiffs' injuries, permit the plaintiffs to be efficient enforcers of the antitrust laws. *Reading Int'l*, 317 F. Supp. 2d at 311; *Paycom*, 467 F.3d at 290-91; *AGC*, 459 U.S. at 537-44. Plaintiffs fail both prongs of this test.

**A.    Plaintiffs Have Not Pleaded any Reduction in Competition and Therefore Have Not Suffered an "Antitrust Injury"**

The antitrust laws are not intended to provide a remedy for every type of purportedly objectionable conduct; their purpose is to protect *competition*. *See Brunswick*, 429 U.S. at 488; *Brown Shoe*, 370 U.S. at 320. "[I]njury to competition . . . is the type of injury the antitrust laws are intended to prevent." *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 544 (S.D.N.Y. 2009) (dismissing claims for lack of antitrust injury because plaintiffs failed to allege how the challenged conduct caused harm to competition in the market). Consistent with this purpose, the

26

antitrust injury requirement seeks to ensure "that a plaintiff can recover only if the loss stems from a *competition-reducing* aspect or effect of the defendant's behavior." *Paycom*, 467 F.3d at 290 (quoting *Atlantic Richfield*, 495 U.S. at 344) (emphasis added).  This requirement applies equally to all antitrust plaintiffs, including those that allege *per se* violations of the antitrust laws. *Atlantic Richfield*, 495 U.S. at 341-42.  For the reasons set forth in the preceding section (*see supra* § II), the injuries alleged by Plaintiffs did not stem from any reduction in competition in the marketplace or from any restraint on trade.

### B.       Plaintiffs' Injuries Are Too Indirect and Speculative to Support Standing

Even if the Court were to determine that Plaintiffs have alleged an antitrust injury, Plaintiffs' claims would still fail because their alleged injuries are too remote from Defendants' allegedly anticompetitive acts to support standing.

Courts in the Second Circuit assess whether antitrust injury is too indirect and speculative to support standing by applying the factors the Supreme Court set forth in *AGC*.  Courts consider, for example, "the directness or indirectness of the asserted injury," "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," and "the speculativeness of the alleged injury." *Paycom*, 467 F.3d at 290-91 (citing *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988)).  These factors weigh in Defendants' favor.

### 1.       Plaintiffs' Alleged Injuries Are Indirect and Attenuated

The *AGC* court held that an assessment of the directness of any alleged injury requires an analysis of the "chain of causation" between the alleged injury and the alleged restraint in the market.  *AGC*, 459 U.S. at 540.  "[V]aguely defined links" in the chain of causation are insufficient, as a matter of law, to establish a direct injury.  *Id.*  Following this principle, courts in the Second Circuit regularly dismiss antitrust claims that depend on reconstructing the choices of

multiple independent decision-makers and the operation of independent market variables.  *See de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985) (dismissing antitrust claims where plaintiff's claims were too indirect and where other market variables could have intervened to affect pricing decisions) (citing *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980) (same)); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403 (S.D.N.Y. 2011) (denying standing because injury in the compact disc (CD) market was too attenuated from the source of the alleged misconduct in the internet music market).

The present cases must be dismissed because the values of the USD LIBOR-based financial instruments that Plaintiffs purchased, held, or traded are substantially determined by other factors that are set through competitive processes and are affected by other market forces and independent decision-makers.[20]

For example, the profitability of transactions at issue in the Exchange-Based Plaintiffs' claims depends on the future direction of USD LIBOR.  One party is expecting USD LIBOR to increase, the other party expects it to decrease, relative to its current position.  Raising the level of USD LIBOR, as Plaintiffs claim should have happened, does not answer the question of who would have profited on the transaction.  That is because the terms of the transaction likely would have been different.  Had USD LIBOR been consistently higher than it actually was (*i.e.*, absent the alleged suppression), that surely would have influenced the terms of the transaction.

---

[20]   *See, e.g.*, Exch. Compl. ¶ 11 (noting that market participants use USD LIBOR as a reference to compare with the offered rate); *id.* ¶ 15 (USD LIBOR alleged to be "the starting point for negotiating rates of return on short-term fixed-rate instruments"); *id.* ¶¶ 20-26 (conceding that Exchange-Based Plaintiffs traded on exchanges with third parties, not Defendants); Gelboim Compl. ¶¶ 15-16 (same); Charles Schwab Compl. ¶ 193 (conceding that the price of fixed-rate instruments was unrelated to USD LIBOR, which was only used as a reference for the relative *attractiveness* of the offered rate); *id.* ¶ 194 (conceding that at least some of the Schwab Entities dealt with parties other than Defendants); OTC Compl. ¶ 32(h) ("Swaptions" are not themselves indexed to USD LIBOR, but are again one level removed; they are only affected insofar as the underlying asset is indexed to USD LIBOR).

