**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRU-MENTS ANTITRUST LITIGATION | MDL No. 2262 |
| | Master File No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | ECF Case |

| |
|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL., |
| Plaintiffs, |
| v. |
| CREDIT SUISSE GROUP AG, ET AL., |
| Defendants. |
| METZLER INVESTMENT GMBH, ET AL., |
| Plaintiffs, |
| v. |
| CREDIT SUISSE GROUP AG, ET AL., |
| Defendants. |
| GELBOIM, ET AL., |
| Plaintiffs, |
| v. |
| CREDIT SUISSE GROUP AG, ET AL., |
| Defendants. |
| CHARLES SCHWAB BANK, N.A., ET AL., |
| Plaintiffs, |
| v. |
| BANK OF AMERICA CORPORATION, ET AL. |
| Defendants. |
| SCHWAB MONEY MARKET FUND, ET AL., |
| Plaintiffs, |
| v. |
| BANK OF AMERICA CORPORATION, ET AL., |
| Defendants. |
| SCHWAB SHORT-TERM BOND MARKET FUND, ET AL., |
| Plaintiffs, |
| v. |
| BANK OF AMERICA CORPORATION, ET AL., |
| Defendants. |

**MEMORANDUM OF LAW IN SUPPORT OF UBS AG'S**
**MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .......................................................................................................................... 2

I.    Plaintiffs Have Failed To Plead An Antitrust Conspiracy ...................................... 2

      A.    Defendants' Alleged "Motives" Strongly Support The Inference That There
            Was *No* Conspiracy ......................................................................................... 2

      B.    The Undisclosed Studies By Anonymous Consultants Fail To Support An
            Inference Of Concerted Activity ....................................................................... 4

      C.    None Of The Publicly Available Analyses Cited In The Complaints Support An
            Allegation Of Concerted Conduct .................................................................... 8

      D.    Plaintiffs' Impermissible Attempt To Co-Opt Government Investigations Of
            Different Alleged Conduct Should Be Rejected ............................................. 12

II.   The Exchange-Based Plaintiffs' Manipulation Claims Under the CEA Must Be
      Dismissed as Impermissibly Extraterritorial ...................................................... 14

      CONCLUSION .......................................................................................................... 19

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.,*
   680 F.3d 162 (2d Cir. 2012) .................................................. 3, 5, 8

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007).................................................. 2, 3, 5, 8, 11

*Fin. Acquisition Partners LP v. Blackwell,*
   440 F.3d 278 (5th Cir. 2006) .................................................. 4

*Fisk v. Letterman,*
   401 F. Supp. 2d 362 (S.D.N.Y. 2005) .................................................. 12

*Highland Capital Mgmt., L.P. v. Schneider,*
   No. 02 Civ. 8098(PKL), 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004).................................... 4

*In re Energy Transfer Ptnrs. Natural Gas Litig.,*
   No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009)........................................ 17

*In re Platinum and Palladium Commod. Litig.,*
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) .................................................. 12

*In re Rough Rice Commodity Litig.,*
   No. 4:07–cv–3349, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ................................. 17

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887 (2d Cir. 1976) .................................................. 12

*Meeks v. Murphy Auto Grp., Inc.,*
   No. 8:09-cv-1050-T-TBM, 2009 WL 3669638 (M.D. Fla. Oct. 30, 2009) .............................. 4

*Morrison v. National Australia Bank Ltd.,*
   130 S. Ct. 2869 (2010).................................................. 15, 18

*Norex Petroleum Ltd. v. Access Indus., Inc.,*
   631 F.3d 29 (2d Cir. 2010) .................................................. 14, 15

*United States v. Philip Morris USA, Inc.,*
   783 F. Supp. 2d 23 (D. D.C. 2011) .................................................. 18

**Statutes**

15 U.S.C. § 1 .................................................. 2

18 U.S.C. §§ 1961 *et seq.*.................................................. 15

**Other Authorities**

Carrick Mollenkamp & Mark Whitehouse, "Study Casts Doubt on Key Rate," THE
   WALL STREET J. (May 29, 2008) .................................................. 8, 9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Connan Snider & Thomas Youle, *Does the LIBOR reflect banks' borrowing costs?*
(Apr. 2, 2010)......................................................................................................................... 9

http://bbalibor.com/technical-aspects/fixing-value-and-maturity (last visited June 29,
2012) ...................................................................................................................................... 16

http://www.bbalibor.com/about-the-bba
(last visited June 29, 2012) ................................................................................................... 16

http://www.bbalibor.com/governance (last visited June 29, 2012) ............................................ 16

http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited June 29,
2012) ...................................................................................................................................... 16

Justin T. Wong, *LIBOR Left in Limbo; A Call for More Reform*, 13 N. CAR.
BANKING INSTITUTE 365 (2009).............................................................................................. 11

Liam Vaughan et al., "Life as Libor Traders Knew It Seen as Abusive by
Investigators," BLOOMBERG, Mar. 2, 2012............................................................................ 13

Lindsay Fortado & Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of
Internal Controls," BLOOMBERG, Feb. 14, 2012 ...................................................................... 13

Defendant UBS AG ("UBS") submits this memorandum of law in support of its motion to dismiss the six operative USD LIBOR-related complaints in this multi-district litigation.[1]

