UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

In re:                                      **MEMORANDUM, ORDER,**
                                                **AND JUDGMENT**

LIBOR-Based Financial Instruments
Antitrust Litigation.                       11 MD 2262 (NRB)


This Document Applies to:

  OTC Plaintiff Action                      11 Civ. 5450


-------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I.  INTRODUCTION

This memorandum and order addresses the motions for final

approval of OTC plaintiffs' settlements with two panel banks,

Barclays and Citi (the "Barclays Settlement" and "Citi

Settlement," respectively).[1]  We have previously set forth the

nature of LIBOR, its alleged manipulation, and OTC plaintiffs'[2]

---

[1] The Barclays Settlement Agreement, entered into on November 11, 2015, is attached as Exhibit 1 to the March 9, 2016 declaration of Michael Hausfeld, ECF No. 1338-1. The Citi Settlement Agreement, entered into on July 27, 2017, is attached as Exhibit 1 to the August 15, 2017 declaration of Marc Seltzer, ECF No. 2226-1.

[2] The specific plaintiffs differ for purposes of the two settlements. As to the Barclays settlement, the plaintiffs are: "the Mayor and City Council of Baltimore; City of New Britain; Texas Competitive Electric Holdings Company LLC; Yale University; Jennie Stuart Medical Center, Inc.; Variety Children's Hospital d/b/a Miami Children's Hospital; Highlander Realty LLC; and SEIU Pension Plans Master Trust." Barclays Settlement Agreement ¶ 1. As to the Citi settlement, the plaintiffs are "Mayor and City Council of Baltimore, City of New Britain, Vistra Energy Corp., Yale University, and Jennie Stuart Medical Center, Inc." Citi Settlement Agreement ¶ 1.

Paragraph 2(*l*) of the Barclays Settlement Agreement defines "Defendants" as: "Credit Suisse Group AG; Credit Suisse International; Credit Suisse (USA) Inc.; Bank of America Corporation; Bank of America, N.A.; JPMorgan Chase & Co.; JPMorgan Chase Bank, NA; HSBC Holdings PLC; HSBC Bank PLC; Barclays Bank PLC; Lloyds Banking Group PLC; WestLB AG; Westdeutsche Immobilienbank AG; UBS AG; The Royal Bank of Scotland Group PLC; Citizens Bank of Massachusetts a/k/a RBS

specific claims at length, and general familiarity with the background of this case continues to be assumed.[3]  As set forth below, the Barclays and Citi settlements are finally approved and partial judgment will be entered accordingly.[4]

---

Citizens Bank N.A.; Deutsche Bank AG; Citibank NA; Citigroup Inc.; Coöperatieve Centrale Raiffeisen Boerenleenbank B.A.; The Norinchukin Bank; The Bank of Tokyo-Mitsubishi UFJ, Ltd; HBOS PLC; Société Générale S.A.; Royal Bank of Canada; and any other Person or Persons who are named as defendants in the OTC Action at any time up to and including the date a Preliminary Approval Order is issued." Barclays Settlement Agreement ¶ 2(*l*).

Paragraph 2(*l*) of the Citi Settlement Agreement defines "Defendants" as: "Citibank; Barclays Bank PLC; Credit Suisse Group AG; Credit Suisse International; Credit Suisse (USA) Inc.; Bank of America Corporation; Bank of America, N.A.; JPMorgan Chase & Co.; JPMorgan Chase Bank, NA; HSBC Holdings PLC; HSBC Bank PLC; Lloyds Banking Group PLC; WestLB AG; Westdeutsche Immobilienbank AG; UBS AG; The Royal Bank of Scotland Group PLC; Citizens Bank of Massachusetts a/k/a RBS Citizens Bank N.A.; Deutsche Bank AG; Coöperatieve Centrale Raiffeisen Boerenleenbank B.A.; The Norinchukin Bank; The Bank of Tokyo-Mitsubishi UFJ, Ltd; HBOS PLC; Société Générale S.A.; Royal Bank of Canada; and any other Person or Persons who are or were named as defendants in the OTC Action at any time up to and including the date a Preliminary Approval Order is issued." Citi Settlement Agreement ¶ 2(*l*).

[3] We rely extensively on our prior opinions in this case, including the seven denominated by roman numerals.  See LIBOR VII, 299 F. Supp. 3d 430 (S.D.N.Y. 2018), ECF No. 2452; LIBOR VI, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016), ECF No. 1676; LIBOR V, 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015), ECF No. 1234; LIBOR IV, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), ECF No. 1222, aff'd in part, vacated in part, and remanded sub nom. Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68 (2d Cir. 2018); LIBOR III, 27 F. Supp. 3d 447 (S.D.N.Y. 2014), ECF No. 568; LIBOR II, 962 F. Supp. 2d 606 (S.D.N.Y. 2013), ECF No. 389; LIBOR I, 935 F. Supp. 2d 666 (S.D.N.Y. 2013), ECF No. 286, vacated and remanded sub nom. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016).

[4] Additionally, Kenneth Feinberg is appointed as Settlement Administrator and Huntington National Bank is appointed as Escrow Agent.

Pursuant to paragraph 7(c) of each settlement agreement: "The Settlement Administrator shall assist in the development of the Plan of Distribution and the resolution of any disputes between OTC Class Members and the Claims Administrator pursuant to the Plan of Distribution." Barclays Settlement Agreement ¶ 7(c); Citi Settlement Agreement ¶ 7(c).

Pursuant to paragraph 10(a) of each settlement agreement: "The Settlement Fund shall be established as an escrow account and administered by the Escrow Agent, subject to approval by the Court." Barclays Settlement Agreement ¶ 10(a); Citi Settlement Agreement ¶ 10(a).

## II. SETTLEMENT APPROVAL

We consider, in turn, class certification, sufficiency of the notice distributed to potential class members, the fairness of the settlements, and the fairness of the plans of distribution.

### 1. Settlement Classes

#### 1.1. Certification

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in Rule 23(a) and (b) have been satisfied." In re Am. Int'l Grp., Inc. Sec. Litig. (In re AIG), 689 F.3d 229, 238 (2d Cir. 2012). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems" precluding findings of predominance under Rule 23(b)(3). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997); see also In re AIG, 689 F.3d at 242 ("[M]anageability concerns do not stand in the way of certifying a settlement class."). "But other specifications of the Rule -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." Amchem, 521 U.S. at 620.

In LIBOR VII, we considered extensively whether a proposed class of OTC plaintiffs could be certified for litigation purposes. We found that OTC plaintiffs satisfied the numerosity,

commonality, typicality, and adequacy of representation requirements of Rule 23(a), see LIBOR VII, 299 F. Supp. 3d at 585-90, concluded that common issues predominated at least with respect to OTC plaintiffs' antitrust claims, see id. at 590-95, and found that a class action was a superior method of adjudication, see id. at 607. We see no reason to depart from these prior holdings.[5]

Accordingly, we certify two classes (the "Settlement Classes"): (1) a class corresponding to the Barclays settlement (the "Barclays Settlement Class") and (2) a class corresponding to the Citi settlement (the "Citi Settlement Class").

Each settlement class is defined as follows:

> All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in the United States, directly from a Defendant (or a Defendant's subsidiaries or affiliates), a U.S. Dollar LIBOR-Based Instrument and that owned the U.S. Dollar LIBOR-Based Instrument any time during the period August 2007 through May 2010 (the "Class Period").[6]

---

[5] Further, while we concluded that variations in state substantive law raised considerable manageability concerns precluding a finding of predominance as to OTC plaintiffs' unjust enrichment claims and certification of a nationwide class as to those claims, see LIBOR VII, 299 F. Supp. 3d at 600-02, "the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis," In re AIG, 689 F.3d at 242.

[6] Specifically excluded from the Classes are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf. Also excluded from the Classes are any judicial officers presiding over this action and the members of his/her immediate families and judicial staff, and any juror assigned to the OTC Action. Barclays Settlement Agreement ¶ 3(b); Citi Settlement Agreement ¶ 3(b).

Paragraph 2(qq) of the Barclays Settlement Agreement and paragraph 2(ss) of the Citi Settlement Agreement each define "U.S. Dollar LIBOR-Based

The Barclays Settlement Class does not include the 17 individuals and entities who have timely requested exclusion (the "Barclays Opt-Outs"), as listed in Exhibit A to the Supplemental Declaration of Jason Rabe dated October 16, 2017, ECF No. 2319. The Citi Settlement Class does not include the 16 individuals and entities who have timely requested exclusion (the "Citi Opt-Outs"), as listed in Exhibit A to the Declaration of Jason Rabe dated January 23, 2018, ECF No. 2412.

The Court's certification of the Settlement Classes as provided herein is without prejudice to, or waiver of the rights of, any defendant to contest certification of any other class proposed in these actions (i.e., the actions included in the above-captioned multi-district litigation). The Court's findings in this Order shall have no effect on the Court's ruling on any motion to certify any class in these actions, and no party may cite or refer to the Court's approval of the Class as persuasive or binding authority with respect to any motion to certify any such class.

---

Instrument" as: "An instrument that includes any term, provision, obligation or right to be paid or to receive interest based upon the U.S. Dollar LIBOR rate, including but not limited to asset swaps, collateralized debt obligations, credit default swaps, forward rate agreements, inflation swaps, interest rate swaps, total return swaps, options or floating rate notes. For the avoidance of doubt, U.S. Dollar LIBOR-Based Instrument does not include an instrument that includes only a term, provision, obligation or right to pay interest based upon the U.S. Dollar LIBOR rate, such as business, home, student or car loans, or credit cards." Barclays Settlement Agreement ¶ 2(qq); Citi Settlement Agreement ¶ 2(ss).

If the Effective Date[7] does not occur with respect to a Settlement because of the failure of a condition that affects the Settlement, the certification of the corresponding Class shall be deemed null and void as to the parties subject to that Settlement without the need for further action by the Court or further action by Barclays or Citi (as relevant).  In such circumstances, Barclays or Citi (as relevant) shall retain its rights to seek or to object to certification of this litigation as a class action under Rule 23 of the Federal Rules of Civil Procedure, or under any other state or federal rule, statute, law, or provision thereof, and to contest and appeal any grant or denial of certification in this litigation or in any other litigation on any grounds.