Determining the winner (and loser) of that revised transaction under those hypothetical circumstances is far removed from the question of the level of USD LIBOR itself.

       2.      **The Exchange and *Gelboim* Plaintiffs' Claims Are Indirect and More Direct Plaintiffs Have Filed Claims in this Case**

The Exchange-Based and *Gelboim* Plaintiffs did not transact directly with any Defendant.[21]  (*See* Exch. Compl. ¶¶ 1, 20-26, 214, 221; Gelboim Compl. ¶¶ 1, 15-16.)  These Plaintiffs lack standing because there is an identifiable class of plaintiffs with more-direct claims – the OTC Plaintiffs.[22]  As OTC Plaintiffs' counsel stated in their motion to be appointed interim class counsel, the OTC Plaintiffs have more direct claims because the other classes' purchases of USD LIBOR-based financial instruments cannot be directly traced to any individual Defendant. (*See* Response of Plaintiff Mayor and City Council of Baltimore to Motion to Appoint Grant & Eisenhofer, Kirby McInerny, Robbins Geller Rudman & Dowd, Steward Halebian Jacobson as Interim Class Counsel, 11-cv-05450, Docket No. 22 at 6-7 (Sept. 8, 2011) (noting that courts have rejected claims brought by plaintiffs who did not deal directly with defendants where a more direct purchaser has brought a claim).)

       3.      **Plaintiffs' Injuries Are Highly Speculative**

Like the claims rejected in *AGC*, Plaintiffs' claims "rest[] at bottom on some abstract conception or speculative measure of harm."  459 U.S. at 543 (internal citations and quotations omitted); *see also Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 585 (3d Cir. 1979) (holding that plaintiff had no antitrust standing where determination of any injury suffered would "require complex and ultimately unrewarding economic analyses at trial,

---

[21] Likewise, the Schwab Plaintiffs base at least some of their claims on transactions where Defendants were not present in the chain of commerce.  (*See* Charles Schwab Compl. ¶¶ 12, 17-19,191-200.)  The Schwab Plaintiffs lack standing to bring those claims for the same reasons set forth in this section.

[22] As discussed below, the injuries suffered by the OTC Plaintiffs are too speculative to confer standing and, in any event, should be dismissed for all the other reasons explained herein.

particularly where, as here, such analyses invariably are a prerequisite to establishing that the plaintiff has suffered compensable injury altogether").[23]  Any attempt to analyze how each Plaintiff has been injured by Defendants' alleged manipulation would be an exercise in pure conjecture and speculation.  Rather than an injury based on one component of value, Plaintiffs' injuries, if any, result from the value of interest payments on, and the price of, securities purchased in competitive markets.  The measure of Plaintiffs' injury is not simply the difference between what USD LIBOR was and what, in Plaintiffs' view, it ought to have been; rather, it is the difference between what the total value of the transaction was and what it ought to have been.

Determining those injuries would be a highly speculative enterprise, involving at least the following steps.  *First*, the Court would need to determine the USD LIBOR quotes that each of the sixteen panel banks "should" have given on each day of the relevant period.[24]  This process would be little more than educated guesswork, as USD LIBOR quotes are not mere reflections of historical borrowing rates, and are not even alleged to be derived from sets of accepted data that invariably yield predictable numbers, but rather represent a bank's belief about what it *could* pay to borrow dollars in a "reasonable market size" in the interbank market at a particular time.

*Second*, once the "corrected" quotes were established and USD LIBOR for each day calculated according to the BBA method, the Court would then have to examine each individual instrument to determine what rate(s) should have applied over the instrument's lifetime.  This analysis is especially complicated where Plaintiffs allege that USD LIBOR was used only as a

---

[23] *See also Mid-West*, 596 F.2d at 583-87 (holding that a purchaser from non-conspiring competitors of defendants had no standing to sue defendants, where he alleged that defendants had created an "umbrella" under which their competitors were able to charge higher prices than otherwise, given the speculative nature of the resulting injury); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339-41 (9th Cir. 1982) (same); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246 (S.D.N.Y. 1997) (same).