## PRELIMINARY STATEMENT

Although UBS joins the other Defendants in moving to dismiss the complaints and joins in most of the arguments presented by its Co-Defendants, UBS is differently situated in one respect.  In 2011, UBS secured conditional leniency from the U.S. Department of Justice's Antitrust Division and other antitrust authorities for potential antitrust infringements related to Yen LIBOR and Euroyen TIBOR.  As such, UBS has voluntarily reported certain conduct relating to Yen LIBOR and Euroyen TIBOR, and is assisting in the authorities' investigation into that conduct.  Although the substance of UBS's cooperation with those authorities is confidential, the company's leniency status has led it to exercise care in connection with the positions it takes in other contexts.  This is true with respect to this motion to dismiss even though, as is clear from the complaints, the Yen LIBOR and Euroyen TIBOR investigations in connection with which UBS has secured conditional leniency have nothing to do with the allegations relating to USD LIBOR in these actions.

With these considerations in mind, UBS has joined Co-Defendants' arguments where appropriate.[2]  In addition, this memorandum sets forth a small number of distinct and/or supplemental arguments related to Plaintiffs' antitrust and Commodity Exchange Act ("CEA") claims, which UBS believes are important to the Court's consideration of the motion to dismiss.

---

[1]  To avoid needless redundancy, UBS adopts the Statement of Facts and defined terms in the Memorandum of Law in Support of Defendants' Motion to Dismiss Antitrust Claims ("Co-Defendants' Antitrust Memo"), in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Exchange-Based Plaintiffs' Claims ("Co-Defendants' Exchange-Based Memo"), and in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Schwab Plaintiffs' Amended Complaints ("Co-Defendants' Schwab Memo").

[2]  UBS joins in and incorporates by reference the Co-Defendants' Antitrust Memo and the Co-Defendants' Exchange-Based Memo except as otherwise stated herein.  UBS also joins and incorporates by reference Co-Defendants' Schwab Memo, except Section I.C and the portions of the Schwab Memo that incorporate portions of Co-Defendants' Antitrust Memo that UBS does not join.

**ARGUMENT**

## I.     Plaintiffs Have Failed To Plead An Antitrust Conspiracy

The Complaints simply do not present a serious effort to satisfy the most basic require-

ments to proceed beyond the pleading stage.  In drafting the Complaints, Plaintiffs wrote at con-

siderable length. Yet one searches in vain to find allegations that satisfy the threshold require-

ments of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), which explained that "parallel

conduct" is not a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, because such behav-

ior, though "consistent with conspiracy," is often "just as much in line with a wide swath of ra-

tional and competitive business strategy."  *Id.* at 545; *see also* Co-Defendants' Antitrust Memo at

11-13.

As explained in Co-Defendants' Antitrust Memo, Plaintiffs have built a case that, at its

core, revolves around individual action motivated by independent economic interests.  Co-

Defendants' Antitrust Memo at 14-18.[3]  Several additional points merit emphasis.

### A.     Defendants' Alleged "Motives" Strongly Support The Inference That There Was *No* Conspiracy

Plaintiffs' motive-related allegations undermine, rather than support, the conclusion that a

conspiracy to suppress USD LIBOR existed.  *See id* at 14-18.  In fact, Plaintiffs' implausible

theory is contradicted by their own complaints, which implicitly acknowledge that Defendants

regularly enter into contracts in which they will benefit from higher interest rates, including

higher USD LIBOR rates.  *See, e.g.*, OTC Compl. ¶¶ 31–32[4] (describing instruments "sold in

---

[3]   UBS joins and incorporates by reference only Section I and pages 22-23 of Section II of the Co-Defendants'
Antitrust Memo.  Further, as the Co-Defendants explain in their Schwab Memo, the Schwab Plaintiffs' claim
under California's Cartwright Act is entirely derivative of their federal antitrust claims.  *See* Co-Defendants'
Schwab Memo at 24-25.  Therefore, for the reasons expressed in this memorandum and so much of the Co-
Defendants' Antitrust Memo as UBS joins, the Schwab Plaintiffs' Cartwright Act claim should be dismissed.
[4]   To conform to the citations in Co-Defendants' Antitrust Memo, Section I cites the OTC Complaint ("OTC
Compl.") for illustrative purposes due to the near-uniformity of the factual allegations across the various Com-

over the counter transactions," including, for example, "Forward Rate Agreements," which "set[] the rate of interest or the currency exchange rate to [be] *paid or received* on an obligation" and explaining that these contracts "can be indexed to LIBOR" (emphasis added)).

This point is underscored in connection with Plaintiffs' inappropriate attempt to taint the defendants by discussing UBS's conditional leniency for Yen LIBOR-related conduct.  Plaintiffs describe allegations that traders "entered into agreements to submit *artificially high* or artificially low London Inter-Bank Offered Rate ('LIBOR') submissions in order to . . . adjust[] the prices of financial instruments that use Yen LIBOR rates as a basis"—meaning that during various time periods, Defendants stood to *lose* money from lower LIBOR rates.  *Id.* ¶ 174 (emphasis added). Given Plaintiffs' acknowledgement that Defendants often stood to benefit from a higher LIBOR, their contention that Defendants had a motive to enter into a long-term conspiracy aimed solely at suppressing LIBOR does not begin to satisfy *Twombly*; there are simply not "sufficient factual allegations to make the complaint[s'] claim plausible."  *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 189 (2d Cir. 2012).