---

[7] Pursuant to paragraph 6(a) of the Barclays Settlement Agreement: "The Effective Date of Settlement shall be the date when all of the following events shall have occurred and shall be conditioned on the occurrence of all of the following events: (i) The contribution to the Settlement Fund has been made pursuant to this Agreement; (ii) Entry of the Preliminary Approval Order; (iii) Final approval by the Court of the settlement set forth in this Agreement, following Class Notice and the Fairness Hearing; (iv) No Party has exercised his, her, or its rights to terminate this Agreement pursuant to Paragraphs 10(c), 13(a), 13(c), or 13(d); and (v) Entry by the Court of a Final Judgment and Order of Dismissal, and the Final Judgment and Order of Dismissal becomes final, or, in the event that the Court enters an Alternative Judgment and neither Class Plaintiffs nor Barclays elects to terminate this Agreement, and such Alternative Judgment becomes final." Barclays Settlement Agreement ¶ 6(a).

Pursuant to paragraph 6(a) of the Citi Settlement Agreement: "The Effective Date of Settlement shall be the date when all of the following events shall have occurred and shall be conditioned on the occurrence of all of the following events: (i) The contribution to the Settlement Fund has been made pursuant to this Agreement; (ii) Entry of the Preliminary Approval Order; (iii) Final approval by the Court of the settlement set forth in this Agreement, following Class Notice and the Fairness Hearing; (iv) No Party has exercised his, her, or its rights to terminate this Agreement pursuant to Paragraphs 10(c), 13(a), or 13(d); and (v) Entry by the Court of a Final Judgment and Order of Dismissal, and the Final Judgment and Order of Dismissal becomes final, or, in the event that the Court enters an Alternative Judgment and neither Class Plaintiffs nor Citibank elects to terminate this Agreement, and such Alternative Judgment becomes final."  Citi Settlement Agreement ¶ 6(a).

**1.2. Class Counsel**

Consistent with our prior orders, see <u>LIBOR VII</u>, 299 F. Supp. 3d at 608; <u>see also</u> Dec. 22, 2011 Order, ECF No. 90, Susman Godfrey LLP and Hausfeld LLP are appointed as class counsel for each of the Settlement Classes.

**2.  Final Approval of Notice**

When a Rule 23(b)(3) class is certified for settlement purposes, Rule 23 imposes two distinct notice obligations.  First, Rule 23(c)(2)(B) directs the provision of "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  "The notice must clearly and concisely state in plain, easily understood language" seven specific pieces of information relating to the action:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

<u>Id.</u>  Second, Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 114 (2d Cir. 2005).  Rather,

"the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" Id. (quoting Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982)). Additionally, while due process also requires that class members receive notice of certification and settlement, "[c]onformity with the requirements of Rule 23(c)(2) fulfills the due process mandate." In re Glob. Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (Lynch, J.) (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974)).

We find these standards met here. Substantively, the notices distributed to the classes[8] contain each of the seven enumerated requirements of Rule 23(c)(2)(B), and contain content sufficient to inform class members of the proposed settlement and apprise

_____

[8] Paragraph 2(i) of each settlement agreement defines Class Notice as: "The Notice and Summary Notice, collectively." Barclays Settlement Agreement ¶ 2(i); Citi Settlement Agreement ¶ 2(i). Each settlement agreement further defines the "Notice" as "The Notice of Proposed Settlement of Class Action to be provided to the Class as provided in this Agreement and the Preliminary Approval Order," Barclays Settlement Agreement ¶ 2(w); Citi Settlement Agreement ¶ 2(y), and the "Summary Notice" as "The summary notice of proposed settlement and hearing for publication," Barclays Settlement Agreement ¶ 2(nn); Citi Settlement Agreement ¶ 2(pp).
    The Class Notice distributed for the Barclays settlement is comprised of the long-form notice, Exhibit A to the June 5, 2017 letter from William C. Carmody to the Court, ECF No. 1943-1, and the publication notice, Exhibit 4 to the May 25, 2017 declaration of Shannon R. Wheatman, ECF No. 1929-4. See June 6, 2017 Order, ECF No. 1948 (approving notice program for the Barclays settlement). The Class Notice distributed for the Citi settlement is comprised of the long-form notice, Exhibit A to the October 27, 2017 letter from William C. Carmody to the Court, ECF No. 2331-1, and the publication notice, Exhibit B to the September 14, 2017 letter from William C. Carmody to the Court, ECF No. 2264-3. See Sept. 26, 2017 Order, ECF No. 2290 (approving notice program for the Citi settlement); Oct. 30, 2017 Order, ECF No. 2332 (approving slight modification to Citi notice program).

them of their options moving forward.  Further, we note that the notices first proposed by counsel were not summarily accepted; rather, the notices that were ultimately distributed resulted from an iterative revision process involving both counsel and the Court. See ECF Nos. 2254, 2264, 2266, 2331 (revisions to Citi notice); ECF Nos. 1882, 1930, 1939, 1943 (revisions to Barclays notice).

Procedurally, we find that the notice programs undertaken as to each settlement constitutes the best notice practicable under the circumstances.  The long-form notices were mailed directly to a developed list of more than 137,000 potential class members, while the publication notices were placed in various publications focused on finance and investment subjects that are likely of particular interest to potential class members.  These means of informing potential class members were further supplemented by a dedicated website and toll-free telephone number.  These myriad methods, taken together, are sufficient to satisfy the standards of Rule 23(c), Rule 23(e), and due process.  See In re IMAX Sec. Litig., 283 F.R.D 178, 184-85 (S.D.N.Y. 2012); In re Glob. Crossing, 225 F.R.D. at 449-50.

### 3. Final Approval of the Settlements

"Federal Rule of Civil Procedure 23(e)(2) provides that a court may approve a class action settlement only if it is 'fair, reasonable, and adequate.'"  Charron v. Wiener, 731 F.3d 241, 247 (2d Cir. 2013) (quoting Fed. R. Civ. P. 23(e)(2)).  We "determine[]

a settlement's fairness by examining [1] the negotiating process leading up to the settlement as well as [2] the settlement's substantive terms." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

### 3.1. Procedural Fairness

"The court must review the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators." Charron, 731 F.3d at 247; see also McReynolds v. Richards-Cantave, 588 F.3d 790, 804 (2d Cir. 2009) (considering whether "plaintiffs' counsel . . . possessed the [necessary] experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests" (alterations in original) (quoting D'Amato, 236 F.3d at 85)). When these criteria are met, "a presumption of fairness, reasonableness, and adequacy" arises, which is "consistent with the 'strong judicial policy in favor of settlements, particularly in the class action context.'" McReynolds at 803 (quoting Wal-Mart Stores, 396 F.3d at 116).

Here, there is no dispute that the class has been represented by experienced and skilled counsel, that the parties have engaged in extensive discovery, or that the settlement resulted from good faith negotiation. As we have previously explained, "Barclays and the OTC plaintiffs entered into multiple rounds of mediation with

three . . . mediators" and, indeed, the OTC-Barclays settlement was reached only "after years of negotiation." Dec. 21, 2016 Order ("Barclays Preliminary Approval Order"), 2016 WL 7625708, at *1 (S.D.N.Y. Dec. 21, 2016), ECF No. 1678; see also Decl. of Michael D. Hausfeld ¶¶ 6-7, Sept. 22, 2017, ECF No. 2275; Decl. of Michael D. Hausfeld ¶¶ 20-27, Mar. 9, 2016, ECF No. 1338. The OTC-Citi settlement arises out of similarly protracted and extensive negotiations before mediators. See Decl. of Michael D. Hausfeld ¶¶ 5-8, Dec. 15, 2017, ECF No. 2378.

Given the foregoing, and the absence of any suggestion of collusion or other impropriety, cf. D'Amato, 236 F.3d at 85 ("[A] . . . mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."), that could rebut the presumption of fairness that arises here, we find that the settlement is procedurally fair.

### 3.2. Substantive Fairness

"In this Circuit, courts examine the [substantive] fairness, adequacy, and reasonableness of a class settlement according to the 'Grinnell factors.'" Wal-Mart Stores, 396 F.3d at 117. These nine factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action

11

through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated by other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000)). "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" In re Glob. Crossing, 225 F.R.D. at 456 (quoting Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003)); cf. Charron, 731 F.3d at 248 (identifying "the deference [the Second Circuit] accord[s] to trial courts in these situations").

First, we consider "the complexity, expense and likely duration of the litigation." Grinnell, 495 F.2d at 463. "The economies and certainties achieved by settlement usually result in this factor favoring settlement in complex class action litigation," 2 McLaughlin on Class Actions § 6:9 (14th ed.) (Westlaw 2017), and particularly so here. "[T]his case is rapidly approaching its seventh birthday, having journeyed up and down the appellate ladder in the process," LIBOR VII, 299 F. Supp. 3d at 545, and "we have issued opinions on substantive issues totaling more than 1000 pages," id. at 603 n.186. And as complex as this action has been, "we have [only] proceeded beyond the pleading

12

stage" and class certification, and we "have not yet reached summary judgment." Id. at 531. There is little reason to believe that this complexity will abate if the case were to proceed through to summary judgment and trial, and indeed, even the optimistic schedule advanced by OTC plaintiffs regarding the litigation class has a trial being held in late 2020 or early 2021. See Proposed Scheduling Order, Letter from William C. Carmody to the Court ex. 1, Apr. 30, 2018, ECF No. 2499-1. This factor therefore weighs strongly in favor of settlement.

Second, we consider "the reaction of the class to the settlement." Grinnell, 495 F.2d at 463. The classes' favorable response to the settlements weighs strongly in favor of final approval. Of the more than 137,000 potential class members informed of the Barclays settlement, only two entities have objected[9] and only 17 requests for exclusion from the class have been received, see Decl. of Jason Rabe ex. A, Oct. 16, 2017, ECF No. 2319. Similarly, of a comparable number of class members informed of the Citi settlement, only one entity has objected[10] and only 16 have sought exclusion, see Suppl. Decl. of Jason Rabe, Jan. 23, 2018, ECF No. 2412. "[T]his small number of objections weigh[s] in favor of the settlement." D'Amato, 236 F.3d at 87.

---

[9] We address these objections in Section III, infra.
[10] And, as we will address, this objector is not in fact a class member.

Third, we consider "the stage of the proceedings and the amount of discovery completed." Grinnell, 495 F.2d at 463. Here, while the action has proceeded only past class certification, the parties have had the benefit of an extensive record: "the record in this case has included more than 1.1 million documents and 6000 audio files," and plaintiffs have had access to the materials generated by "multiple government investigations, consent decrees, and trials" regarding LIBOR manipulation. LIBOR VII, 299 F. Supp. 3d at 608 (alteration incorporated). These "extensive discovery proceedings spanning over [several] years" and the expansive record generated thereby also weighs in favor of settlement. Wal-Mart Stores, 396 F.3d at 118.