[24] USD LIBOR is published for fifteen maturity periods, ranging from overnight to one year.  For each business day during the nearly three-year Relevant Period therefore, the Court would have to re-create fifteen quotes for sixteen panel banks, or 240 quotes per business day.

reference point or starting point of negotiation between two sophisticated market participants.[25]

Even where USD LIBOR was the basis for calculating the relevant interest rate of an instrument, determining what rate independent third parties would ultimately have negotiated if USD LIBOR had been higher at the point of sale would require the Court to substitute its judgment for that of a sophisticated market trader.

*Third*, even if the Court found the "correct" interest rate for each instrument, it would still have to consider the totality of the economics of each transaction.  Here, the economics of Plaintiffs' transactions are divided into two parts:  the price of the instrument and its rate of interest.  Plaintiffs have uniformly focused their allegations only on part of the economic equation (interest rate), ignoring the price of the instrument altogether.  To determine Plaintiffs' injury, the Court would need to analyze how each independent seller set the price of each instrument sold.  *Cf. Mid-West*, 596 F.2d at 584-86 (refusing to find standing where to establish even that an injury had occurred would require unacceptable speculation as to pricing decisions by multiple third parties).  Establishing whether and how each seller would have reacted to a change in USD LIBOR, especially in light of Plaintiffs' numerous allegations that, in many cases, the relevant interest rates were either "floating" or "variable" (*see, e.g.*, Exch. Compl. ¶ 15; Charles Schwab Compl. ¶¶ 191, 193), would require considerable guesswork.  *See, e.g., Mid-West*, 596 F.2d at 584 ("[A] wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the

---

[25] *See, e.g.*, Exch. Compl. ¶ 11 (noting that market participants use USD LIBOR as a reference to compare with the offered rate); *id.* ¶ 15 (USD LIBOR alleged to be "the starting point for negotiating rates of return on short-term fixed-rate instruments"); Charles Schwab Compl. ¶ 193 (conceding that the price of fixed-rate instruments was unrelated to USD LIBOR, which was only used as a reference for the relative *attractiveness* of the offered rate).

fact.") (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 492-93 (1968)).[26]

*Fourth*, even if the Court could determine the quotes each bank "should" have submitted each day during the relevant period, the revised USD LIBOR for each such day, the "correct" interest rate for each instrument Plaintiffs purchased and the revised price of each such instrument in light of the corrected rate, the Court would still need to determine whether each Plaintiff suffered a net injury as a result of allegedly suppressed USD LIBOR.[27]  To establish a net injury, each class member of each of the three Plaintiff classes, as well as each Schwab Entity, would have to establish that it was, during the relevant period, a net recipient of interest based on USD LIBOR by repeating steps one through three for all of their USD LIBOR-related transactions.  That analysis would involve re-pricing nearly all transactions in what Plaintiffs allege is a more than $300 trillion market.

The self-described USD LIBOR exposure of the City of Baltimore, one of the lead OTC Plaintiffs, is illustrative of the uncertain and speculative inquiry required to determine whether Plaintiffs suffered any net injury.  The City of Baltimore represented in its 2009 Annual Financial Report that it used interest rate swaps to create "synthetic rate financing (by issuing

---

[26] For example, the Schwab Plaintiffs' allegation that they purchased both floating and fixed rate instruments that "were affected by Defendants' suppression of LIBOR" does not come close to answering the question of whether the overall economics of the transaction injured Plaintiffs.  (Schwab Compl. ¶¶ 17-19, 196-200.)  This general allegation does not address (i) the price the Schwab Plaintiffs paid for these instruments, (ii) whether the Schwab Plaintiffs received USD LIBOR-based interest payments on these instruments during the relevant period, or even (iii) whether the Schwab Plaintiffs were on the receiving or paying side of the instruments in question.  Absent allegations sufficient to address these issues, the Schwab Plaintiffs' injuries are simply hypothetical.  The OTC and Exchange-Based Plaintiffs' allegations are equally vague.