Bereft of any plausible motive for a conspiracy, the complaints fall apart.  In the ensuing 84 paragraphs, Plaintiffs unleash a barrage of purported analyses in an attempt to overcome *Twombly* by attrition.  But all of those studies reach the same limited and largely irrelevant conclusion: USD LIBOR was lower than it should have been.  Whether that is true or not, it is perfectly consistent with independent, parallel conduct.  In fact, in light of the alleged "motives" cited by Plaintiffs themselves, it is *only consistent* with such conduct.  This is thus an easier case than where the alleged facts are "'merely consistent' with an agreement," which is insufficient to state a Section 1 claim.  *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556).

plaints.  To conform to the citations in Co-Defendants' Exchange-Based Memo, Section II cites the Exchange-Based Complaint ("Exch. Compl.").

Plaintiffs' imagined conspiracy, in which to preserve the illusion of financial strength Defendants disclosed their weaknesses to their largest competitors, simply could not exist in the real world.

**B.    The Undisclosed Studies By Anonymous Consultants Fail To Support An Inference Of Concerted Activity**

Plaintiffs devote a substantial portion of their complaint to recounting the conclusions reached by Plaintiffs' unidentified "experts."  *See* OTC Compl. ¶¶ 55–88.  The identities, credentials, relevant experience, and work product of these so-called experts have not been disclosed to Defendants or the Court, nor would such work product be appropriate for consideration at the pleadings stage even if it had been.

As a threshold matter, it is improper for a court to consider opinions contained in expert reports at the pleading stage.  As the Fifth Circuit has explained in the context of securities claims, "allowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage."  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285–86 (5th Cir. 2006) (internal quotation marks omitted); *see also, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, No. 02 Civ. 8098(PKL), 2004 WL 2029406, at *4 (S.D.N.Y. Sept. 9, 2004) ("[A]llegations that simply set forth the opinions of its proposed expert . . . serve[] no permissible purpose in [a] [c]omplaint.").  A complaint must "allege specific facts" demonstrating the plaintiffs' entitlement to relief, and "opinions cannot substitute for facts."  *Fin. Acquisition Partners LP*, 440 F.3d at 286.  Moreover, such "untested expert testimony" is inappropriate at the pleading stage, because it cannot be evaluated "without testing the sufficiency of same via the procedures set forth in *Daubert*."  *Meeks v. Murphy Auto Grp., Inc.*, No. 8:09-cv-1050-T-TBM, 2009 WL 3669638, at *1 & n.2 (M.D. Fla. Oct. 30, 2009).

4

In any event, based on the allegations set forth in the complaint, the conclusions allegedly reached by Plaintiffs' undisclosed "experts" are insufficient to support a Section 1 conspiracy claim. The reports allege parallel conduct by Defendants—submitting artificially low rates to the BBA—but none supports a plausible inference of concerted action. Taken in its most favorable light, Plaintiffs' statistical analysis shows only "conscious parallelism," which "does not establish the contract, combination, or conspiracy required by Sherman Act § 1." *Twombly*, 550 U.S. at 554 (internal quotation marks omitted); *see also Anderson News*, 680 F.3d at 184 ("'A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim[, some] further circumstance pointing toward a meeting of the minds.'" (emphasis omitted) (quoting *Twombly*, 550 U.S. at 557)).[5]

***KRIS Analysis.*** Plaintiffs' consultants allegedly compared Defendants' USD LIBOR quotes from 2007 through 2008 with a measure of the default risk of 13 of the defendants over the same period produced by Kamakura Risk Information Services ("KRIS"). *See* OTC Compl. ¶¶ 57–66. Plaintiffs' basic argument is that as the KRIS measure indicated that the risk of Defendants' default was increasing, the interest rates they reported to USD LIBOR should have gone up, but they did not. *See id.* ¶¶ 59–60, 64.

Critically, Plaintiffs *do not even allege that this evidence demonstrates a conspiracy.* OTC Compl. ¶¶ 57–66. Nor could they. Taken at face value, the alleged "negative correlation" between KRIS and Defendants' USD LIBOR submissions might suggest that Defendants acted similarly in artificially lowering their USD LIBOR submissions during the Class Period. Such parallel conduct, however, does not suffice to survive a motion for dismiss, particularly where, as

---

[5]   *See also* Co-Defendants' Antitrust Memo at 18-20. Because Plaintiffs devote over forty pages, including thirty-two graphs and charts, to presenting these analyses and studies—and given that a careful, thorough review of this material affirmatively undermines an inference of conspiracy—UBS believes a brief review of each item is merited.

here, such alleged conduct is perfectly consistent with the exercise of independent business judgment by each of the banks.  Indeed, the complaint supplies an obvious, non-collusive explanation for this alleged parallel conduct:  As Plaintiffs themselves state, "[b]y submitting an artificially low LIBOR quote, *the bank* sends a false signal that it is less risky than it truly is."  OTC Compl. ¶ 62 (emphasis added).