The fourth, fifth, and sixth factors consider the risks of establishing liability, establishing damages, and maintaining the action as a class through trial. See Grinnell, 495 F.2d at 463. As our questions posed during the oral argument held on January 18, 2018 and our prior opinions have made clear, each of these facets of trial poses substantial risks to this action. First, as to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage. See, e.g., Gelboim, 823 F.3d at 782 (considering the alternative explanation "that the 'pack' behavior described in the complaints is equally

14

consistent with parallelism"); id. ("The net impact of a tainted
LIBOR in the credit market is an issue of causation reserved for
the proof stage."); see also Jan. 18, 2018 Hr'g Tr. 49:4-7, ECF
No. 2425 ("How can the plaintiffs establish what the proper
submission by the bank should have been if the meaning of LIBOR is
not entirely clear and the submission need not be grounded in an
actual transaction?").

As to establishing damages, the Second Circuit has remarked
that "it is difficult to see how appellants would arrive at such
an estimate [of damages], even with the aid of expert testimony,"
and expressly acknowledged that "this case presents some unusual
challenges" in terms of assessing damages.  Gelboim, 823 F.3d at
779-80.  Indeed, we specifically declined to endorse a model for
the calculation of but-for LIBOR, see LIBOR VII, 299 F. Supp. 3d
at 595 ("Regardless of whether this evidence consists of
regressions that are capable of estimating but-for LIBOR over the
class period in a few calculations (like those offered by Dr.
Bernheim), or something more complex as Dr. Willig suggests is
necessary . . . ."), and any such models will unquestionably be
challenged and perhaps subject to further Daubert motions.
Further, as we have explained at length, questions of netting and
absorption loom large over the amount of damages that any plaintiff
may ultimately recover.  See LIBOR VII, 299 F. Supp. 3d at 591-92
(addressing netting and absorption in the OTC context); LIBOR VI,

2016 WL 7378980, at *17-20 (discussing the issue of "speculative damages").

And as to maintaining the action as a class, Bank of America and JPMorgan have sought interlocutory review of our decision in LIBOR VII certifying a litigation class as to OTC plaintiffs' antitrust claims. See Mayor of Baltimore v. Bank of Am. Corp., No. 18-746 (2d Cir. filed March 16, 2018). But regardless of proceedings on appeal, we have also noted that "[o]ur decision to certify a class as to OTC plaintiffs' antitrust claims rests on the action in its current form, including on OTC plaintiffs' allegations of a sixteen-bank conspiracy to suppress LIBOR" and have cautioned that "subsequent developments in the case [that] call into question those allegations or the other bases on which we rely" could warrant modification or decertification of the class. LIBOR VII, 299 F. Supp. 3d at 607 n.189; see also Jan. 18, 2018 Hr'g Tr. 38:9-11 ("I'm not sure why you're so sanguine that the case just proceeds as a class action if you're unable to prove the 16-bank conspiracy that you've alleged."). Therefore, the certainty of maintaining a class action is by no means guaranteed. Each of the fourth, fifth, and sixth factors, accordingly, weighs strongly in favor of final approval.

Seventh, we consider the ability of defendants to withstand a greater judgment. See Grinnell, 495 F.2d at 463. We do not doubt that as two globally prominent financial institutions,

16

Barclays and Citi, could each withstand a greater judgment, but "fairness does not require that the [defendant] empty its coffers before this Court will approve a settlement." McBean v. City of New York, 233 F.R.D. 377, 388 (S.D.N.Y. 2006) (Lynch, J.); see also In re Wachovia Equity Sec. Litig., No. 08 Civ. 6171 (RJS), 2012 WL 2774969, at *5 (S.D.N.Y. June 12, 2012). Rather, as Judge Lynch has explained, this factor is intended to "strongly favor settlement" when "there is a risk that an insolvent defendant could not withstand a greater judgment" but that "the ability of defendants to pay more, on its own, does not render the settlement unfair." McBean, 233 F.R.D. at 388; cf. Gelboim, 823 F.3d at 779 (expressing concern about "bankrupt[ing] 16 of the world's most important financial institutions").

Finally, we consider the range of reasonableness of the settlement fund to the best possible recovery (the eighth factor) and the possible recovery given all the attendant risks of litigation (the ninth factor). Grinnell, 495 F.2d at 463. In considering these factors, "the settlement amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness." In re Glob. Crossing, 225 F.R.D. at 460-61. As the Second Circuit has explained, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate

17

and should be disapproved." _Grinnell_, 495 F.2d at 455. Rather,
"there is 'a range of reasonableness with respect to a
settlement,'" _Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd._, No. 01
Civ. 11814 (MP), 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004)
(quoting _Newman v. Stein_, 464 F.2d 689, 693 (2d Cir. 1972)), and
"there is no reason, at least in theory, why a satisfactory
settlement could not amount to a hundredth or even a thousandth
part of a single percent of the potential recovery," _Grinnell_, 495
F.2d at 455 n.2.

Here, we conclude that the eighth factor is, at most, neutral,
and the ninth factor strongly weighs in favor of settlement. An
assessment of the eighth factor is somewhat difficult to make, as
OTC plaintiffs have not offered an estimate of "the best possible
recovery" that plaintiffs often do in the class-action context,
_see_ _In re IMAX_, 283 F.R.D. at 191-92 (collecting cases). But this
shortcoming is perhaps understandable, as any assessment of the
best possible recovery against a single defendant would indeed be
difficult to make given that "there are features of this case that
make it like no other," _Gelboim_, 823 F.3d at 778. The
recoverability of damages is indeed particularly complex in this
case. Under an antitrust conspiracy theory, a class member may
recover against a given panel bank (assuming liability has been
established) for losses incurred in OTC transactions with any panel
bank <u>that is found to have participated in the conspiracy</u>. By

contrast, under an implied covenant theory or an unjust enrichment theory, a class member may recover against a given panel bank only for losses incurred in transacting with that specific panel bank. The settlement, of course, releases both forms of claims. Given these varying metrics, and the other difficulties associated with the calculation of damages that we discuss in analyzing the other Grinnell factors, we conclude that an assessment of the "best possible recovery" would be of little value in assessing the substantive fairness of the settlement. Rather, "[d]ue to the complexities inherent in this case, the certainty of this settlement amount has to be judged in [the] context of the legal and practical obstacles to obtaining a large recovery." In re Glob. Crossing, 225 F.R.D. at 461.

Accordingly, we turn to the ninth factor, the "possible recovery in light of all the attendant risks of litigation." Grinnell, 495 F.2d at 463. This factor at least somewhat overlaps with the fourth, fifth, and sixth factors, which consider the risks of establishing liability, establishing damages, and maintaining a class action through trial. We concluded above that there are substantial risks as to all three, and that those factors therefore weighed heavily in favor of a finding of substantive fairness; our analysis of the final factor is no different. "The prompt, guaranteed payment of the settlement money increases the settlement's value in comparison to 'some speculative payment of

a hypothetically larger amount years down the road,'" and "when judged against the realistic, rather than theoretical, potential for recovery after trial, the settlement amount is extremely beneficial." In re Glob. Crossing, 225 F.R.D. at 461 (quoting A.C.L.N., 2004 WL 1087261, at *5).

We conclude that the Grinnell factors, taken together, strongly weigh in favor of a finding of substantive fairness.

## 4.    Final Approval of the Plans of Distribution

"A district court 'has broad supervisory powers with respect to the . . . allocation of settlement funds.'" In re Credit Default Swaps Antitrust Litig. (In re CDS), No. 13 MD 2476 (DLC), 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (omission in original) (quoting In re Holocaust Victim Assets Litig., 424 F.3d 132, 146 (2d Cir. 2005)). "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized -- namely, it must be fair and adequate." In re Giant Interactive Grp., Inc. Sec. Litig., 279 F.R.D. 151, 163 (S.D.N.Y. 2011) (quoting In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)).

"[I]n the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision." In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 133 (S.D.N.Y.), aff'd, 117 F.3d 721 (2d Cir. 1997) (per curiam). Accordingly, "a plan of allocation need

not be perfect." Hart v. RCI Hosp. Holdings, Inc., No. 09 Civ. 3043 (PAE), 2015 WL 5577713, at *12 (S.D.N.Y. Sept. 22, 2015). Rather, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." In re Wachovia, 2012 WL 2774969, at *5. Ultimately, "[t]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 William B. Rubenstein, Newberg on Class Actions § 12:15 (5th ed.) (Westlaw 2018); see also In re CDS, 2016 WL 2731524, at *9 ("A principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund." (emphasis added)).

The Plan of Distribution for the Barclays settlement (amended and set forth as Exhibit A to the August 24, 2017 letter from William C. Carmody to the Court, ECF No. 2239-1) and the Plan of Distribution for the Citi Settlement (set forth as Exhibit 1 to the Declaration of Seth Ard dated September 6, 2017, ECF No. 2253-1), each provide for pro rata distributions of the respective settlement funds net of expenses, attorneys' fees, and incentive awards to class members. We previously approved these Plans of Distribution preliminarily, see Aug. 28, 2017 Order, ECF No. 2243 (approving the plan of distribution, as amended, as to the Barclays settlement); Sept. 26, 2017 Order, ECF No. 2290 (approving the

plan of distribution as to the Citi settlement), and see no reason to change course at this juncture. The Plans of Distribution ensure a reasonable relationship between the magnitude of a class member's alleged loss due to suppression and the recovery that the class member will receive, while requiring only mathematically straightforward calculations that are easily performed. While greater precision could be achieved by taking into account, for example, the issues of netting and absorption that we have repeatedly emphasized, see, e.g., LIBOR VII, 299 F. Supp. 3d at 599-92, the Plans of Distribution and the pro rata means of allocation they contemplate strike a reasonable balance between precision and efficiency. The Plans of Distribution are finally approved.

### III.  OBJECTIONS

We next consider the three objections lodged against the two settlements: (1) Maimonides Medical Center's objection to the Barclays settlement, (2) Managed Care Advisory Group's objection to the Barclays settlement, and (3) the Virgin Islands Public Finance Authority's objection to the Citi settlement.