[27] It is axiomatic that Plaintiffs may not receive damages and also retain a windfall resulting from Defendants' misconduct.  *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.") (quoting *Los Angeles Memorial Coliseum Comm'n v. NFL,* 791 F.2d 1356, 1367 (9th Cir.1986)).

floating-rate bonds and swapping them to fixed)." (Exhibit D to Wise Decl. at 57.)[28]  Baltimore

was exposed to interest rate fluctuations because it had issued floating rate bonds to investors in

the municipal bond market.  (*Id.*)  To hedge against this exposure, Baltimore entered into interest

rate swaps with banks, under which Baltimore paid a fixed interest rate to the banks and the

banks paid a floating interest rate to Baltimore, which offset the floating rate paid to its

bondholders.  The effect of this arrangement was to make Baltimore floating rate neutral – *i.e.*, to

remove any potential gain or loss from movements in floating rates in either direction.  Thus, the

ability of Baltimore to establish a non-speculative, net injury is highly uncertain at best.  *See*

*Gross*, 955 F. Supp. at 246.[29]

## IV.   INDIRECT PURCHASERS LACK STANDING UNDER *ILLINOIS BRICK*

Plaintiffs allege that suppression of USD LIBOR resulted in their paying more, or being

paid less, on financial instruments tied to USD LIBOR.  (*E.g.*, Exch. Compl. ¶ 217; Gelboim

Compl. ¶ 173.)  For the reasons discussed above, the conduct alleged does not constitute a

restraint on trade of any kind.  (*See supra* § II.)  Moreover, to the extent Plaintiffs bought or sold

USD LIBOR financial instruments in transactions with non-Defendants, and to the extent the

alleged overcharge or underpayment was already built into those instruments, the claims of such

Plaintiffs are barred by the direct purchaser rule of *Illinois Brick*.  *See Illinois Brick Co. v.*

---

[28] Baltimore's Financial Report is a matter of public record and may properly be considered on a motion to dismiss. *See, e.g., Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.").  Notably, during briefing regarding appointment of Interim Class Counsel in this case, counsel for certain plaintiffs vying for interim class counsel appointment cited this statement from Baltimore's Financial Report to undercut the argument that Baltimore would be an appropriate lead plaintiff.  *See* Majority Plaintiffs' Memorandum of Law in Response to the Court's October 18, 2011 Order and in Support of Appointment of Proposed Interim OTC Class Counsel, 11-md-02262, Docket No. 36 at 3-5 (Oct. 28, 2011).

[29] Similar issues regarding net injury exist for other Plaintiffs as well.  Plaintiffs whose net positions in USD-LIBOR instruments benefitted from lower USD LIBOR would have no claim even if they held some positions that would have benefitted from higher USD LIBOR.  Moreover, for Plaintiffs who arguably did experience some net injury as a result of allegedly lower USD LIBOR, determining the existence and extent of that injury would require a repeat of the various speculative steps described above.

*Illinois*, 431 U.S. 720, 728-29 (1977) (precluding antitrust claims of indirect purchasers allegedly harmed by price fixing conspiracy); *Reading Indus., Inc.*, 631 F.2d at 14 (holding that *Illinois Brick* barred indirect purchasers' claims and that purchasers therefore lacked standing to pursue their Sherman Act claims); *Paycom*, 467 F.3d at 291-92 (granting a motion to dismiss under the direct purchaser doctrine).  This bright-line rule reflects the Supreme Court's recognition that some potential plaintiffs, even if they suffered antitrust injury and would otherwise qualify for antitrust standing, are simply too attenuated from defendants and their alleged conduct to permit recovery absent an unacceptably far-reaching and speculative inquiry.  *See Illinois Brick*, 431 U.S. at 731-33.

Other than the OTC Plaintiffs and certain Schwab entities that allegedly purchased USD LIBOR-based instruments from Defendants (*see* Charles Schwab Compl. ¶¶ 12, 192, 194-200), the remaining Plaintiffs do not allege any direct transactions with Defendants.  At least certain Schwab Plaintiffs concededly purchased from third parties.  (*See id.*)  The *Gelboim* Plaintiffs fail to allege any direct purchases from Defendants and expressly exclude from their proposed class all securities in which a Defendant is an obligor.  (*See* Gelboim Compl. ¶¶ 1, 198.)  Similarly, the Exchange Plaintiffs fail to allege any direct purchases from Defendants.  Thus, to the extent these Plaintiffs claim overcharges or underpayments incorporated into the instruments they bought or sold, their claims are barred by *Illinois Brick*.[30]

## CONCLUSION

For the foregoing reasons, all antitrust claims asserted by all Plaintiffs should be dismissed with prejudice.