Simply put, it makes no sense for a bank that desires to mask its financial straits to inform 15 of its largest competitors that its borrowing costs are significantly higher than its USD LIBOR submissions indicate.  Each of these banks enters into innumerable transactions with each other (after all, "LIBOR" stands for the London Interbank Offered Rate) and they compete for the same clients; the other banks are precisely the parties that a bank intent on hiding its financial problems would not want to know that its borrowing rates are higher than advertised.  Thus, independent self-interest motivating low USD LIBOR submissions is the only plausible explanation for the alleged parallel conduct in light of the motives alleged in the complaint.  A global conspiracy, by contrast, is implausible, because Defendants had no incentive to disclose to each other that they were facing financial difficulties.  In fact, the complaints concede that the consultants did not even find that the suppression was unanimous among all 16 panel banks.  *See* OTC Compl. ¶ 64.

**Federal Reserve Eurodollar Deposit Rate.**  Only *one* of the consultants retained by Plaintiffs asserts that statistical evidence supported an inference of conspiracy.  *See* OTC Compl. ¶¶ 67–88.  But the analysis of that "expert," so far as it can be gleaned from Plaintiffs' complaints, fails on its face to support that inference.  The consultant supposedly calculated the spread between the Federal Reserve Eurodollar Deposit Rate with USD LIBOR submissions over the Class Period and then compared it to prior years.  *See* OTC Compl. ¶¶ 71–75.  Although

Plaintiffs set forth pages and pages of descriptions and graphs, the bottom line of the consultant's alleged findings is simple:  although historically there was little difference between the Eurodollar Deposit Rate and USD LIBOR (a "zero spread"), during the Class Period USD LIBOR was lower than the Eurodollar Deposit Rate (a "negative spread").  "LIBOR," the consultant concluded, "did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread to become more negative."  OTC Compl. ¶ 81.

Even accepting the undisclosed consultant's conclusions at face value, this is at most evidence that Defendants acted in parallel to suppress their USD LIBOR submissions.  The complaints nevertheless assert that the alleged negative correlation between the Eurodollar Deposit Rate and USD LIBOR is evidence of conspiratorial conduct, because "it would be unusual even for one bank to submit a LIBOR bid below the Federal Reserve's Eurodollar Deposit Rate."  OTC Compl. ¶ 70.  Plaintiffs supply no factual substantiation for that naked assertion, and none of the statistical analysis set forth in the complaint addresses that point.  And even if it were true, Defendants' allegedly uniform action is readily explainable, at minimum, by the fact that in the wake of the financial crisis, all of the banks faced the same incentives to underreport—*as the Complaints themselves allege*.

***Analysis of April 17, 2008 USD LIBOR Submissions.***  Finally, Plaintiffs claim that one of their "experts" conducted a statistical analysis of the USD LIBOR submissions on April 17, 2008, the day after the *Wall Street Journal* ran an article on problems with LIBOR.  *See* OTC Compl. ¶¶ 121–27.  The consultant allegedly concluded that "LIBOR increased on April 17, 2008 at a statistically significant level."  *Id.* ¶ 124.  But again, plaintiffs do not even allege that this consultant opined that this increase evidenced collusion, or even made suppression more likely than not.  The alleged conclusion is "'merely consistent' with an agreement" and therefore

does not meet the *Twombly* standard.  *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556).

C.     **None Of The Publicly Available Analyses Cited In The Complaints Support An Allegation Of Concerted Conduct**

The complaints also cite "publicly available analyses by academics and other commentators" to support the allegation of conspiracy.  OTC Compl. ¶ 89.  But none of the cited studies supports an inference of concerted activity; many of them expressly refute it.   Indeed, Plaintiffs do not even contend that any of the studies found evidence of concerted activity during the Class Period.  *See id.* ¶¶ 90–127.

***Wall Street Journal Analysis of Credit Default Swaps.***  The complaints point to a *Wall Street Journal* article on May 29, 2008, which recounted a study that the newspaper had commissioned comparing USD LIBOR to the price of credit-default swaps ("CDS")—a type of financial instrument used to insure against default risk.  OTC Compl. ¶¶ 93–94.  Nothing in the *Journal*'s analysis, however, suggests conspiratorial conduct.  In fact, as Plaintiffs concede, the report shows that Defendants varied widely in the degree to which their USD LIBOR submissions diverged from the CDS measure of risk (*id.* ¶ 94), which is consistent with each bank attempting through guesswork not to be "the high offer," not with the secretly coordinated conspiracy that Plaintiffs allege.  *See* Carrick Mollenkamp & Mark Whitehouse, "Study Casts Doubt on Key Rate," WALL STREET J. (May 29, 2008), (Declaration of Lawrence J. Zweifach ("Zweifach Decl."), Ex. 1).  The article also explains that "[a]nalysts offer various reasons why some banks might report Libor rates lower than what other markets indicate"—none of which involves a conspiracy.  *Id.*   For example, "since the financial crisis began, banks have all but stopped lending to each other for periods of three months or more, so their estimates of how much it would cost to borrow *involve a lot of guesswork*."  *Id.* (emphasis added).  In addition, "some U.S.