### 1.  Maimonides Medical Center

Maimonides Medical Center (MMC) entered into an interest-rate swap with Bank of America in April 2006, under which it would pay Bank of America interest at a fixed 4.14 percent in exchange for 70 percent of one-month LIBOR, and held this swap through the class

period.  See Letter from Les Jacobowitz to the Court ex. 1, Oct. 10, 2017, ECF No. 2320-1.  MMC is therefore a member of the settlement classes and has standing to the Barclays settlement.

Citing no authority, MMC objects on grounds that read, in their entirety:

> The Medical Center's main objections include: (i) breach of contract and unfair enrichment by the breaching Defendants, (ii) lack of transparency by the Defendants, (iii) insufficient Class Period timeframe and (iv) inadequate compensation of the Class Members due to the overall significant swap exposure of the Class Members.

See Letter from Les Jacobowitz to the Court at 3, Oct. 10, 2017, ECF No. 2320-1.  While the sparseness of MMC's objections render them somewhat difficult to parse, we nonetheless consider each point in turn.

First, MMC contends that the defendants have engaged in "breach of contract and unfair enrichment."  These are indeed among the claims asserted by the OTC plaintiffs in the second amended complaint (operative as to Barclays), supported by allegations that, at this juncture, remain only allegations.  Particularly in light of the difficulties that OTC plaintiffs may face in establishing liability and damages, MMC's contention that these allegations form the basis of an objection is more or less indecipherable.

Second, MMC objects that the settlement process has been characterized by a "lack of transparency by the Defendants."  Though MMC clarified at the Barclays fairness hearing that its

counsel "[did]n't know how these settlement negotiations" came to pass and that "it would be ironic if the 120 million was the number that had come from Barclays in determining . . . the settlement amount that is being decided today," Oct. 23, 2017 Hr'g Tr. 49:25-50:3, ECF No. 2344, this objection remains baffling and its relevance is not readily discernable.  To the extent MMC calls into question the procedural fairness of the settlement, however, MMC does not overcome the presumption of procedural fairness that arises "from an arm's-length, good faith negotiation between experienced and skilled litigators." Charron, 731 F.3d at 247.

Third, MMC argues that the settlement is characterized by an "insufficient class period timeframe."  This objection is again difficult to decrypt, as MMC does not, however, explain whether it believes the class period should begin earlier, end later, both, or neither.  But regardless, "it is not the Court's prerogative to pick and choose terms of the settlement . . . or substitute terms more to the Court's liking," McBean, 233 F.R.D. at 382, and so we decline MMC's invitation that we quibble with the Barclays settlement class's class period, cf. In re WorldCom, 388 F. Supp. 2d at 343 ("Because [MMC] chose to remain a Class Member, there is no unfairness in applying the Release to all of [its] claims, even if they involve securities purchased prior to the Class Period, so long as they are predicated on the same facts alleged in the class action complaint.").  The legally relevant point is that we have

found, under the <u>Grinnell</u> factors, that the settlement on its terms is fair, reasonable, and adequate.

We further note, however, that the settlement class period corresponds closely with the period on which OTC plaintiffs have focused their allegations, August 2007 through May 2010, <u>see, e.g.</u>, Second Am. Compl. ¶¶ 1-2, 66, 338, Sept. 10, 2013, ECF No. 406, and that given the pro rata nature of the distribution plan we have approved, a modified class period is unlikely to meaningfully change the amount of recovery to any settlement class member. OTC plaintiffs' expert modeling shows little amounts of suppression beyond the settlement class period as a general matter, and while inclusion of that suppression will increase a class member's overall notional stake, <u>see</u> Plan of Distribution ¶ 5(a), that increase will not necessarily flow through to the class member's pro rata share, which is the ultimate determinant of that class member's recovery, <u>see</u> <u>id.</u> ¶ 5(b)-(c).

Fourth, MMC asserts that the Barclays settlement provides "inadequate compensation" to class members in light of their overall swap exposures.[11]  As an initial matter, we have already

---

[11] We also remark that MMC's submission suggests that its LIBOR exposure may be less than the full amount of its loan.  As MMC notes, it was "required" to enter into the swap "[i]n connection with a $31,200,000 bond financing with the New York City Capital Resource Corporation's Variable Rate Demand Revenue Bonds (Loan Enhanced Assistance Program), Series 2006 A."  Letter from Les Jacobowitz to the Court at 2, Oct. 10, 2017, ECF No. 2320-1.  To the extent that bond financing involved MMC's <u>payment</u> of interest at a LIBOR-based rate, the bond financing would reduce MMC's overall exposure to LIBOR below that suggested by the swap standing alone.

concluded that the Barclays settlement is substantively fair under the Grinnell factors, and note that the vast majority of class members -- as demonstrated through their revealed preferences -- consider the compensation provided by the settlement sufficiently adequate such that they have not sought exclusion or objected.

At the October 23, 2017 fairness hearing, counsel for MMC made reference to certain fines that had been paid by Barclays to the Department of Justice, the Commodities Futures Trading Commission, and the United Kingdom's Financial Services Authority. According to MMC, Barclays had paid $435 million to those regulatory authorities, which suggests "$191 million for an equivalent type of settlement." Oct. 23, 2017 Hr'g Tr. 42:4-5. But even assuming that $120 million and $191 million do not lie within the same range of reasonableness, MMC's conflation of civil damages on the one hand and criminal and regulatory fines on the other is unpersuasive.

Criminal liability may be more expansive than civil liability, and the two forms of liability serve largely different purposes. As the Supreme Court has explained, "[c]ompensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct,'" State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) (quoting Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 432 (2001)), while the criminal law, by

contrast, advances interests such as "the interests of punishment and deterrence," <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 504 (2008) (quoting <u>Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.</u>, 492 U.S. 257, 275 (1989)). As particularly relevant here, the government may prosecute "[e]very contract, combination . . . or conspiracy, in restraint of" interstate or foreign commerce as a criminal violation, 15 U.S.C. § 1, but the law also recognizes that "not every victim of an antitrust violation needs to be compensated under the antitrust laws" through the recovery of civil damages, <u>Gelboim</u>, 823 F.3d at 779; <u>see also Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519 (1983). Indeed, the critical question of "whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement" has been considered at length and highlights this difference in scope. <u>LIBOR VI</u>, 2016 WL 7378980, at *15 (quoting <u>Gelboim</u>, 823 F.3d at 780).

Similarly, regulatory enforcement authority may sweep more broadly than a private civil right of action. For example, under the Securities Exchange Act, "while a plaintiff must prove reliance . . . in a private securities fraud suit, there is no such requirement in an SEC enforcement action." <u>SEC v. Apuzzo</u>, 689 F.3d 204, 213 (2d Cir. 2012) (citation omitted). Likewise, under the Commodity Exchange Act, "a plaintiff has standing to bring a

commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation," LIBOR VII, 299 F. Supp. 3d at 495 n.46 (quoting LIBOR II, 962 F. Supp. 2d at 620), but the CFTC is subject to no such requirement, see id. at 539 (citing DiPlacido v. CFTC, 364 F. App'x 657, 661 (2d Cir. 2009)).

As a result of these types of differences, the amount of criminal and regulatory fines previously levied against a defendant will rarely be an appropriate metric by which to estimate civil damages. Those amounts will be an even less appropriate metric by which to assess the appropriateness of a civil settlement, where competing assessments of risk -- of civil liability to private plaintiffs as distinguished from criminal or regulatory liability -- are incorporated into settlement amount.

Ultimately, MMC was made aware, at the Barclays fairness hearing, of its ability to opt out and exclude itself from the Barclays settlement. Oct. 23, 2017 Hr'g Tr. 55:15-56:5; cf. Fed. R. Civ. P. 23(e)(4) (providing that prior to settlement approval, a court may "afford[] a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so"). It has not done so, and its chosen course of action is telling. See, e.g., In re WorldCom, 388 F. Supp. 2d at 343. MMC's objection is overruled.

## 2. Managed Care Advisory Group

Managed Care Advisory Group (MCAG) holds itself out as a firm "with a broad range of clients who file for recovery in the various class actions [sic] and to do so hire MCAG to organize and marshal their claim information for submission to the courts, information, [sic] and paying agents involved in the class action matters," and broadly asserts the ability to "act behind the scenes with these clients to organize their submissions, take on the role of legal representative, or act as power of attorney and directly submit claims forms for clients." MCAG Mem. in Opp'n to Final Approval at 2, Oct. 9, 2017, ECF No. 2305.[12] MCAG objects to the OTC-Barclays settlement, OTC plaintiffs contest MCAG's standing, and we address MCAG's standing before any consideration of the merits of MCAG's objection.

### 2.1. Standing

Rule 23(e)(5) provides that "[a]ny <u>class member</u> may object [to a proposed settlement] if it requires court approval under [Rule 23(e)]." Fed. R. Civ. P. 23(e)(5) (emphasis added). Consistent with this textual command, courts have recognized that "[o]nly Class members have standing to object to the Settlement of a class action." <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 130 B.R. 910, 923 (S.D.N.Y. 1991), <u>aff'd</u>, 960 F.2d 285 (2d Cir. 1992).

---

[12] Though the process established by the Court did not provide for any such filing, MCAG also filed a sur-reply brief in opposition to final approval, ECF No. 2330, at 6:00 p.m. on Sunday, October 22, 2017, fewer than 24 hours before the 10:45 a.m. fairness hearing on October 23.

That is, "[n]onparties to a settlement generally do not have standing to object to a settlement of a class action." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 244 (2d Cir. 2007) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 13:69 (4th ed. 2002)); see 2 McLaughlin on Class Actions § 6:10 (14th ed.) (Westlaw 2017) ("Generally, non-parties and non-settling defendants lack standing to object to most provisions of a partial settlement, because their rights are usually not affected by the settlement."). "The objector, as a party seeking to generate a court ruling, has the burden of demonstrating her standing." 4 William B. Rubenstein, Newberg on Class Actions § 13:22 (5th ed.) (Westlaw 2018).