---

[30] The Schwab Plaintiffs' claims under the California state antitrust statute, the Cartwright Act (Cal. Bus. & Prof. Code § 16720, *et seq.*), should also be dismissed for the reasons articulated in Defendants' memorandum addressed to the Schwab Plaintiffs' Amended Complaints, which Defendants adopt and incorporate by reference.  (*See* Mem. of Law in Support of the Defs.' Mot. to Dismiss the Schwab Plaintiffs' Am. Compls. at § II.A.)

Dated:   New York, New York
         June 29, 2012

Respectfully Submitted,

/s/ Robert F. Wise, Jr.                          /s/ Daryl A. Libow
Robert F. Wise, Jr.                              Daryl A. Libow
Arthur J. Burke                                  Christopher M. Viapiano
Paul S. Mishkin                                  SULLIVAN & CROMWELL LLP
DAVIS POLK & WARDWELL LLP                        1701 Pennsylvania Avenue, N.W.
450 Lexington Avenue                             Washington, D.C. 20006
New York, NY 10017                               libowd@sullcrom.com
robert.wise@davispolk.com                        viapianoc@sullcrom.com
arthur.burke@davispolk.com                       Telephone: (202) 956-7500
paul.mishkin@davispolk.com                       Fax: (202) 956-7056
Telephone: (212) 450-4000
Fax: (212) 450-4800                              *Attorneys for Defendant The Bank of Tokyo-*
                                                 *Mitsubishi UFJ, Ltd.*

*Attorneys for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

35

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com
Tel: 212.841.1000

Alan M. Wiseman
Thomas A. Isaacson
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
awiseman@cov.com
tisaacson@cov.com
Tel: 202.662.6000

Michael R. Lazerwitz
Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
mlazerwitz@cgsh.com
jkim@cgsh.com
Tel: 212.225.2000

*Attorneys for Defendants Citibank, N.A. and Citigroup, Inc.*

/s/ David R. Gelfand
David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY
LLP
One Chase Manhattan Plaza
New York, New York 10005
dgelfand@milbank.com
smurphy@milbank.com
Telephone: (212) 530-5000

*Attorneys for Defendant Coöperatieve
Centrale Raiffeisen-Boerenleenbank B.A.*

/s/ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

Richard Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
richard.schwed@shearman.com

*Attorneys for Defendant Credit Suisse Group AG*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
msilverman@paulweiss.com
afinch@paulweiss.com
Telephone: (212) 373-3355

*Attorneys for Defendant Deutsche Bank AG*

37

/s/ Ed DeYoung
Ed DeYoung
Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com

Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, NY 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
gcasamento@lockelord.com

*Attorneys for Defendant HSBC Holdings plc
and HSBC Bank plc*

/s/ Thomas C. Rice
Thomas C. Rice
Juan A. Arteaga
Joan E. Flaherty
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
jarteaga@stblaw.com
jflaherty@stblaw.com

*Attorneys for Defendants JPMorgan Chase &
Co. and JPMorgan Chase Bank, N.A.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant Lloyds Banking Group
plc other than in 11-cv-6409, 11-cv-6411, and
11-cv-6412*

/s/ Marc J. Gottridge
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
marc.gottridge@hoganlovells.com
eric.stock@hoganlovells.com
Telephone: (212) 918-3000

*Attorneys for Defendant HBOS plc other than
in 11-cv-6409, 11-cv-6411, and 11-cv-6412*

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant Lloyds Banking Group plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Richard Williamson
Richard Williamson
Megan P. Davis
FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
One Liberty Plaza
New York, New York  10006-1404
rwilliamson@fzwz.com
mdavis@fzwz.com
Telephone: (212) 412-9571
Fax: (212) 964-9200

*Attorneys for Defendant HBOS plc in 11-cv-6409, 11-cv-6411, and 11-cv-6412 only*

/s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendant The Norinchukin Bank*

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
Telephone: (312) 902-5200

*Attorneys for Defendant Royal Bank of Canada*

39

/s/ Robert G. Houck
Robert G. Houck
Alejandra de Urioste
James D. Miller
CLIFFORD CHANCE US LLP
31 West 52nd St.
New York, NY 10019
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com
jim.miller@cliffordchance.com
Telephone: 212-878-8000

*Attorneys for Defendant The Royal Bank of
Scotland Group plc*

/s/ Ethan E. Litwin
Ethan E. Litwin
Morgan J. Stecher
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
litwin@hugheshubbard.com
stecher@hugheshubbard.com
Telephone: (212) 837-6000

*Attorneys for Defendant WestLB AG*