8

banks, such as Citigroup and J.P. Morgan, have ample customer deposits and access to loans from the Federal Reserve, meaning they might not need to borrow at higher rates from other banks." *Id.*  The plethora of non-conspiratorial explanations set forth in the article refutes rather than supports Plaintiffs' inference of conspiracy.[6]

**Snider / Youle Analysis.**  The complaints cite a 2010 paper by economists Connan Snider and Thomas Youle called "Does the Libor reflect banks' borrowing costs?"  OTC Compl. ¶ 101 & n.34.  Plaintiffs correctly state that the paper concludes that "USD-LIBOR panel banks in fact deviated from their costs of borrowing as reflected in [credit-default swap] spreads." *Id.* ¶ 101.  But they miss a central point of the authors' analysis, which is that different members of the USD LIBOR panel had *different* incentives to misreport.  That proposition repudiates any notion of a conspiracy.

The authors discuss, for example, how two of the defendants—Citigroup and Bank of Tokyo-Mitsubishi—submitted different USD LIBOR bids that would seem to reflect that Citigroup was the safer investment, even though Citigroup had a significantly higher CDS spread than Mitsubishi.  Connan Snider & Thomas Youle, *Does the LIBOR reflect banks' borrowing costs?* (Apr. 2, 2010) (unpublished study), *available at:* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1569603 4 (Zweifach Decl., Ex. 2).  For various reasons, the authors suggest that "differences in banks' Libor quotes are not primarily due to differences in credit risk" but rather misreporting by some of the banks. *Id.* at 5.  The authors suggest that only certain banks misreport because "[s]ome banks may profit from *a higher over-*

---

[6]   In addition, the Complaints incorrectly assert that the *Journal* "estimated that misreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (*the banks*) did not pay to lenders (*investors in debt instruments issued by the banks*)."  OTC Compl. ¶ 99 (emphases added).  That characterization erroneously implies—in line with the complaints' earlier unsupported assertion—that Defendants consistently stood to gain financially from a lower USD LIBOR rate.  What the *Journal* article in fact says is that a lower USD LIBOR rate "would represent a roughly $45 billion break on interest payments for *homeowners, companies and investors* over the first four months of [2008]."  Mollenkamp & Whitehouse, *supra* (emphasis added).

*all Libor rate*, others may profit from a lower overall rate, and others still might be *perfectly hedged*."  *Id.* at 7 (emphasis added).  Right or wrong, this assessment is entirely inconsistent with the alleged conspiracy, because the authors suggest that different members of the alleged conspiracy had entirely different incentives; some wanted USD LIBOR rates to be higher, some wanted them to be lower, and others wanted them to remain at the same level.  It also refutes the second purported conspiratorial motive that Plaintiffs attribute to Defendants—that each had a financial incentive to ensure lower USD LIBOR rates.

Plaintiffs pluck Snider and Youle's discussion of the alleged "bunching" phenomenon entirely out of context.  *See* OTC Compl. ¶¶ 105–113.  They claim that the authors' analysis shows that USD LIBOR quotes would cluster around the fourth-lowest quote of the day and that, given the formula for USD LIBOR (which excludes the four highest and four lowest bids), this "suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day."  OTC Compl. ¶ 105.

Plaintiffs fail to acknowledge, however, that Snider and Youle's explanation for the "bunching" phenomenon is *not* that the banks engaged in collusive conduct.  Noting at the outset that "[t]here are several possible explanations for the bunching of quotes around the fourth lowest," the authors set forth a detailed economic model that explains that so long as each USD LIBOR panel member has an approximate estimate of the quotes that other members would submit on a given day, the optimal behavior for a bank with an incentive to lower the rate is to submit a rate equivalent to the fourth-lowest.  Snider & Youle, *supra*, at 6–7.  And the authors explain exactly how a USD LIBOR panel member could "know[] the quotes of the 15 other members on a given day" without conspiratorial conduct: "Simple forecasting models do an excellent job in predicting the levels of Libor quotes in 2009 [the year the authors studied].  *Id.* at 6–7 & 7 n.8.

This is because Libor is administered with a daily frequency and Libor quotes move in a slow and predictable manner." *Id.* at 7 n. 8.  In other words, because USD LIBOR moves slowly from day to day, sophisticated banks acting individually can readily predict the fourth-lowest bid. And, of course, such "conscious parallelism" is "'not in itself unlawful.'"  *Twombly*, 550 U.S. at 553–54 (citation omitted).   In addition, the authors further note that their conclusion would still hold if "there is uncertainty about the exact location of the pivotal quotes."  Snider & Youle, *supra,* at 7 n. 8.  They ultimately conclude, in conflict with the premise of Plaintiffs' conspiracy theory, that the "bunching" pattern "suggests that some banks may have incentives to alter the rate *while others may not*."  *Id.* at 12 (emphasis added).

*Overnight-Index Swap Rate.*  The Complaints devote a paragraph to what they describe as an "academic article" comparing USD LIBOR to yet another measure of risk—the overnight-index swap ("OIS") rate.  OTC Compl. ¶ 116.  Like the Complaints' other citations, the article, written by a second-year law student, nowhere concludes that concerted activity was the necessary or even plausible cause of the alleged suppression of USD LIBOR.  *See* Justin T. Wong, *LIBOR Left in Limbo; A Call for More Reform*, 13 N. C. BANKING INST. 365 (2009) (Zweifach Decl. Ex. 3). Furthermore, the article states that an "in-depth analysis of the validity of the indicators [such as the spread between the OIS swap and USD LIBOR] is beyond the scope of this article." *Id.* at 370.  What the article does observe—in direct contradiction to the posited conspiracy to reduce LIBOR—is that LIBOR increased to historic highs during the Class Period.  *See id.* at 366 ("In the fall of 2008, LIBOR reached historic highs, both in actual terms and when compared to U.S. Treasuries of comparable maturities.  *Ironically,* only a few months earlier in 2008, some expressed concern that LIBOR was not high enough because LIBOR panel banks had an incentive not to report their true estimated borrowing costs for fear of suggesting their own fi-

nancial weakness."). "This Court . . . is not obliged to reconcile [Plaintiffs'] own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).[7]