MCAG does not claim to have transacted in qualifying LIBOR-based instruments with the panel banks and is not itself a class member. Rather, MCAG asserts it has authority, under various arrangements with class members, to file claims and involve itself in settlements on those class members' behalves.[13]

We are dubious that MCAG in fact has such authority, and MCAG's actions taken to date does nothing to assuage our suspicions. We have previously expressed our skepticism as to

---

[13] Curiously enough, MCAG initially referred to its ability to "act as power of attorney and directly submit claims forms for clients," MCAG Mem. in Opp'n to Final Approval at 2, Oct. 9, 2017, ECF No. 2305, but now disclaims that power of attorney is necessary in order for it to directly submit a claim on behalf of a class member, see Letter from Joseph D. Carney to the Court at 6, July 20, 2017, ECF No. 2637.

whether MCAG has authority to file the extent of claims it did, given its "purported filing of claims on behalf of, among other entities, General Electric Corp., Morgan Stanley, and perhaps most incredibly, Citizens Bank, presumably the then-U.S. subsidiary of panel bank Royal Bank of Scotland." Apr. 11, 2018 Order at 1, ECF No. 2489. Accordingly, we ordered that "MCAG shall provide Class Counsel and the Claims Administrator . . . proof of its authority to file the claim for each of the claims that MCAG has already filed" and that "should MCAG wish to continue filing claims on behalf of class members moving forward, it shall attach proof of its authority when filing each claim." Id. at 2-3 (second emphasis added).

MCAG subsequently withdrew a substantial portion of the claims it had previously filed, see Letter from William C. Carmody to the Court at 3 & n.1, June 29, 2018, ECF No. 2603; Letter from Joseph D. Carney to the Court at 6, July 20, 2018, ECF No. 2637, and MCAG does not dispute that it has been less than fully compliant with our April 11, 2018 order directing that MCAG provide proof of authority contemporaneously with any subsequent claims, see Letter from William C. Carmody to the Court at 3, June 29, 2018, ECF No. 2603; Letter from William C. Carmody to the Court at 3, July 24, 2018, ECF No. 2639. Given the apparent difficulty that MCAG has had in establishing its authority to file claims thus far, and its continued reluctance to be forthcoming with such

proof in the face of an order of this Court so directing, we would be hard pressed to conclude that MCAG in fact possesses the authority it asserts.

But even if MCAG were to have claim-filing authority, whether it has authority to undertake the further-reaching act of objecting to the settlement is a separate question. For MCAG to have such authority, it would, at minimum,[14] (1) need to have been validly assigned such authority by (2) an entity that is a member of the Barclays class. Yet many of the entities on whose behalf MCAG has filed claims appear not to be class members at all. Even though MCAG was required to submit proof of its standing along with its objection, see Barclays Settlement Long Form Notice at 10, ECF No. 1943-1 (requiring that any objection be submitted before the relevant objection deadline and include "Proof of membership in the Class, including documentation evidencing ownership of a U.S. Dollar LIBOR-Based Instrument during the Class Period (August 2007 and May 2010)"). Questions of MCAG's standing have been raised almost immediately following the submission of MCAG's objection, and its response has been more or less limited to naked assertions of its authority to do so. See, e.g., MCAG Suppl. Opp'n to Final

---

[14] We say "at minimum," because at least one court has rejected MCAG's argument that it has standing by virtue of its contractual relationships with class members. See In re Tricor Indirect Purchaser Antitrust Litig., No. 05-360-SLR, 2009 WL 3460769, at *2 (D. Del. Oct. 28, 2009).

Approval at 12-17, Oct. 22, 2017, ECF No. 2330.[15]   Even if MCAG

could provide proof that it was given authority to object, it has

not offered (let alone actually presented) any proof to the Court

that an entity conferring such authority is itself a proper member

of the Barclays class.

Indeed, MCAG admits that it has filed numerous claims with no

actual knowledge as to whether the entity on whose behalf the claim

is being filed is in fact a member of the Barclays or Citi

settlement classes.  Letter from Joseph D. Carney to the Court at

2, July 20, 2018, ECF No. 2637.  Rather, MCAG appears to have

submitted claims based on its educated guesses as to which entities

would have owned LIBOR-based instruments satisfying the class

definition, see id., thereby foisting on the claims administrator

the entire burden of determining which entities in fact have valid

claims and, as a corollary, saddling the class with the expenses

---

[15] MCAG contends, at one point, that it has its own organizational standing
to object to the settlement.  For it to have organizational standing, MCAG must,
"[bear] the burden of showing: (i) an imminent 'injury in fact' to itself as an
organization (rather than to its members) that is 'distinct and palpable'; (ii)
that its injury is 'fairly traceable' to [the complained-of act]; and (iii)
that a favorable decision would redress its injuries."  Centro de la Comunidad
Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017)
(quoting Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011)); see also Knife
Rights, Inc. v. Vance, 802 F.3d 377, 388 (2d Cir. 2015) ("Insofar as the
organizational plaintiffs sue on their own behalf, they must independently
satisfy the requirements of Article III standing.").  But MCAG's arguments as
to its organizational standing, e.g., MCAG Suppl. Opp'n to Final Approval at
14, ECF No. 2330, relate solely to the claims of the class members on whose
behalf it has purported to file claims, rather than an injury to itself.
Accordingly, the question of MCAG's organizational standing is no different
here from the question of MCAG's authority to assert an objection on behalf of
its purported clients.  Nor could MCAG have associational standing, since it is
not a membership-based organization either formally or functionally.  See
Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc., 675
F.3d 149, 156-57 (2d Cir. 2012).

incurred by the claims administrator in so doing. In addition, one would seriously question why MCAG's process has resulted in the submission of claims for some entities in only one of the two settlements, as the two settlement classes are identical except for minor differences in opt-outs.

MCAG's responses have been insufficient on multiple levels, and we therefore find, as a factual matter, MCAG has failed to carry its burden of establishing that it has standing to object to the Barclays settlement.

## 2.2. Merits

But even if MCAG did have standing, its objection would fail on the merits. The crux of MCAG's objection relates to over-the-counter transactions with non-Panel Banks that are allegedly extinguished by the Barclays settlement. According to MCAG, nay, Guaranty Bank,[16] the settlement suffers from three flaws: (1) the release of those claims without compensation renders the settlement overbroad; (2) claims arising out of non-Panel Bank transactions do not share an identical factual predicate and therefore may not be released; and (3) OTC plaintiffs cannot

---

[16] MCAG's objection here could perhaps be more accurately characterized as Guaranty Bank's objection. MCAG's first brief submitted in support of its objection is, in large part, a copy-paste job from an earlier objection submitted by Guaranty Bank in opposition to preliminary approval of the Barclays settlement. Compare ECF No. 1395 (Guaranty Bank's objection), with ECF No. 2305 (MCAG's objection). MCAG, of course, does not purport to have a contractual relationship with Guaranty Bank and does not purport to be representing Guaranty Bank in any capacity.

adequately represent class members who transacted with both Panel Banks and non-Panel Banks.

These contentions are unavailing.  As a threshold matter, we have previously considered the non-Panel Bank transactions about which MCAG expresses concern: claims arising out of those transactions were dismissed in <u>LIBOR VI</u> for lack of antitrust standing.  <u>See</u> <u>LIBOR VI</u>, 2016 WL 7378980, at *16.  To the extent such claims retain any value following <u>LIBOR VI</u>, MCAG proceeds from an incorrect factual premise, as those claims are <u>not</u> released to the extent they are part of the Bondholder action[17] or the <u>Green Pond</u> actions.[18]  Given that the Bondholder action covers all LIBOR-based debt securities issued by non-Panel Banks and that the <u>Green Pond</u> actions cover transactions with a lengthy list of non-Panel Bank institutions, the scope of claims arising out of non-Panel Bank transactions that are extinguished is minimal.[19]

Consider, for example, the evidence that MCAG itself submitted at the Barclays Fairness Hearing.  MCAG provided reports from the Office of the Comptroller of the Currency (OCC) identifying the 25 bank holding companies with the largest notional

---

[17] <u>Gelboim v. Credit Suisse Grp. AG</u>, Case No. 12 Civ. 1025.

[18] <u>33-35 Green Pond Road Assocs. LLC v. Bank of Am. Corp.</u>, Case No. 12 Civ. 5822; <u>Courtyard at Amwell II, LLC v. Bank of Am. Corp.</u>, Case No. 12 Civ. 6693.

[19] The Bondholder and <u>Green Pond</u> plaintiffs have reached their own settlements with a number of panel banks.

amount of derivatives contracts.[20]  Taking March 31, 2008, as an example, MCAG asserts that Panel Banks correspond to only 4 of the top 25 (JPMorgan, Citi, Bank of America, and Barclays).  Setting aside MCAG's failure to recognize HSBC as a panel bank, its failure to recognize Taunus Corporation as the main U.S. subsidiary of Deutsche Bank,[21] and its failure to recognize that two other entities became part of other panel banks,[22] 16 of the remaining 17 institutions listed in the top 25 are captured by the Green Pond carve-out once consolidation in the financial industry occurring since 2008 is considered.[23]  That is, only one of the top 25, First Horizon National Corporation is not, and the notional amount of its forwards, swaps, and options amount to 0.024 percent of the total notional amount held by the top 25, and the OCC in turn notes that "the largest 25 banks with derivatives activity account for nearly 100% of all contracts."[24] As the statistics and authorities that MCAG itself provided at the Barclays fairness

---

[20] E.g., Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities, https://www.occ.gov/topics/capital-markets/financial-markets/derivatives/dq108.pdf [hereinafter 2008Q1 OCC Report].

[21] See Deutsche Bank Changes Legal Status of U.S. Unit, Reuters (Mar. 21, 2012, 7:12 P.M.), https://www.reuters.com/article/deutschebank-us-idUSL6E8ELB1N20120321.

[22] Unionbancal Corporation became part of panel bank Bank of Tokyo-Mitsubishi, and Citizens Bank became part of panel bank Royal Bank of Scotland.

[23] Wachovia Corporation was acquired by Wells Fargo and Company, and National City Corporation was subsumed into PNC Financial Services Group.

[24] 2008Q1 OCC Report at 7; see also id. tbl.1.

hearing indicate, almost 100% of OTC derivatives transactions with non-Panel Banks are accounted for by the <u>Green Pond</u> carve-outs.[25]

But even if MCAG were right on the facts, it would be wrong on the law: we have previously concluded that claims arising out of Panel Bank transactions and non-Panel Bank transactions <u>do</u> arise out of an identical factual predicate -- "the alleged suppression and manipulation of LIBOR." Barclays Preliminary Approval Order, 2016 WL 7625708, at *2. Claims arising out of non-Panel Bank transactions may be properly released as a result (even though the scope of such released claims is in fact <u>de minimis</u>). <u>See</u> <u>Wal-Mart Stores</u>, 396 F.3d at 107. MCAG argues that the non-Panel Banks did not participate in the setting of LIBOR, but makes no argument as to why the conduct of non-Panel Banks is relevant when the only defendants here are Panel Banks (and associated individuals and entities). The claims about which MCAG expresses concern do not ultimately involve the conduct of non-Panel Banks, and therefore do not change our conclusion that those claims arise from an identical factual predicate: the alleged suppression and manipulation of LIBOR <u>by Panel Banks</u>.[26]

_____

[25] The Bondholder action captures all relevant non-Panel Bank bond issuances, regardless of financial institution.