**Study Outside of the Class Period.**   Finally, Plaintiffs cite a nine-page paper supposedly demonstrating collusion on USD LIBOR *before* the period at issue in the complaint.  OTC Compl. ¶¶ 117–20.  It, too, undermines—rather than supports—a claim of collusion during the relevant time period, as discussed in Co-Defendants' memorandum. *See* [Co-Defendants' Antitrust Memo at 19-20].

### D.    Plaintiffs' Impermissible Attempt To Co-Opt Government Investigations Of Different Alleged Conduct Should Be Rejected

The final pillar of Plaintiffs' complaints is that government agencies in the United States and elsewhere are *conducting investigations* into Defendants' USD LIBOR submissions. *See* OTC Compl. ¶¶ 139–86.  As a matter of law, however, the existence of ongoing government investigations is insufficient to plead an antitrust conspiracy. *See* Co-Defendants' Antitrust Memo at 20-21.[8]

Even if the law deemed the existence of government investigations sufficient to create an inference of illegality (which it does not), the investigations referenced in the Complaints are not even alleged to involve the conduct that Plaintiffs describe—a conspiracy among Defendants to

---

[7]   Plaintiffs briefly advert to *Wall Street Journal* articles discussing the Federal Reserve auction rate but do not place heavy reliance on them. *See* OTC Compl. ¶¶ 114–15.  And with good reason: Each suggests only that USD LIBOR was too low on particular dates relative to other indices.  As with Plaintiffs' other citations, the sources do not imply a conspiracy but rather attribute the alleged discrepancies to incentives of individual banks.

[8]   Negotiated settlements resolving investigations for a defendant are equally insufficient to satisfy Plaintiffs' pleading requirements under *Twombly*. *See In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-95 (S.D.N.Y. 2011) (granting motion to strike from a complaint references to a consent order issued by the Commodities Futures Trading Commission because it "was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding"); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that "neither a compliant nor references to a complaint [that] results in a consent judgment may properly be cited in the pleadings.").

suppress USD LIBOR.[9]  For example, the Complaints discuss investigations related to Yen LIBOR and Euroyen TIBOR—different indices, submissions for which are created by different bank staff and, as Plaintiffs concede, involving a different set of banks.  *See* OTC Compl. ¶ 46.

More fundamentally, the theories of manipulation that Plaintiffs attribute to investigations that they cite are not only different from the conspiracy they allege, but entirely inconsistent with it.  As described in the complaints, the alleged misconduct at issue in these investigations involved episodic attempts by individual traders collusively to manipulate the Yen LIBOR or Euroyen TIBOR rate to benefit specific positions already entered into.  *See* OTC Compl. ¶¶ 159, 162–164; 174–176; 178–179; 181–185. This meant that, depending on the contract, the trader(s) would have desired to move the particular LIBOR rate *either* lower *or* higher on a given day.  *See, e.g.,* OTC Compl. ¶¶ 174–175.

That conduct is irreconcilable with the core theory of Plaintiffs' complaint, which is that Defendants conspired to *suppress* USD LIBOR rates consistently over a sustained period of time to portray themselves as healthier than they were and to benefit their overall positions in LIBOR-linked contracts.[10]

Thus, for example, the Complaints state that an investigation by Canadian authorities involves an allegation that banks "entered into agreements to submit *artificially high* or artificially low London Inter-Bank Offered Rate ('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the [BBA]."  OTC Compl. ¶ 174 (emphasis added).  They go on to

---

[9]    The same is true with respect to Defendant Barclays' recently-announced settlements.  *See* Co-Defendants' Antitrust Memo at 10 n.11.

[10]    As another article cited by Plaintiffs explains, the question in these investigations is not whether the banks globally colluded to suppress USD LIBOR rates, but rather "whether banks' proprietary-trading desks exploited information they had about the *direction* of Libor to trade interest-rate derivatives."  Lindsay Fortado & Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," BLOOMBERG, Feb. 14, 2012 (emphasis added) (Zweifach Decl. Ex. 4); *see also, e.g.,* Liam Vaughan *et al.,* "Life as Libor Traders Knew It Seen as Abusive by Investigators," BLOOMBERG, Mar. 2, 2012 (Zweifach Decl. Ex. 5)(explaining that a former Royal Bank of Scotland trader "tried to improperly influence the bank's rate setters from 2007 to 2011 to persuade them to offer Libor submissions that would benefit his trading positions").

describe in detail that the Canadian investigation involves *ad hoc* efforts by individual traders to influence Yen LIBOR either higher or lower to benefit a specific trading position.  *See id.* ¶¶ 175–76, 179.  The same conduct is allegedly at issue in proceedings in Singapore.  *See id.* ¶¶ 181–85.  Alleged conduct by individual traders collusively to attempt to adjust LIBOR up *or* down on a given day to benefit a specific trading position is simply inconsistent with Plaintiffs' theory that Defendants conspired to keep USD LIBOR artificially low over a period of years.