[26] We have also previously rejected MCAG's third contention, that OTC plaintiffs do not adequately represent the Barclays class, because certain members of the Barclays class also transacted with non-Panel Bank institutions in addition to the Panel Banks. <u>See</u> Barclays Preliminary Approval Order, 2016 WL 7625708, at *7. While adequacy of representation requires some alignment of interests between class representatives and class members, <u>see, e.g.</u>, <u>Wal-Mart Stores</u>, 396 F.3d at 113, it does not require perfect alignment, <u>see, e.g.</u>, <u>In re Literary Works in Elec. Databases Copyright Litig.</u>, 654 F.3d 242, 249 (2d Cir. 2011) ("[A] conflict must be 'fundamental' to violate Rule 23(a)(4)).

* * *

MCAG's objection is overruled. It has not carried its burden of establishing its standing, and its behavior here is hardly inconsistent with the type of unscrupulous behavior previously identified by another court within this Circuit. See generally In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig., No. 05-MD-1720 (JG), 2014 WL 4966072, at *9-10 (E.D.N.Y. Oct. 3, 2014). But even if MCAG had standing, its objection is meritless because it misapprehends the Barclays Settlement's impact on claims arising out of transactions with non-Panel Banks.

## 3. Virgin Islands Public Finance Authority

The Virgin Islands Public Finance Authority (VIPFA) objects to the OTC-Citi settlement. See Letter from Les Jacobowitz to the Court, Jan. 2, 2018, ECF No. 2399. We again consider issues of standing first.

### 3.1. Standing

VIPFA does not assert that it purchased a financial instrument entitling it to payment based directly on U.S. Dollar LIBOR from one of the LIBOR panel banks. Rather, VIPFA contends that it is nonetheless a class member because it entered into an interest rate swap with UBS under which VIPFA paid UBS the one-week USD BMA Municipal Swap Index in exchange for UBS's payment of 67.03% of the 10-year USD ISDA Swap Rate, which is also known as the 10-year

ISDAFix rate.  See ISDA Master Agreement between UBS AG and Virgin Islands Public Finance Authority, Sept. 19, 2006, ECF No. 2399-1.

But ISDAFix -- a wholly separate interest rate index that is the subject of its own litigation pending in this district before Judge Furman, see generally, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp. (ISDAFix), 175 F. Supp. 3d 44, 51 (S.D.N.Y. 2016) -- is not LIBOR.  VIPFA correctly notes that ISDAFix is intended to represent a rate related to LIBOR in that the $x$-year ISDAFix rate is supposed to represent the interest rate corresponding to the fixed leg of a hypothetical fixed-for-floating interest-rate swap with a maturity of $x$ years and where the floating leg of the swap is based on 3-month LIBOR.[27]  That is, the $x$-year ISDAFix rate is a function of not only 3-month LIBOR, but also expectations of future 3-month LIBOR over the next $x$ years.  And as relevant here, ISDAFix was set through a process not unlike the setting of LIBOR: a panel of contributor banks was selected for each ISDAFix currency, and contributor banks would make submissions that would then be trimmed and averaged.[28]  While ISDAFix (now known as the

_____

[27] For example, the Federal Reserve Bank of St. Louis describes the 10-year swap rate as the "[r]ate paid by fixed-rate payer on an interest rate swap with maturity of ten years" and "[is] for a Fixed Rate Payer in return for receiving three month LIBOR, and [is] based on rates collected at 11:00 a.m. Eastern time by Garban Intercapital plc and published on Reuters Page ISDAFIX®1."  10-Year Swap Rate, Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DSWP10 (last visited July 31, 2018).

[28] See ISDAFIX, Int'l Swaps & Derivatives Ass'n, Inc. (June 30, 2012), https://web.archive.org/web/20120630173533/https://www.isda.org/asset-classes/interest-rates-derivatives/isdafix.  While some banks are members of both, the US Dollar ISDAFix contributor panel is different from the US Dollar LIBOR panel.  Indeed, LIBOR panel bank Portigon AG is an ISDAFix plaintiff.

ICE Swap Rate) has since been reformed to be calculated using observed trade data,[29] it was formerly dependent on the submissions made by the contributor banks at their (allegedly abusable) discretion.

Therefore, while spot 3-month LIBOR and the rate that ISDAFix is supposed to represent are theoretically related through the principles of absorption discussed in LIBOR VI and LIBOR VII, see LIBOR VII, 299 F. Supp. 3d at 591 (citing LIBOR VI, 2016 WL 7378980, at *20), that relationship is too attenuated to render VIPFA's ISDAFix-based swap a "US Dollar LIBOR-Based Instrument" -- i.e., "[a]n instrument that includes any term, provision, obligation or right to be paid or to receive interest based upon the U.S. Dollar LIBOR rate" -- as defined in the Citi Settlement Agreement and for purposes of the Citi settlement class. Citi Settlement Agreement ¶ 2(ss). VIPFA's ISDAFix-based swap does not entitle it to be paid or to receive interest based on US Dollar LIBOR; rather, it entitles VIPFA to be paid and to receive interest based on a rate that is related to US Dollar LIBOR as a matter of finance theory but is ultimately determined through an independent submission and calculation process.

To further illustrate the tenuousness of VIPFA's position, consider if VIPFA sued the US Dollar LIBOR panel banks advancing

---

[29] Calculation of ICE Swap Rate from Tradeable Quotes, ICE Benchmark Admin. (2015), https://www.theice.com/publicdocs/ICE_Swap_Rate_Full_Calculation_Methodology.pdf.

the causes of action asserted by the OTC plaintiffs. An antitrust claim would plainly fail, as VIPFA would not be an efficient enforcer of the antitrust laws under the analysis conducted by the Second Circuit in Gelboim, 823 F.3d at 778-80, and by this Court in LIBOR VI, 2016 WL 7378980, at *15-23. Any chain of causation would be interrupted by the independent process by which ISDAFix was previously calculated (thereby rendering damages particularly speculative), and more direct victims would exist in the form of Panel Bank counterparties whose financial instruments entitled them to payment based on LIBOR itself (i.e., the OTC plaintiffs). An implied covenant of good faith and fair dealing claim or an unjust enrichment claim against Citi would fare no better, as the swap on which VIPFA relies was entered into with UBS and not Citi. See LIBOR VII, 299 F. Supp. 3d at 581 n.160 (citing LIBOR III, 27 F. Supp. 3d at 482).

In sum, ISDAFix is not LIBOR, and VIPFA's ISDAFix-based swap is not a "US Dollar LIBOR-Based Instrument" as defined in the Citi settlement agreement or for purposes of the Citi settlement class. VIPFA therefore lacks standing, and this lack of standing is sufficient by itself to warrant the overruling of its objection.

### 3.2. **Merits**

But even if VIPFA had standing, its objection would be overruled on the merits. VIPFA correctly identifies the Grinnell factors as controlling our inquiry into the fairness of the

41

settlement, but VIPFA's analysis of the <u>Grinnell</u> factors belies a thorough misunderstanding of the history of this case, its present posture, and the path forward. While VIPFA correctly notes that this case has certainly been complex up to this point, it errs in suggesting that the first and third <u>Grinnell</u> factors therefore weigh against settlement; rather, all signs suggest that this case would continue to be complex and intensive moving forward if litigated. As we have discussed, we have only recently addressed class certification and, absent a settlement, full-fledged fact discovery, summary judgment motions, and trial would await. Similarly, as we have documented above, this case and this action face ample challenges moving forward in terms of establishing liability, establishing damages, and maintaining class-action status (the fourth, fifth, and sixth <u>Grinnell</u> factors). VIPFA's analysis of the seventh <u>Grinnell</u> factor, the defendants' ability to withstanding a greater judgment, is not incorrect, but the defendants' ability to do so is simply not dispositive. <u>See, e.g.</u>, <u>McBean</u>, 233 F.R.D. at 388.

VIPFA's analysis of the eighth and ninth <u>Grinnell</u> factors warrants more detailed treatment, though it ultimately remains unpersuasive. First, VIPFA estimates damages attributable to Citi to be $23.9 billion, calculated using the average notional amount of Citi's U.S. dollar interest rate contracts (derived from reports published by the OCC) and a damages multiplier calculated based on

the swap held by MMC.[30]  See Mem. from Les Jacobowitz to the Court,
Jan. 2, 2018, ECF No. 2399-4.  While VIPFA's counsel may enjoy
bandying about casually empirical, but large, dollar amounts,
"there is no reason, at least in theory, why a satisfactory
settlement could not amount to a hundredth or even a thousandth
part of a single percent of the potential recovery," Grinnell, 495
F.2d at 455 n.2 -- even assuming that this proffered calculation
is minimally reliable.

But such an assumption may be generous.  The statistics
presented in the OCC reports relied on by VIPFA include interest-
rate contacts that would be well outside the scope of the class
-- including (1) non-OTC contracts, (2) non-LIBOR-based contracts,
and (3) contracts on which Citi received rather than paid LIBOR.
While this second dimension of overinclusiveness is perhaps merely
curious given that VIPFA itself held a non-LIBOR-based contract
that would be included in the corresponding figure for UBS, the
third dimension is entirely unjustifiable given that it is
undisputed that panel banks both borrowed and lent at LIBOR-based
rates and that we have repeatedly rejected as implausible
allegations that "each bank borrowed more money using a LIBOR-
based interest rate than the amount it lent using a LIBOR-based
interest rate throughout the class period."  LIBOR VI, 2016 WL

---

[30] VIPFA and MMC were represented in their capacity as objectors by the
same attorney.

7378980, at *5. By failing to account for any of these issues, the $23.9 billion figure that VIPFA offers bears no reasonable relationship to an actual assessment of damages.