## II.    The Exchange-Based Plaintiffs' Manipulation Claims Under the CEA Must Be Dismissed as Impermissibly Extraterritorial

In further support of the arguments by the Co-Defendants that the Exchange-Based Plaintiffs fail to state a claim under the CEA, UBS submits that the CEA claims must be dismissed as impermissibly extraterritorial.[11]  In determining whether the Exchange-Based Complaint improperly asserts extraterritorial claims, this Court need not determine the "focus" of Congressional concern in enacting Section 9(a)(2) of the CEA.  *Cf.* Co-Defendants' Exchange-Based Memo at 14−15.  Nor need it fashion a comprehensive test for resolving all questions of extraterritoriality that may arise under the CEA.  Regardless of the focus of Section 9(a)(2) or the appropriate overarching test, the Exchange-Based Plaintiffs here plainly seek an impermissible extraterritorial application of the CEA.[12]  Their "case arises from the manipulation of LIBOR," the target of the "scheme" they allege.  Exchange-Based Compl. ¶ 5.  But LIBOR *is not a U.S.-based commodity*.  And the Exchange-Based Plaintiffs do not allege that Defendants acted with the specific intent to manipulate the price of any such commodity.  Nor do they allege that any manipulative acts occurred in this country.  The only alleged connection between the claimed violation and the

---

[11]  UBS joins and incorporates by reference the Co-Defendants' Exchange-Based Memo except for Section II and footnote 25, and except insofar as it incorporates portions of Co-Defendants' Antitrust Memo that UBS does not join.

[12]  *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32 (2d Cir. 2010) (observing that "[t]he slim contacts with the United States alleged by [the plaintiff] are insufficient to support extraterritorial application of the RICO statute," without determining the focus of the statute or adopting a RICO-specific test for territorial applications).

territory of the United States is an *effect* or, as the complaint puts it, "*impact*[]" on the prices of Eurodollar futures contracts traded here—an effect Plaintiffs do not claim was the objective of Defendants' alleged CEA violation.  Exchange-Based Compl. at p. 94 (capitalization altered). But the Supreme Court has emphatically rejected the proposition that extraterritorial application can be justified solely by domestic effects.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010).  For this reason alone, the Exchange-Based Plaintiffs' CEA claims fail.

In *Morrison*, the Supreme Court reaffirmed the presumption against extraterritoriality: "When a statute gives no clear indication of an extraterritorial application, it has none."  *Id.* at 2878.  Because there is no "affirmative indication" of extraterritorial application in Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *Morrison* held that that statute has only domestic application.  *Id.* at 2883.  *Morrison* thus abrogated various "conduct" and "effects" tests by which lower courts had "divin[ed] what Congress would have wanted if it had thought of the situation before the court," a practice by which courts had justified extraterritorial applications of the Exchange Act.  *See id.* at 2878−81.

Although *Morrison* involved Section 10(b) of the Exchange Act, its reasoning is general, and so applies to all federal statutes.  *Id.* at 2881 ("[W]e apply the presumption in all cases . . . ."); *see also, e.g.*, *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32−33 (2d Cir. 2010) (applying *Morrison* to the RICO statute, 18 U.S.C. §§ 1961 *et seq.*).  And the CEA provisions at issue here, like the relevant provisions of the Exchange Act in *Morrison*, lack any affirmative indication that they apply extraterritorially.  *See also* Co-Defendants' Exchange-Based Memo at 13−14.  Therefore these CEA provisions do not so apply.

Yet extraterritorial application of the CEA is exactly what the Exchange-Based Plaintiffs seek.  This Court need not resolve how to determine the territorial application of the CEA for all

cases—here it is unmistakably clear that the Plaintiffs seek to regulate wholly extraterritorial conduct based on nothing more than indirect effects allegedly felt in this country. By their own admission, the Exchange-Based Plaintiffs' CEA claims "arise[] from the manipulation of LI-BOR" (Exchange-Based Compl. ¶ 5)—an interest rate set in London and defined by circumstances in the London interbank market—not the manipulation of a U.S. commodity. Specifically, USD LIBOR is the *London* Interbank Offered Rate (denominated in U.S. dollars) set by the British Bankers' Association ("BBA"). *See* Exchange-Based Compl. ¶¶ 6−7. The BBA bases the rate on submissions from designated member banks concerning the "cost of unsecured funds in the *London* interbank market." Exchange-Based Compl. ¶ 7 (emphasis added). Moreover, as established by the very websites and articles on which the Exchange-Based Plaintiffs rely, this process of setting LIBOR takes place outside the United States. The entity that manages the process, BBA LIBOR Ltd., is an organization registered in England and Wales and headquartered in London.[13]

The BBA selects banks for LIBOR panels "on the basis of activity in the *London* market."[14] It instructs those banks to contribute "[r]ates…for deposits: [1] made in the *London* interbank market in reasonable market size; [2] that are simple and unsecured; [3] governed by the laws of *England and Wales*; [and 4] where the parties are subject to the jurisdiction of the courts of *England and Wales*." *Id.* (emphasis added). Banks make their contributions "between 1100 hrs and 1110 hrs, *London* time." *Id.* (emphasis added). LIBOR is then "constructed in *London*."[15] Thus, the manipulative conduct at the heart of the Exchange-Based Plaintiffs' com-

---

[13]   *See* http://www.bbalibor.com/governance (last visited June 29, 2012) (www.bbalibor.com relied on in Am. Compl. at ¶ 11 n.14); http://www.bbalibor.com/about-the-bba (last visited June 29, 2012).