Second, VIPFA contends that the amount of the Citi settlement ($130 million) is disproportionate when compared to amount of the Barclays settlement ($120 million), because the notional value of Citi's interest rate contracts far exceeded that of Barclays and that Citi's liability is therefore much greater than Barclays'. Again assuming the appropriateness in this context -- of OTC contracts where a panel bank paid (rather than received) interest at U.S. Dollar LIBOR (rather than another interest rate) -- of the figures in the OCC reports on which VIPFA relies, the dollar amount of contracts issued by the settling panel bank is not related to its liability: OTC plaintiffs advance an antitrust conspiracy theory, under which the conspirators may be held jointly and severally liable. Indeed, this joint and several liability is why, for example, a plaintiff like MMC, which did not transact with either Barclays or Citi, may participate in these settlements. Accordingly, neither of VIPFA's empirical arguments causes us to reassess how the eighth and ninth <u>Grinnell</u> factors figure into the Citi settlement's fairness and reasonableness.

*    *    *

Because ISDAFix is not LIBOR, VIPFA is not a member of the Citi settlement class and therefore lacks standing to object.[31] But, of course, even if VIPFA were a class member and we were to consider its objection on the merits, its arguments would not alter our conclusion that the settlement is fair, adequate, and reasonable under the <u>Grinnell</u> factors. VIPFA's objection is overruled.

## IV. PROVISIONS OF FINAL JUDGMENT

We proceed to set forth certain additional provisions of the final judgments as to Barclays and Citi.

### 1. Final Judgment and Order as to Barclays

1. The Court approves and directs the implementation of all the terms of the Barclays Settlement.

2. If this Final Judgment and Order is set aside, materially modified, or overturned by this Court or on appeal, and is not fully reinstated on further appeal, this Final Judgment and Order shall be deemed vacated and shall have no force or effect whatsoever.

3. Except as to any individual claim of those Persons who have validly and timely requested exclusion from the Barclays Class (the Barclays Opt-Outs), all Released Parties,[32] and Releasing

---

[31] VIPFA would certainly appear to be a member of the <u>ISDAFix</u> settlement classes certified by Judge Furman. Its efforts would perhaps have been more productively spent monitoring those settlements.

[32] For purposes of the Barclays settlement and pursuant to paragraph 2(gg) of the Barclays Settlement Agreement, "Released Parties" are defined as:

Parties[33] are bound by this Final Judgment and Order and by the Barclays Settlement Agreement.

4. Except as to the Barclays Opt-Outs, the Court dismisses the OTC Action, as well as all of the Released Claims,[34] against any of the Released Parties by the Releasing Parties, with

---

"Barclays and each of its past or present direct and indirect parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, successors, and each of their respective officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, advisors, and assigns. Released Parties does not include: (i) any of the other Defendants; or (ii) any other Person formerly named as a party in the OTC Action." Barclays Settlement Agreement ¶ 2(gg).

[33] Pursuant to paragraph 2(hh) of the Barclays Settlement Agreement, "Releasing Parties" are defined as: "Individually and collectively, Class Plaintiffs and each OTC Class Member, on behalf of themselves and any of their respective past or present officers, directors, stockholders, agents, employees, legal representatives, partners, associates, trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns, whether or not they object to the settlement set forth in this Agreement and whether or not they make a claim for payment from the Net Settlement Fund." Barclays Settlement Agreement ¶ 2(hh).

[34] Pursuant to paragraph 2(ff) of the Barclays Settlement Agreement, "Released Claims" are defined as: "Any and all manner of claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract, or otherwise in nature, for fees, costs, penalties, fines, debts, expenses, attorneys' fees, and damages, whenever incurred, and liabilities of any nature whatsoever (including joint and several), known or unknown, suspected or unsuspected, asserted or unasserted, arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the OTC Action; provided, however, that Released Claims do not include (1) claims that are the subject of the Settlement Agreement, dated October 7, 2014, between Barclays and the Exchange-Based Plaintiffs, specifically claims arising from or relating in any way to any conduct alleged in the Exchange-Based Plaintiffs' Action or that could have been alleged in the Exchange-Based Plaintiffs' Action concerning Eurodollar future contracts or options; (2) claims arising under foreign law related to transactions outside the United States; or (3) claims to enforce any of the terms of this Agreement. For the avoidance of doubt, Released Claims does not include claims relating to or arising out of the purchase of non-U.S. Dollar LIBOR-Based Instruments or any other claims that do not arise out of the factual predicate of the OTC Action, such as a claim to complete the settlement or otherwise enforce the terms of a U.S. Dollar LIBOR-Based Instrument." Barclays Settlement Agreement ¶ 2(ff). This term is subject to the limitations in provisions 7 and 8 of the Barclays portion of this judgment.

prejudice. The Parties are to bear their own costs, except as otherwise provided in the Barclays Settlement, provided that such dismissal shall not affect, in any way, the right of the Releasing Parties to pursue claims, if any, outside the scope of the Released Claims.

5. Any Barclays Opt-Outs that have timely and validly requested exclusion from the Barclays Class are hereby excluded from the Barclays Class, are not bound by this Final Judgment and Order, and may not make any claim or receive any benefit from the Barclays Settlement, whether monetary or otherwise.

6. Upon the Effective Date, the Releasing Parties: (a) shall be deemed to have hereby fully and irrevocably waived, released, relinquished, and discharged all Released Claims against the Released Parties, regardless of whether such Releasing Party executes and delivers a proof of claim; (b) shall be forever enjoined from prosecuting in any forum any Released Claim against any of the Released Parties; and (c) agree and covenant not to sue any of the Released Parties on the basis of any Released Claims or to assist any third party in commencing or maintaining any suit against any Released Party related in any way to any Released Claims.

7. Notwithstanding the foregoing, persons or entities that only purchased bonds issued by entities other than a Defendant (or a Defendant's subsidiary or affiliate) are not members of the OTC

Class. Further, claims that are alleged in the Bondholder Plaintiff Action (Case No. 12 Civ. 1025 (NRB)) concerning U.S. Dollar LIBOR-Based Debt Securities[35] are not released by the OTC Settlement. Thus, any claim based on a U.S. Dollar LIBOR-Based Debt Security may be asserted only against the Barclays' settlement of the Bondholder Plaintiff Action ("Bondholder Settlement") (and not the OTC Settlement), and will only be released pursuant to the Bondholder Settlement. Likewise, any claim based on a debt security tied to U.S. Dollar LIBOR that was issued by a Defendant (or a Defendant's subsidiary or affiliate) as obligor and was purchased directly from a Defendant (or a Defendant's subsidiary or affiliate) may be asserted only against the OTC Settlement (and not the Bondholder Settlement), and will only be released pursuant to the OTC Settlement. Any OTC Class Member who is also a member of the class alleged in the Bondholder Plaintiff Action will be entitled to assert claims to share in the settlement funds established in both actions in accordance with the limitations set forth in this paragraph. Similarly, any member of the class in

---

[35] "U.S. Dollar LIBOR-Based Debt Securities" means any U.S. Dollar-denominated debt security (a) that was assigned a unique identification number by the CUSIP system; (b) on which interest was payable at any time during August 1, 2007 through May 31, 2010; and (c) where that interest was payable at a rate based on U.S. Dollar LIBOR. U.S. LIBOR-Based Debt Securities include, but are not limited to, any such bonds, corporate bonds, municipal bonds, government bonds, asset backed securities, residential mortgage backed securities, commercial mortgage backed securities, collateralized debt obligations and collateralized loan obligations. Excluded from the definition of U.S. Dollar LIBOR-Based Debt Securities are any such securities that were issued by any Defendant or its subsidiaries or affiliates as obligor. "CUSIP" stands for Committee on Uniform Securities Identification Procedures.

the Bondholder Plaintiff Action who is also a member of the OTC Class will be entitled to assert claims to share in both settlement funds in accordance with the limitations set forth in this paragraph.

8. In addition, claims concerning U.S. Dollar LIBOR-Based Instruments purchased from one or more Non-Defendant OTC Financial Institutions[36] which are alleged in <u>33-35 Green Pond Road Assocs. LLC v. Bank of America Corp.</u> (Case No. 12 Civ. 5822 (NRB)) and <u>Courtyard at Amwell II, LLC v. Bank of America Corp.</u> (Case No. 12 Civ. 6693 (NRB)) class actions (collectively the "Non-Defendant OTC Action") are not released by the OTC Settlement. Accordingly, any OTC Class Member who is also a member of the class alleged in the Non-Defendant OTC Action will be entitled to assert claims to share in any settlement funds established in both actions. A member of the OTC Class may also be a member of a potential class in the Non-Defendant OTC Action. If that is the case, that entity can make claims from any settlement funds established in both actions. Thus, a person or entity who purchased U.S. Dollar LIBOR-Based Instruments from Non-Defendant OTC Financial Institutions

---

[36] The "Non-Defendant OTC Financial Institutions" are: Wells Fargo & Company; Goldman Sachs Group, Inc.; Morgan Stanley; Metlife, Inc.; U.S. Bancorp; The PNC Financial Services Group, Inc.; The Bank of New York Mellon Corporation; Capital One Financial Corporation; Ally Financial Inc.; Suntrust Banks, Inc.; BB&T Corporation; TD Bank US Holding Company; State Street Corporation; American Express Company; Regions Financial Corporation; Fifth Third Bancorp; Keycorp Cleveland; Northern Trust Corporation; Bancwest Corporation; M&T Bank Corporation; Harris Financial Corp.; BBVA USA Bancshares, Inc., as well as any of their subsidiaries or affiliates.

and also purchased U.S. Dollar LIBOR-Based Instruments directly from a Defendant (or subsidiary or affiliate of a Defendant) will be legally entitled to assert a claim to share in any settlement by Barclays of the Non-Defendant OTC Action based on purchases of U.S. Dollar LIBOR-Based Instruments from Non-Defendant OTC Financial Institutions, and will also be legally entitled to assert a claim to share in the OTC Settlement based on U.S. Dollar LIBOR-Based Instruments purchased directly from a Defendant (or subsidiary or affiliate of a Defendant), but will not be legally entitled to assert a claim to share in the OTC Settlement based on purchases of U.S. Dollar LIBOR-Based Instruments from Non-Defendant OTC Financial Institutions.

9.    This Final Judgment and Order shall not affect, in any way, the right of the OTC Plaintiffs or OTC Class Members to pursue claims, if any, outside the scope of the Released Claims.