[14]   *See* http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited June 29, 2012) (emphasis added) (www.bbalibor.com relied on in Am. Compl. at ¶ 11 n.14).

[15]   *See* http://bbalibor.com/technical-aspects/fixing-value-and-maturity (last visited June 29, 2012) (emphasis added) (www.bbalibor.com relied on in Am. Compl. at ¶ 11 n.14).

plaint—Defendants allegedly underreporting their borrowing costs to the BBA—took place entirely outside the United States. *See, e.g.*, Exchange-Based Compl. ¶ 5 ("Defendants understated their borrowing costs to the [BBA] (thereby suppressing LIBOR)"); *accord, e.g.*, *id.* ¶¶ 6, 13, 45.

Moreover, the Exchange-Based Complaint makes no plausible claim that Defendants acted with the specific intent to manipulate commodities in the United States. Rather, Plaintiffs' theory is that Defendants manipulated USD LIBOR in order "to portray themselves as economically healthier than they actually were." Exchange-Based Compl. ¶ 5.[16] The *only* commodity that Plaintiffs claim was the target of Defendants' manipulation—and thus the *only* commodity underlying Plaintiffs' claim—is located in London; and the only alleged manipulative acts took place there. These observations alone suffice to require dismissal the Exchange-Based Plaintiffs' CEA claims.

Nevertheless, the Exchange-Based Plaintiffs apparently believe it is enough to allege that "[a]ny manipulation of LIBOR is in fact a manipulation of the commodity underlying the Eurodollar futures contracts" (Exchange-Based Compl. ¶ 207) and that "Defendants' suppression of LIBOR broadly impacted Eurodollar Futures and Options on Futures" in the U.S, (*id.* at 94 (capitalization altered)). They are mistaken. The only thing manipulation of LIBOR is, "in fact," is

---

[16] The Exchange-Based Plaintiffs also tack onto their complaint that "artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments." Exchange-Based Compl. ¶ 5. This conclusory allegation is implausible, as explained in the Co-Defendants' Exchange-Based Memo at 26−27. Nor can Plaintiffs save it by asserting that "Defendants well knew that, by manipulating LIBOR, Defendants necessarily manipulated the Eurodollar futures contract. Defendants fully and specifically intended the consequences of their manipulation of LIBOR, including the artificial inflation of Eurodollar futures contract prices, in order to accomplish Defendants' goal of artificially suppressing LIBOR and thereby avoiding any 'run' on their banks." *Id.* ¶ 230; *see also id.* ¶ 219. This is an attempt to bootstrap into allegations of LIBOR manipulation the effect of such manipulation on Eurodollar futures contracts. This attempt fails, for even if the Exchange-Based Plaintiffs had plausibly pled specific intent (they have not) the effects of specifically intended manipulation do not come within the CEA's reach. *See In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) ("Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA."); *In re Energy Transfer Ptnrs. Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *7 (S.D. Tex. Aug. 26, 2009) (noting that, even if Plaintiffs alleged a causal relationship between defendants' actions and the effect on futures and options, "they do not allege facts that allow the reasonable inference that Defendants intended to affect the prices on the exchanges").

manipulation of LIBOR.  The Exchange-Based Plaintiffs' allegations as to Eurodollar futures contracts rely entirely upon *the supposed effects* of manipulation (which took place outside the United States) of LIBOR (which is a foreign commodity).  But to apply the CEA to *foreign* manipulation of a *foreign* commodity because of its alleged *effects* or "*impact*[]" on a U.S.-traded commodity would be to contradict *Morrison*'s express rejection of an "effects" test.  *See* 130 S. Ct. at 2878−81.  Unless *some* part of *the alleged violation itself*—not merely its effects— occurred in the United States, the plaintiff has not stated a claim.  Thus, after the Supreme Court's decision*,* this Court and others have properly rejected reliance on alleged domestic effects to bring extraterritorial schemes within the reach of U.S. laws.  *See United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 27–29 & n.5 (D. D.C. 2011) (holding that "*Morrison*['s] proscription against the 'effects' test" was not "confine[d] . . . to the Exchange Act" and ruling that RICO claim could therefore not be predicated solely on domestic effects).  Here, the violation that Plaintiffs allege consists of *foreign* manipulation of a *foreign* commodity.  Whatever far-flung effects followed this alleged violation of the CEA, the statute simply does not apply to such conduct.

18

**CONCLUSION**

For the foregoing reasons, Plaintiffs' claims should be dismissed for failure to state a

claim on which relief can be granted.


Dated:  New York, New York
          June 29, 2012

GIBSON, DUNN & CRUTCHER LLP

By:  ___s/Peter Sullivan_____
          Peter Sullivan
          Lawrence J. Zweifach

200 Park Avenue
New York, New York 10166-0193
(212) 351-4000
*Attorneys for Defendant UBS AG*

Of Counsel:

Thomas G. Hungar
D. Jarrett Arp
John F. Bash
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306