10.    The Barclays Settlement, acts performed in furtherance of the Barclays Settlement and/or documents executed in furtherance of the Barclays Settlement may not be deemed or used as evidence of an admission or other statement supporting: (a) the validity of any claim made by OTC Plaintiffs, OTC Class Members, or Class Counsel (including the appropriateness of class certification); (b) any wrongdoing or liability of the Released Parties; or (c) any fault or omission of the Released Parties in any court, administrative agency, or other proceeding.

11.  The Barclays Settlement shall not be offered or be admissible in evidence against Released Parties in any action or proceeding, except in an action or proceeding that is in furtherance of the Barclays Settlement's terms or brought to enforce its terms.  Notwithstanding the foregoing, the Barclays Settlement may be filed in an action to enforce or interpret the terms of the Barclays Settlement and any other documents executed in connection with the performance of the agreements embodied therein.  The Released Parties may file the Barclays Settlement and/or this Final Judgment and Order in any action that may be brought against them in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12.  Any order entered regarding the motion for attorneys' fees and expenses in this action shall in no way disturb or affect this Final Judgment and Order and shall be considered separate from this Final Judgment and Order.

13.  Without affecting the finality of this Final Judgment and Order in any way, this Court hereby retains exclusive continuing jurisdiction over: (a) implementation of the Barclays Settlement and any award or distribution of monies under the claims-made Settlement; (b) the validity and timeliness of any

51

Supplemental Opt-Outs; (c) hearing and determining applications for attorneys' fees, costs, expenses, and service awards to the OTC Plaintiffs; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Barclays Settlement.

14.  To the extent permitted by law, the Court bars claims against the Released Parties for contribution or indemnification (however denominated) for all or a portion of any amounts paid or awarded in the OTC Action by way of any settlement, judgment or otherwise by any of the following: (a) Any of the other Defendants currently named in the OTC Action; (b) Any other Person[37] formerly named as a party in the OTC Action; or (c) Any other Person subsequently added or joined as a party in the OTC Action.

15.  To the extent permitted by law, the Court bars claims by the Released Parties for contribution or indemnification (however denominated) for all or a portion of any amounts paid or awarded in the OTC Action by way of any settlement, judgment or otherwise against any of the following: (a) Any of the other Defendants currently named in the OTC Action; (b) Any other Person formerly

---

[37] Paragraph 2(cc) of the Barclays Settlement Agreement defines "Person" as: "An individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, municipality, state, state agency, any entity that is a creature of any state, any government or any political subdivision, authority, office, bureau or agency of any government, and any business or legal entity, and any spouses, heirs, predecessors, successors, representatives, or assignees of the foregoing." Barclays Settlement Agreement ¶ 2(cc).

named as a party in the OTC Action; or (c) Any other Person subsequently added or joined as a party in the OTC Action.

## 2. Final Judgment and Order as to Citi

1. The Court approves and directs the implementation of all the terms of the Citi Settlement.

2. If this Final Judgment and Order is set aside, materially modified, or overturned by this Court or on appeal, and is not fully reinstated on further appeal, this Final Judgment and Order shall be deemed vacated and shall have no force or effect whatsoever.

3. Except as to any individual claim of those Persons who have validly and timely requested exclusion from the Citi Class (the Citi Opt-Outs), all Released Parties,[38] and Releasing Parties[39] are bound by this Final Judgment and Order and by the Citi Settlement Agreement.

---

[38] For purposes of the Citi settlement and pursuant to paragraph 2(ii) of the Citi Settlement Agreement, "Released Parties" are defined as: "Citibank and each of its past or present direct and indirect parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, successors, and each of their respective officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, advisors, and assigns. Released Parties does not include: (i) any of the other Defendants; or (ii) any other Person formerly named as a party in the OTC Action."  Citi Settlement Agreement ¶ 2(ii).

[39] Pursuant to paragraph 2(jj) of the Citi Settlement Agreement, "Releasing Parties" are defined as: "Individually and collectively, Class Plaintiffs and each OTC Class Member, on behalf of themselves and any of their respective past or present officers, directors, stockholders, agents, employees, legal representatives, partners, associates, trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, purchasers, predecessors, successors, and assigns, whether or not they object to the settlement set forth in this Agreement and whether or not they make a claim for payment from the Net Settlement Fund."  Citi Settlement Agreement ¶ 2(jj).

4. Except as to the Citi Opt-Outs, the Court dismisses the OTC Action, as well as all of the Released Claims,[40] against any of the Released Parties by the Releasing Parties, with prejudice. The Parties are to bear their own costs, except as otherwise provided in the Citi Settlement, provided that such dismissal shall not affect, in any way, the right of the Releasing Parties to pursue claims, if any, outside the scope of the Released Claims.

5. Any Citi Opt-Outs that have timely and validly requested exclusion from the Citi Class are hereby excluded from the Citi Class, are not bound by this Final Judgment and Order, and may not

---

[40] Pursuant to paragraph 2(hh) of the Citi Settlement Agreement, "Released Claims" are defined as: "Any and all manner of claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract, or otherwise in nature, for fees, costs, penalties, fines, debts, expenses, attorneys' fees, and damages, whenever incurred, and liabilities of any nature whatsoever (including joint and several), known or unknown, suspected or unsuspected, asserted or unasserted, arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the OTC Action; provided, however, that Released Claims do not include (1) claims concerning Eurodollar futures contracts or options arising from or relating in any way to the conduct alleged in the Exchange-Based Plaintiffs' Action; (2) claims for transactions purchased from one or more Non-OTC Defendant as alleged in the Green Pond Action arising from or relating to conduct that is alleged in the Green Pond Action; (3) claims concerning U.S. Dollar LIBOR-Based debt securities that were not issued or sold directly to the claimant by an OTC Defendant arising from or relating to conduct that is alleged in the Non-OTC Bondholder Action; (4) claims arising solely under foreign law related to transactions outside the United States; or (5) claims to enforce any of the terms of this Agreement. Expressly excluded from the release are any claims that Plaintiffs or any absent class members may have arising out of the purchase, sale or ownership of any U. S. Dollar- linked instruments that were issued by a non-panel bank or which were not directly sold to or purchased from a Defendant. For the avoidance of doubt, Released Claims does not include claims relating to or arising out of the purchase of non-U.S. Dollar LIBOR-Based Instruments or any other claims that do not arise out of the factual predicate of the OTC Action, such as a claim to complete the settlement or otherwise enforce the terms of a U.S. Dollar LIBOR-Based Instrument." Citi Settlement Agreement ¶ 2(hh).

make any claim or receive any benefit from the Citi Settlement, whether monetary or otherwise.

6. Upon the Effective Date, the Releasing Parties: (a) shall be deemed to have hereby fully and irrevocably waived, released, relinquished, and discharged all Released Claims against the Released Parties, regardless of whether such Releasing Party executes and delivers a proof of claim; (b) shall be forever enjoined from prosecuting in any forum any Released Claim against any of the Released Parties; and (c) agree and covenant not to sue any of the Released Parties on the basis of any Released Claims or to assist any third party in commencing or maintaining any suit against any Released Party related in any way to any Released Claims.

7. This Final Judgment and Order shall not affect, in any way, the right of the OTC Plaintiffs or OTC Class Members to pursue claims, if any, outside the scope of the Released Claims.

8. The Citi Settlement, acts performed in furtherance of the Citi Settlement and/or documents executed in furtherance of the Citi Settlement may not be deemed or used as evidence of an admission or other statement supporting: (a) the validity of any claim made by OTC Plaintiffs, OTC Class Members, or Class Counsel (including the appropriateness of class certification); (b) any wrongdoing or liability of the Released Parties; or (c) any fault

or omission of the Released Parties in any court, administrative agency, or other proceeding.

9.    The Citi Settlement shall not be offered or be admissible in evidence against Released Parties in any action or proceeding, except in an action or proceeding that is in furtherance of the Citi Settlement's terms or brought to enforce its terms. Notwithstanding the foregoing, the Citi Settlement may be filed in an action to enforce or interpret the terms of the Citi Settlement and any other documents executed in connection with the performance of the agreements embodied therein. The Released Parties may file the Citi Settlement and/or this Final Judgment and Order in any action that may be brought against them in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12.    Any order entered regarding the motion for attorneys' fees and expenses in this action shall in no way disturb or affect this Final Judgment and Order and shall be considered separate from this Final Judgment and Order.

13.    Without affecting the finality of this Final Judgment and Order in any way, this Court hereby retains exclusive continuing jurisdiction over: (a) implementation of the Citi Settlement and any award or distribution of monies under the

claims-made Settlement; (b) the validity and timeliness of any Supplemental Opt-Outs; (c) hearing and determining applications for attorneys' fees, costs, expenses, and service awards to the OTC Plaintiffs; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Citi Settlement.

14. To the extent permitted by law, the Court bars claims against the Released Parties for contribution or indemnification (however denominated) for all or a portion of any amounts paid or awarded in the OTC Action by way of any settlement, judgment or otherwise by any of the following: (a) Any of the other Defendants currently named in the OTC Action; (b) Any other Person[41] formerly named as a party in the OTC Action; or (c) Any other Person subsequently added or joined as a party in the OTC Action.

15. To the extent permitted by law, the Court bars claims by the Released Parties for contribution or indemnification (however denominated) for all or a portion of any amounts paid or awarded in the OTC Action by way of any settlement, judgment or otherwise against any of the following: (a) Any of the other Defendants currently named in the OTC Action; (b) Any other Person formerly

---

[41] Paragraph 2(ee) of the Citi Settlement Agreement defines "Person" as: "An individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, municipality, state, state agency, any entity that is a creature of any state, any government or any political subdivision, authority, office, bureau or agency of any government, and any business or legal entity, and any spouses, heirs, predecessors, successors, representatives, or assignees of the foregoing." Citi Settlement Agreement ¶ 2(ee).

named as a party in the OTC Action; or (c) Any other Person subsequently added or joined as a party in the OTC Action.

## V. CONCLUSION

The motions for final approval of the OTC-Barclays settlement (ECF No. 2274 and ECF No. 308 in Case 11 Civ. 5450) and final approval of the OTC-Citi settlement (ECF No. 2376) are granted. The motions for attorneys' fees, expenses, and incentive awards (ECF Nos. 2278 and 2386) remain under consideration and will be addressed in a forthcoming order. The Clerk of the Court is respectfully directed to enter partial final judgment consistent with this memorandum and order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

**SO ORDERED.**

Dated:     New York, New York
           August **/ ,** 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE